**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| FELLOWSHIP OF CHRISTIAN UNIVERSITY STUDENTS AT THE UNIVERSITY OF TEXAS AT DALLAS, THE RETROGRADE NEWSPAPER, YOUNG AMERICANS FOR LIBERTY, INC., ZALL ARVANDI, TEXAS SOCIETY OF UNCONVENTIONAL DRUMMERS, AND STRINGS ATTACHED. | CASE NO. 1:25-cv-01411 |
| | **VERIFIED COMPLAINT FOR CIVIL RIGHTS VIOLATIONS** |
| Plaintiffs, | |
| v. | |
| KEVIN P. ELTIFE, JANIECE LONGORIA, JAMES C. "RAD" WEAVER, NOLAN PEREZ, M.D., STUART W. STEDMAN, ROBERT P. GAUNTT, CHRISTINA MELTON CRAIN, JODIE LEE JILES, and KELCY L. WARREN, in their official capacities as members of the Board of Regents of The University of Texas System, | |
| JOHN M. ZERWAS, M.D., in his official capacity as Chancellor of The University of Texas System, | |
| JAMES E. DAVIS, in his official capacity as President of The University of Texas at Austin, and | |
| DR. PRABHAS V. MOGHE, in his official capacity as President of The University of Texas at Dallas, | |
| Defendants. | |

## INTRODUCTION

1.      Texas has made a stunning—and blatantly unconstitutional—about-face on its stance toward protecting free expression and upholding the First Amendment at its public universities and colleges.

2.      Just six years ago, Texas passed a law fortifying broad protections for free speech at its public institutions of higher learning, because at the time, in Governor Abbott's words, "some colleges are banning free speech on college campuses." In passing the law, the Legislature declared, "it is a matter of statewide concern that all public institutions of higher education officially recognize freedom of speech as a fundamental right." Those words echoed the Supreme Court's from decades earlier: "the vigilant protection of constitutional freedoms is nowhere more vital" than at our state colleges and universities. *Healy v. James*, 408 U.S. 169, 180 (1972) (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)).

3.      Yet the campus protests of Spring 2024 led the Texas Legislature and Governor Abbott to change their tune this year. In June, they enacted Senate Bill 2972, the "Campus Protection Act," which bans "any speech or expressive conduct protected by the First Amendment to the United States Constitution" on Texas's public university and college campuses for 10 hours every day, between 10 P.M. and 8 A.M. And it bans an array of protected expression—at all hours, anywhere on campus—during the end of any academic term, periods that exceed 90 days a year.

4.      It would be unconstitutional enough if in passing the Act, Texas targeted only peaceful protest. But the Act casts a long censorial shadow. Early morning prayer meetings on campus, for example, are now prohibited by law. Students best beware of donning a political t-shirt during the wrong hours. And they must think twice before inviting a pre-graduation speaker,

holding a campus open-mic night to unwind before finals, or even discussing the wrong topic—or discussing almost anything—in their dorms after dark.

5.    Plaintiffs are among the countless whom the Act threatens to stifle. At The University of Texas at Dallas, the Act looms over the Fellowship of University Christian Students, a student ministry that invites off-campus ministers year-round to carry out its mission—and must now contend with lawmakers dictating when its members can discuss their faith. The Act also threatens *The Retrograde*, a student-run newspaper at UT Dallas that publishes and gathers news across campus at all hours, keeping alive a long tradition of spirited student journalism. The Act menaces student performance groups, too, like the Texas Society of Unconventional Drummers and Strings Attached, whose members simply want to rehearse and perform on campus without fear of punishment. The Act does not spare even core political speech. It threatens Young Americans for Liberty, an Austin-based organization with student members across The University of Texas System, including University of Texas at Austin student Zall Arvandi, who advocate on campus for principles of freedom.

6.    Simply put, the Act transforms Texas's public universities and colleges into expression-free zones after dark and at the end of academic terms. And the danger to freedom of expression does not end there. The Act's unbounded speech restrictions give campus officials a potent tool to cudgel most any speech—or speaker—they dislike into silence.

7.    But the First Amendment does not go to bed when the sun goes down. Nor does it take days off. Instead, the First Amendment protects free speech at public universities and colleges 24 hours a day, 365 days a year.

8.    The Act's several sweeping prohibitions on protected speech violate the First and Fourteenth Amendments on their face and as applied to Plaintiffs' expression. Plaintiffs bring this

action for prospective relief to stop the Act from chilling a staggering amount of protected expression across The University of Texas System, and to vindicate the First Amendment rights of those who speak at Texas's institutions of higher education.

## JURISDICTION AND VENUE

9.    This action raises federal questions under the First and Fourteenth Amendments of the United States Constitution. Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

10.    This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. §§ 1331 and 1343.

11.    Venue in this court is proper under 28 U.S.C. § 1391(b)(1) because some of the Defendants reside in this district and all Defendants are residents of Texas. Venue in this court is also proper under 28 U.S.C. § 1391(b)(2) because Plaintiffs' claims arise out of actions that occurred in this district.

## PARTIES

**Plaintiff UTD FOCUS**

12.    Fellowship of Christian University Students (FOCUS) is an interdenominational campus ministry at several campuses in the Dallas-Fort Worth area. At UT Dallas, FOCUS has a chapter, UTD FOCUS, that is a registered student organization. Plaintiff UTD FOCUS serves to provide an interdenominational Christian ministry and community at UT Dallas.

13.    UTD FOCUS's students regularly use spaces on campus to host events involving worship, outreach, discussion, music, and other expressive activities furthering its mission. Its students also worship, pray, read, and engage in other religious expression, alone and collectively, in dorm rooms, campus apartments, and similar private spaces on campus.

**Plaintiff *The Retrograde***

14.     *The Retrograde* is UT Dallas's independently-run student newspaper, providing year-round news coverage and editorials over matters important to the UT Dallas community.

15.     Students established *The Retrograde* in 2024, under the Texas non-profit corporation The Retrograde Newspaper. They started the newspaper when UT Dallas administrators took actions against *The Mercury*, another student newspaper at UT Dallas and former home for much of *The Retrograde*'s staff, after *The Mercury* published its May 20, 2024, print issue about campus protests involving the Gaza-Israel conflict and their aftermath.

16.     *The Retrograde* counts local journalists, UT Dallas professors, and outside journalism experts among its board members. The UT Dallas student government recognizes *The Retrograde* as the university's official student newspaper.

**Plaintiffs Young Americans for Liberty and Zall Arvandi**

17.     Plaintiff Young Americans for Liberty, Inc. ("YAL") is a grassroots organization based in Austin, Texas. It has a mission of recruiting, training, educating, and mobilizing college students on the ideals of liberty and the Constitution, including through advocacy for and against legislation and policy consistent with its conception of liberty. YAL has thousands of student members at campuses across the country, including several members at UT Austin, UT Dallas, and other UT System institutions. YAL staff and representatives have visited and intend to continue visiting UT System campuses to help members and student chapters petition university administrators, speak to students about legislation and policy, and guide recruiting efforts.

18.     YAL's student members at UT System institutions, including UT Austin and UT Dallas, often express ideas and views germane to YAL's mission on campus and desire to continue doing so.

19.     For example, Plaintiff Zall Arvandi is a newly enrolled student at UT Austin and a YAL member. Arvandi intends to staff recruiting tables on campus, visit other student organizations and discuss YAL's mission with them, and establish a YAL chapter as a registered student organization. He also desires to invite YAL staff to campus to speak with him and other students. Before he enrolled at UT Austin in Fall 2025, Arvandi was a student at the University of South Florida, where he was involved with YAL's student chapter and actively shared YAL's messaging and ideas with his fellow students.

**Plaintiff Texas Society of Unconventional Drummers**

20.     Plaintiff Texas Society of Unconventional Drummers (SOUnD) is a registered student organization at UT Austin. To carry out its mission of spreading love for music at UT Austin, SOUnD puts on several musical performances throughout the year on UT Austin's campus. They also perform at sites off-campus, like elementary schools and retirement homes. SOUnD's performances focus on exploring alternative percussion techniques, like drumming paint buckets and using utensils to play cafeteria trays.

**Plaintiff Strings Attached**

21.     Plaintiff Strings Attached is a registered student organization at UT Dallas. To carry out its mission of enhancing the UT Dallas campus culture and experience through musical performances, Strings Attached regularly puts on themed concerts at locations across the UT Dallas campus. Its concerts and on-campus rehearsals feature a range of instruments including electric guitars, drums, piano, and horns.

**The Defendants**

22.     The Board of Regents of The University of Texas System is a governmental entity under the laws of the State of Texas, and is the governing body for The University of Texas System

and its member institutions, including UT Austin and UT Dallas. The Board is based in Austin, Texas, and regularly convenes there to discuss UT System business.

23.    Defendant Kevin P. Eltife, sued in his official capacity, is a member of and serves as Chairman of the Board of Regents of The University of Texas System.

24.    Defendant Janiece Longoria, sued in her official capacity, is a member of and serves as Vice Chairman of the Board of Regents of The University of Texas System.

25.    Defendant James C. "Rad" Weaver, sued in his official capacity, is a member of and serves as Vice Chairman of the Board of Regents of The University of Texas System.

26.    Defendants Nolan Perez, M.D., Stuart W. Stedman, Robert P. Gauntt, Christina Melton Crain, Jodie Lee Jiles, and Kelcy L. Warren are members of the Board of Regents of The University of Texas System.[1] They are sued in their official capacities.

27.    Defendants Eltife, Longoria, Weaver, Perez, Stedman, Gauntt, Crain, Jiles, and Warren are collectively referred to as the "UT System Board Defendants."

28.    Texas law authorizes the UT System Board Defendants "to govern, operate, support, and maintain each of the component institutions that are now or may hereafter be included in a part of The University of Texas System," which includes UT Austin and UT Dallas. Tex. Educ. Code § 65.31(a).

29.    Texas law also authorizes the UT System Board Defendants "to promulgate and enforce such other rules and regulations for the operation, control, and management of the university system and the component institutions thereof as the board may deem either necessary or desirable." Tex. Educ. Code § 65.31(c).

---

[1] Luke Schwartz is a student regent for the UT System, but lacks voting power and "is not a member of the board of regents of the system for which the student is appointed." Tex. Educ. Code § 51.355(e). Thus, he is not named as a Board of Regents defendant.

30.     Defendant John M. Zerwas, M.D., is Chancellor of The University of Texas System. Chancellor Zerwas is the chief executive officer of the UT System and reports to the UT System Board of Regents. He has direct line responsibility for all aspects of the UT System's operations. Univ. of Tex. Sys. Bd. of Regents R. 20101.

31.     The UT System Board Defendants exercise their powers and authorities through Chancellor Zerwas. As part of his duties, Chancellor Zerwas is responsible for implementing UT System Board of Regents' policies, purposes, and goals. He also directs the management and administration of all UT System institutions, including UT Austin and UT Dallas.

32.     Defendant James E. Davis, sued in his official capacity, is the president of UT Austin, a member institution of the UT System. President Davis is the chief executive officer of UT Austin with "general authority and responsibility for the administration of that institution." Univ. of Tex. Sys. Bd. of Regents R. 20201 § 4. This includes developing and administering policies "for the program, organization, and operation of the institution," "policies relating to students," and "rules and regulations for the governance of the institution." *Id.* §§ 4.1, 4.3, and 4.9.

33.     Defendant Dr. Prabhas V. Moghe, sued in his official capacity, is the president of UT Dallas, a member institution of The University of Texas System. President Moghe is the chief executive officer of UT Dallas with "general authority and responsibility for the administration of that institution." Univ. of Tex. Sys. Bd. of Regents R. 20201 § 4. This includes developing and administering policies "for the program, organization, and operation of the institution," "policies relating to students," and "rules and regulations for the governance of the institution." *Id.* §§ 4.1, 4.3, and 4.9.

34.     At all relevant times, each Defendant acted under color of state law.

## FACTUAL ALLEGATIONS

**UT System institutions have long accommodated free expression for students, faculty and staff, and the public.**

35.     Students, faculty and staff, and the public alike have engaged, and continue to engage, in a wide range of speech and expressive conduct at UT System institutions, including UT Austin and UT Dallas.

36.     Students and others have long used common outdoor spaces for expressive activities at UT Austin, UT Dallas, and other UT System campuses. A few examples from recent years include students, staff, and the public engaging in prayer walks, peaceful protests and counterprotests, celebrating athletic victories, handing out literature, and putting on artistic performances, all in common outdoor spaces on the UT Austin and UT Dallas campuses.

37.     UT Austin, UT Dallas, and their sister institutions have also opened many facilities on campus to students, staff, and even the public for expressive activities, from hosting student organization meetings and guest lectures to putting on theatrical performances.

38.     At UT Austin, for example, registered student organizations can access general classroom spaces, a variety of meeting rooms, auditoriums and theatres, and other event spaces on campus that the university has made available for student expression.

39.     The same is true at UT Dallas. Even the public has been able to reserve certain indoor facilities at UT Dallas for expressive activities during non-peak periods.

40.     Students at UT System institutions have traditionally engaged in protected expression elsewhere on campus, too, including in the privacy of their dorm rooms.

41.     UT System institutions also provide access to campus networks for internet access for expressive activities. Students, staff, and the public all use campus networks at UT System

institutions, including UT Austin and UT Dallas, to speak online, publish and gather news, and access information.

42.    Political speech is alive and well at UT System institutions. For example, a search of UT Austin's "HornsLink" website shows 81 registered student organizations involved in "Ideology and Politics."

43.    Many students at these institutions belong to off-campus political and issue advocacy groups, and express support on campus for their groups and the issues they advocate.

44.    For example, Plaintiff Arvandi wants to express YAL's views to his fellow students and the staff at UT Austin. This year, he intends to put on tabling events in outdoor spaces at UT Austin, where he and other students will staff a table featuring YAL logos and engage curious visitors about YAL's mission and issues. He also intends to spearhead a petition drive concerning student freedom at UT Austin, recruit students for YAL membership, and start the process of obtaining registered status for a YAL chapter on campus.

45.    Students at UT System institutions also engage with national, state, and local elections. For instance, the UT Dallas Student Government Legislative Affairs Committee hosted a slate of local political candidates on campus last fall to discuss local issues and answer audience questions. And at UT Austin, the registered student organization Texas Political Consulting provides pro bono political consulting for political figures and groups.

46.    Religious speech is a staple at UT System campuses, too. At UT Austin, 93 registered student organizations identify as "Faith and Religious."

47.    Likewise, UT Dallas has several registered student organizations with a faith-based mission, like Plaintiff UTD FOCUS.

48.    Non-university religious clergy, advisors, and organizations are vital to religious expression at these institutions. For example, UTD FOCUS relies on ministers who are not students or university employees to visit campus and lead worship, offer spiritual guidance, and participate in events that advance the student group's mission.

49.    And at UT Austin, the Nueces Mosque, just across the street from campus, provides a spiritual and social home for the university's sizable Muslim student community.

50.    Student media is also part of the free expression ecosystem across the UT System, where students—like those at Plaintiff *The Retrograde*—run newspapers, radio, and television broadcasts to deliver news and entertainment to the campus communities at UT Austin, UT Dallas, and other system institutions.

51.    Guest speakers play a significant role at UT System institutions. Registered students groups often invite speakers for panels, debates, lectures, and stage performances, or simply to talk with the student groups and help them carry out their missions. And fellow students, staff, and even members of the public attend and listen to these speakers.

52.    These guest speakers do not stop at the end of semesters. For instance, during the last two weeks of the 2025 spring semester at UT Austin, student groups hosted speakers including a Supreme Court of Texas Justice and an Emmy-winning cinematographer.

53.    Using amplified sound and percussion is also a meaningful part of free expression at UT System institutions. From Plaintiff SOUnD using drums on the performance stage, to Plaintiff YAL and its members using megaphones to garner support for a petition, amplified sound provides students, staff, and the public an effective and time-honored way to communicate.

**Texas passes a law in 2019 providing broad protections for expression at its public universities and colleges.**

54.    In 2019, the Texas Legislature passed a bill fortifying protections for free expression at the state's public universities and colleges. Tex. S.B. 18, 86th Leg., R.S. (2019).

55.    In part, the bill was a response to some Texas public universities and colleges censoring controversial guests that students invited to speak on campus.

56.    When Governor Abbott signed the 2019 bill into law, he remarked "some colleges are banning free speech on college campuses," and lamented that he "shouldn't have to [sign the bill], [the] First Amendment guarantees it."[2]

57.    The 2019 law declared, "it is the policy of this state … to protect the expressive rights … guaranteed by the constitutions of the United States and of this state by recognizing freedom of speech and assembly as central to the mission of institutions of higher education; and ensuring that all persons may assemble peaceably on the campuses of institutions of higher education for expressive activities, including to listen to or observe the expressive activities of others." Tex. Educ. Code § 51.9315(b); *see also* Tex. S.B. 18, 86th Leg., R.S.

58.    In carrying out that goal, the 2019 law defined "expressive activities," as "*any speech or expressive conduct protected by the First Amendment to the United States Constitution or by Section 8, Article I, Texas Constitution, and includes assemblies, protests, speeches, the distribution of written material, the carrying of signs, and the circulation of petitions.*" *Id.*; *see also* Tex. Educ. Code § 51.9315(a)(2) (emphasis added).

59.    The 2019 law required Texas public universities and colleges to treat common outdoor areas as traditional public forums, guaranteeing that "any person" could engage in

---

[2] @GregabbottTX, "Governor Abbott signs law protecting free speech," YouTube.com (June 27, 2019), https://www.youtube.com/shorts/61hlfR-mzgs.

expressive activities on campus. Tex. S.B. 18, 86th Leg., R.S. It also required them to allow "any person to, subject to reasonable restrictions … engage in expressive activities on campus, including by responding to the expressive activities of others" and to allow "student organizations and faculty to … invite speakers to speak on campus." *Id*.

60.     The 2019 law also prohibited campus officials from acting against or denying benefits to student groups based on a group's viewpoint or their expressive activities, as the law broadly defined those activities. And it prohibited institutions from denying guest speakers access to campus based on any anticipated controversy over the speaker's event.

61.     The 2019 law required each institution to adopt its free expression protections within the institution's policies, which UT Austin and UT Dallas both did.

62.     Those policies placed some limits on amplified sound in common outdoor spaces and performance spaces, but they did not impose any blanket prohibitions on amplified sound.[3]

63.     Likewise, while those policies placed some limits on invited speakers (like following reservation guidelines for limited public forums), they did not impose any blanket prohibitions on invited speakers.[4]

**Campus demonstrations test the UT System's commitment to the First Amendment and free expression.**

64.     Free expression has not gone untested at UT System institutions.

65.     In April 2024, UT Austin officials attempted to cancel a daytime protest over the Gaza-Israel conflict. The officials cited concerns over policy violations and campus disruptions.

---

[3] Ex. B, Former UT Dallas Policy No. UTDSP5001, Speech Expression and Assembly at § H; (amended and superseded Aug. 21, 2025). Ex. C, Former UT Austin Institutional Rules on Student Services and Activities, Speech, Expression, and Assembly at Subchapter 13-800 (amended and superseded Aug. 21, 2025).

[4] *E.g.,* Ex. B at § J; Ex. C at Subchapter 13-1000.

Yet they could specify only a single policy against wearing face masks as the reason for trying to impose a prior restraint on political protest.[5]

66.     When the protest went forward, state and local law enforcement confronted the protesters with horses and riot gear, ultimately leading to several trespass arrests. The county prosecutor rejected all criminal trespass charges against the arrestees.

67.     As another example from spring 2024, when UT Dallas student newspaper *The Mercury* published criticism of how the university administration handled a Gaza-Israel conflict protest at that campus, the administration quickly demoted the paper's student media advisor, and ultimately removed the paper's editor-in-chief.

68.     Student expression at other UT System institutions faced similar tests in spring 2024. As one example, Governor Abbott signed an executive order targeting pro-Palestinian student demonstrations.

69.     Still, on August 24, 2024, the UT System Board of Regents published "The University of Texas Commitment to Freedom of Speech and Expression," meeting both the letter and the spirit of the 2019 law. The commitment publicly makes a broad pledge to uphold free expression, and recognizes the UT System's and its institutions' authority to regulate speech "are narrow exceptions to the general principle of freedom of speech and expression, and it is vitally important that these exceptions never be used in a manner that is inconsistent with the UT System commitment to a completely free and open discussion of ideas."[6]

---

[5] Dr. Aaron Voyles & Melissa Jones-Wommack, Apr. 23, 2024, Letter to Palestine Solidarity Committee Regarding Notice Cancelling Planned Event, https://www.documentcloud.org/documents/24628398-ut-dean-of-students-letter-to-psc-about-protest-42324.

[6] *The Univ. of Tex. Sys. Commitment to Freedom of Speech & Expression*, https://www.utsystem.edu/free-speech.

70.     The Texas Legislature did not reiterate a commitment to protect freedom of speech on the state's public university and college campuses. Nor did it stand firm on its 2019 law.

**Texas mandates sweeping restrictions on protected speech at its public universities and colleges.**

71.     On June 2, 2025, the Legislature passed S.B. 2972, the "Campus Protection Act," adding several mandatory bans on expressive activities at Texas's public universities and colleges. Exhibit A, Tex. S.B. 2972, 89th Leg., R.S. (2025).

72.     Governor Abbott signed the Act into law on June 20, 2025.

73.     The Act went into effect on September 1, 2025, amending the 2019 law at Section 51.9315 of the Texas Education Code.

74.     The Act mandates that each public institution of higher education in Texas adopt and enforce several restrictions on protected speech, which the governing board for each institution must approve. Tex. Educ. Code § 51.9315(f).

75.     Because of the Act's mandates, the UT System Board Defendants and Chancellor Zerwas must implement parts of the Act in the UT System Board of Regents' Rules and Regulations. Tex. Educ. Code § 51.9315(d-1), (f); *see also* Tex. S.B. 2972 [Ex. A] at §§ 2(d-1) and (f).

76.     Because of the Act's mandates, the UT System Board Defendants, Chancellor Zerwas, and President Davis must implement and administer the Act, including its prohibitions on speech, through UT Austin's policies, rules, and regulations. Tex. Educ. Code § 51.9315(f); *see also* Tex. S.B. 2972 [Ex. A] at §§ 2(f).

77.     Because of the Act's mandates, the UT System Board Defendants, Chancellor Zerwas, and President Moghe must implement and administer the Act, including its prohibitions on speech, through UT Dallas's policies, rules, and regulations. *Id.*

78.     The UT System Board Defendants have final approval authority over how UT Austin and UT Dallas implement the Act's mandatory speech prohibitions. Tex. Educ. Code § 51.9315(f)(6).

**The Act covers a staggering amount of protected speech, and makes a content-based distinction in doing so.**

79.     The Act's chief sponsor, Senator Brandon Creighton, told *The Washington Post* that the Act was a response to "campuses across the country taken hostage by pro-terrorist mobs last year." Other lawmakers expressed similar sentiments, tying the Act to the "pro-Palestinian demonstrations" from Spring 2024.

80.     A Texas House Committee on Higher Education report indicated the Act was a response to the 2024 protests on campuses across the nation, and "seeks to guarantee the rights of students and university employees to engage in expressive activities while setting clear boundaries to prevent disruption and ensure community safety."

81.     But the Act does not target only conduct that is disruptive or threatens community safety. Nor does it target only unprotected speech.

82.     Rather, the Act takes the 2019 law's broad definition of "expressive activities"— "any speech or expressive conduct protected by the First Amendment to the United States Constitution"—and transforms it from a tool for protecting free expression into one for sweeping censorship, as the Act *prohibits* "engaging in expressive activities" in an overwhelming array of applications.

83.     The definition of "expressive activities" expressly excludes "commercial speech" from its scope.

84.     As a result, several of the Act's prohibitions on expressive activities bar noncommercial speech, but not commercial speech.

**The Act mandates a blanket ban on "expressive activities" between 10 P.M. and 8 A.M.**

85.    The Act requires that each institution's policies "prohibit … engaging in expressive activities on campus between the hours of 10 p.m. and 8 a.m." Tex. Educ. Code § 51.9315(f)(2)(F) ("Overnight Expression Ban").

86.    The Overnight Expression Ban thus prohibits "engaging in expressive activities"—meaning all protected speech other than commercial speech—for 10 hours each day.

87.    The Overnight Expression Ban makes no exceptions or distinctions based on expression in campus forums, including outdoor common areas, other designated public forums, and limited public forums. At the same time, it covers dorm rooms, libraries, athletic facilities, media studios, and a host of other spaces on campus where students, staff, and faculty engage in expressive activities every day.

88.    To that end, the Overnight Expression Ban prohibits a staggering amount of protected speech at UT Austin, UT Dallas, and the rest of Texas's public universities and colleges.

89.    **The Overnight Expression Ban covers UTD FOCUS's expressive activities**. UTD FOCUS routinely hosts evening gatherings on campus for students to engage in fellowship and worship, and to discuss issues of faith. UTD FOCUS obtains standing authorization from UT Dallas every semester to use a campus meeting space for these events.

90.    While UTD FOCUS sets these events to end at 10 P.M., students regularly stay in and around the meeting space afterward to discuss issues of faith, continue fellowship, and talk with FOCUS's ministers. These events sometimes involve UTD FOCUS fundraising for its members to attend leadership conferences, which also lead to students staying in the meeting space afterward for discussion and fellowship. Prior to the Act becoming law, UT Dallas staff never cited UTD FOCUS for using these spaces after 10 P.M. for expressive activities.

91.    UTD FOCUS also offers morning one-on-one meetings on campus with UT Dallas students and staff to discuss issues of faith. In the past, these meetings sometimes have started before 8 A.M.

92.    **The Overnight Expression Ban covers YAL's and Arvandi's expressive activities.** Arvandi has used online recruiting as a tool to spread his pro-liberty beliefs and advocate for YAL's mission. For instance, he has messaged a classmate on social media and emailed like-minded students about those beliefs, and done so after 10 P.M.

93.    Arvandi also researches and reads material related to the issues he seeks to advocate, toward his goal of establishing a YAL chapter and increasing YAL's student membership at UT Austin. Like many college students, he often researches and reads after 10 P.M.

94.    Arvandi intends to engage in these expressive activities, including on campus after 10 P.M. and before 8 A.M. by using the UT Austin computer network, as part of his mission to establish a YAL chapter at UT Austin and advocate on campus for YAL's mission.

95.    YAL also engages in expressive activities directed toward UT System campuses. For example, YAL staff will sometimes help YAL student members collect petition signatures in high-traffic areas of campus before 8 A.M., while students are heading to early classes. YAL staff also sends and receives emails and other electronic communications to and from YAL student members on UT System campuses, including Arvandi and its members at UT Dallas. On occasion, these communications will occur between 10 P.M. and 8 A.M.

96.    As its footprint with student members continues to increase on UT System campuses, YAL intends to continue these expressive activities at those institutions, including UT Austin and UT Dallas.

97.     **The Overnight Expression Ban covers *The Retrograde*'s expressive activities.**
From locations on the UT Dallas campus and using the UT Dallas computer network, the
newspaper's editors and reporters (a) write, edit, and publish articles after 10 P.M., and (b)
assemble, format, and produce *The Retrograde*'s digital and print editions after 10 P.M., often to
meet late-night publishing deadlines. As one recent example, *The Retrograde* reported well into
the night when a destructive storm on March 4, 2025, knocked out power to campus, publishing
updates at 10:30 P.M. and 12:59 A.M.[7]

98.     *The Retrograde* staff also gathers news on campus between the hours of 10 P.M.
and 8 A.M. For instance, staff will meet sources at the student union and other public on-campus
locations for late-night interviews and fact-gathering. As another example, staff will travel to areas
of campus after 10 P.M. to cover and gather information about breaking news and campus events.

99.     *The Retrograde* and its staff, many of whom live on campus, intend to continue
engaging in news publishing and newsgathering activities on campus between 10 P.M. and 8 A.M.
Working during those hours is necessary for *The Retrograde* to accurately and timely fulfill its
journalistic mission, as its students are often busy during the day with classes, labs, and other
commitments.

100.     **The Overnight Expression Ban covers SOUnD's expressive activities.** SOUnD
members regularly communicate through an online chat group about the organization's business.
This includes sending and receiving messages on campus after 10 P.M., and doing so over UT
Austin's wireless network.

---

[7] Maria Shaikh, *Storm knocks out power across University Village*, The Retrograde (updated Mar.
5, 2025, 12:59 a.m.), https://retrogradenews.com/2025/03/04/storm-knocks-out-power-across-
university-village.

101.    **The Overnight Expression Ban covers Strings Attached's expressive activities.**
Once a week, Strings Attached and its members rehearse for their upcoming concerts. They
typically rehearse at the Science Pavilion, an outdoor covered pavilion which buildings surround
on three sides. The group obtains authorization from UT Dallas to use the space to rehearse.

102.    Strings Attached generally reserves the space from early evening until 10 P.M. But
its rehearsals often extend beyond 10 P.M., which is often necessary to polish their sound before
upcoming concerts, and because students have little time during the day to rehearse.

103.    Strings Attached has also performed at "Finals Scream," an annual event the UT
Dallas student government holds on campus during the last two weeks of spring semester, and
which often ends after 10 P.M. Strings Attached intends to perform at "Finals Scream" in the
future.

104.    Prior to the Act becoming law, UT Dallas staff never cited Strings Attached for
using campus spaces after 10 P.M. for expressive activities.

105.    **Other Protected Expression.** The Overnight Expression Ban covers an extensive
number of other expressive activities. For example, and without limitation, the Overnight
Expression Ban covers these expressive activities which occur or are likely to occur on campus
between 10 P.M. and 8 A.M.:

     a.  Wearing a t-shirt with a candidate's name while heading to an early morning class on election day;

     b.  An Easter sunrise service, a Passover seder, or a Ramadan night prayer;

     c.  Celebrating the football team's 10:30 P.M. victory on the sidewalk outside the stadium;

     d.  Setting up a table at a common outdoor area on election morning to provide students with voter awareness and assistance;

     e.  A quiet late-night political discussion in the dorms or at the library;

    f.   Screening a film or album at midnight;

    g.   Late-night political posting on social media from a dorm room or using the campus network;

    h.   Wearing a Halloween costume after 10 P.M.;

    i.   Photographing the sunrise;

    j.   Practicing an instrument before morning classes start; and

    k.   Saying goodnight or good morning while walking on campus.

**The Act mandates a blanket ban on invited speakers the last two weeks of any academic term.**

106.    Wholly apart from the Overnight Expression Ban, the Act requires that each institution's policies "prohibit … during the last two weeks of a semester or term, engaging in expressive activities … by inviting speakers to speak on campus." Tex. Educ. Code § 51.9315(f)(2)(B)(ii) ("End-of-Term Invited Speaker Ban").

107.    The End-of-Term Invited Speaker Ban restricts protected speech at Texas's public universities and colleges for a significant part of the year.

108.    For example, for the 2025–2026 academic calendar, UT Austin has seven academic terms scheduled over three semesters: Fall Term and Winter Term (comprising fall semester); Spring Term and May Term (comprising spring semester); and First Term, Second Term, and Nine-Week Term (comprising summer semester).

109.    Based on UT Austin's academic calendar, the ban on "inviting speakers to speak on campus" "during the last two weeks of a semester or term" will apply for 98 days of the academic year.

110.    For the 2025-2026 academic calendar at UT Dallas, which has multiple academic terms during each of the fall, spring, and summer semesters, the End-of-Term Invited Speaker Ban will apply over 90 days.

111.    The End-of-Term Invited Speaker Ban applies to all locations on campus, even those that the Legislature or an institution has opened to or made available for expressive activities, as UT Austin and UT Dallas both have done.

112.    To those ends, the End-of-Term Invited Speaker Ban prohibits a substantial amount of protected speech at UT Austin, UT Dallas, and the rest of Texas's public universities and colleges.

113.    **The End-of-Term Invited Speaker Ban covers UTD FOCUS's expressive activities.** Every week school is in session, including during the last two weeks of academic terms, UTD FOCUS invites ministers from the main FOCUS organization to campus. These ministers are not students or UT Dallas employees, although several are UT Dallas alumni.

114.    The ministers are indispensable for UTD FOCUS to carry out its expressive activities and fulfill its mission. For example, they are the main speakers during Friday meetings, lead worship, and lead discussion and speak on topics related to UTD FOCUS's ministry. UTD FOCUS intends to keep inviting the ministers to campus during the end of academic terms to engage in those expressive activities.

115.    **The End-of-Term Invited Speaker Ban covers *The Retrograde*'s expressive activities.** The student newspaper's staff occasionally invite an off-campus source to campus to provide an interview, and they intend to continue that practice as part of their year-round news reporting. Because of their year-round newsgathering, *The Retrograde* will likely need to invite off-campus sources to meet and speak with them on campus during the last two weeks of an academic term.

116.    Because *The Retrograde*'s board includes local journalists and a staff member from the Society of Professional Journalists (SPJ), the newspaper will need to meet and speak with these

board members. *The Retrograde* also intends to invite SPJ staff to campus, along with staff from the Student Press Law Center and local journalists, to speak to the student newspaper's staff starting in fall semester 2025.

117.    **The End-of-Term Invited Speaker Ban covers YAL and Arvandi's expressive activities.** As part of its mission, YAL staff and representatives regularly visit campuses at the invitation of student members and YAL campus chapters, including UT Austin and UT Dallas. This includes visiting campuses during the last two weeks of academic terms.

118.    It is often particularly necessary for YAL staff to visit campus at the ends of academic terms to help its student members petition administrators for change, because it often takes the entire term for those members to collect signatures to present to campus administrators.

119.    Likewise, because the biennial Texas Legislative session often overlaps with the end of Spring semester at UT System schools, YAL staff are uniquely positioned to visit campus and discuss pending higher education bills and policy with YAL student members and other interested students, faculty, and staff.

120.    Plaintiff Arvandi intends to invite YAL staff to assist with petitioning, advocacy, and recruiting activity, including during the end of semesters at UT Austin. For Arvandi, who is trying to establish a registered YAL chapter at UT Austin, having YAL staff talk with students on campus to further those efforts is invaluable.

121.    YAL staff and representatives will often speak to dozens of students during an invited visit to campus.

122.    **Other Protected Expression.** The End-of-Term Invited Speaker Ban covers an extensive number of other expressive activities. For example, and without limitation, the End-of-

Term Invited Speaker Ban also covers these expressive activities which occur or are likely to occur during the last two weeks of an academic term:

a. Invited lawmakers and other participants in the Texas legislative session, which traditionally overlaps with spring semester, visiting campus to speak and answer questions about the legislative session or a pending bill;

b. Invited guest performers visiting campus to participate in a winter or late-spring theatre or musical production;

c. An invited celebrity or politician visiting campus to address a pre-graduation honor society ceremony;

d. Invited professionals visiting campus to participate in a career Q&A for soon-to-be graduates; and

e. An invited political candidate visiting campus to discuss the upcoming primary or general election.

**The Act mandates a blanket ban on using amplified sound during the last two weeks of any term.**

123.    The Act requires that each institution's policies "prohibit … during the last two weeks of a semester or term, engaging in expressive activities … by using a device to amplify sound." Tex. Educ. Code § 51.9315(f)(2)(B)(iii) ("End-of-Term Amplified Sound Ban").

124.    While the Act does not define "amplified sound," both UT Austin and UT Dallas policies define "amplified sound" as "sound whose volume is increased by any electric, electronic, mechanical, or motor-powered means." Ex. E, Univ. of Tex. at Austin Institutional Rules on Student Servs. and Activities (adopted Aug. 21, 2025) ("UT Austin Revised Policy"), § 13-104; Ex. D, Univ. of Tex. at Dallas Gen. Admin. Policies, UTDSP5001 (adopted Aug. 21, 2025) ("UT Dallas Revised Policy"), § A.

125.    As with the End-of-Term Invited Speaker Ban, the End-of-Term Amplified Sound Ban applies during the same periods and thus restricts protected speech at UT Austin and UT Dallas for over 90 days a year.

126.    The End-of-Term Amplified Sound Ban applies to all locations on campus, even those the Legislature or an institution has opened to or made available for expressive activities, including those explicitly opened for amplified sound, as UT Austin and UT Dallas both have done.

127.    To that end, the End-of-Term Amplified Sound Ban prohibits a substantial amount of protected speech at UT Austin, UT Dallas, and the rest of Texas's public universities and colleges.

128.    **The End-of-Term Amplified Sound Ban covers UTD FOCUS's expressive activities.** Throughout the year, UTD FOCUS will host worship and similar events spaces on the UT Dallas campus, like the Science Courtyard and Pavillion and The Plinth, during which it will use audiovisual equipment like speakers to amplify worship music and other sound.

129.    Some of these events occur during the last two weeks of an academic term. For example, UTD FOCUS often puts on a Christmas-related event using amplified sound in a classroom at Karl Hoblitzelle Hall at UT Dallas, which typically falls within the last two weeks of the fall semester. Prior to the Act becoming law, UT Dallas staff never cited UTD FOCUS for being disruptive or using amplified sound to engage in expressive activities.

130.    **The End-of-Term Amplified Sound Ban covers YAL's and Arvandi's expressive activities.** YAL staff, representatives, and student members engage in "Student Rights Campaigns," which are semester- or year-long petitioning campaigns aimed at enhancing student freedom on university campuses. As part of these campaigns, YAL staff and representatives often visit campus, at the invitation of YAL student members, to speak with groups of students. These student members and staff will use megaphones to advocate for the petition.

131.    For example, in 2024, YAL members at Texas State University spearheaded a petitioning campaign to end a freshman on-campus housing mandate. The campaign culminated in YAL members delivering a petition to Texas State administrators, before which the YAL members used megaphones to rally fellow students to YAL's message.

132.    Because gathering signatures for YAL petitions can take nearly all semester, YAL members and invited YAL staff sometimes must hold rallies and deliver petitions during the last two weeks of academic terms.

133.    Plaintiff and YAL student member Arvandi, as part of his efforts to spread YAL's message at UT Austin and maintain a registered YAL chapter, intends to conduct YAL Student Rights Campaigns. To carry those out, he intends to invite YAL staff to talk with students on campus, including during the last two weeks of a semester if needed.

134.    **The End-of-Term Amplified Sound Ban covers SOUnD's expressive activities.** At the end of every semester, SOUnD puts on a stage show at UT Austin using an array of percussive instruments at UT Austin. For its 2025 spring semester show, SOUnD performed on April 25, which was within the last two weeks of the term. And for fall semester, SOUnD performed on December 7, just nine days from the last day of the term.

135.    SOUnD uses amplified sound during these stage performances. These performances typically take place in Texas Union Theater, an indoor theatre facility with an elevated stage, microphones, and other sound functionalities.

136.    **The End-of-Term Amplified Sound Ban covers Strings Attached's expressive activities.** Strings Attached and its members have performed using amplified sound during the last two weeks of a term several times, and they intend to do so again. For example, they use amplified sound during the finals week "Finals Scream" event at UT Dallas.

137.    Strings Attached has also put on concerts and held rehearsals during the last two weeks of a term. For instance, on May 9, 2025, it put on a jazz concert using amplified sound as part of its year-end banquet at Artemis Hall on the UT Dallas campus. The last day of the spring semester was May 16.

138.    As another example, Strings Attached held a rehearsal using amplified sound on October 10, 2024, just two days before the end of the first 8-week Fall 2024 session at UT Dallas. Strings Attached intends to put on similar concerts and rehearsals during the last two weeks of academic terms going forward.

139.    **Other Protected Expression.** The End-of-Term Amplified Sound Ban covers an extensive number of other expressive activities. For example, and without limitation, the End-of-Term Amplified Sound Ban also covers these expressive activities which occur or are likely to occur during the last two weeks of a term:

    a.    Playing music, a podcast, or a video, whether showing a news clip to fellow students on a smartphone or using a speaker to screen a film for an event;

    b.    Using a microphone or megaphone in an outdoor area on campus designated for amplified sound to peacefully protest a breaking event or a pending bill at the Texas Legislature;

    c.    Using a megaphone while celebrating a team's victory on a campus sidewalk after a late-season game;

    d.    Using a small microphone or small speaker at a student organization's recruiting table; and

    e.    Using an amplifier during a small musical performance to celebrate the end of the semester.

**The Act mandates a blanket ban on drums and other percussive instruments the last two weeks of any term.**

140.    The Act requires that each institution's policies "prohibit … during the last two weeks of a semester or term, engaging in expressive activities … by using drums or other percussive instruments." Tex. Educ. Code § 51.9315(f)(2)(B)(iv) ("End-of-Term Drum Ban").

141.    The End-of-Term Drum Ban applies to all locations on campus, even those that the Legislature or an institution has opened to or made available for expressive activities, including those opened specifically for musical performance, as UT Austin and UT Dallas both have done.

142.    The Act does not restrict any other types of musical instruments.

143.    **The End-of-Term Drum Ban covers Plaintiff SOUnD's expressive activities.** SOUnD uses a variety of percussive instruments during its campus performances, including the show and rehearsals it holds during the last two weeks of a semester.

144.    To promote its end-of-semester show, SOUnD stages pop-up performances in common outdoor spaces around UT Austin, including on Speedway Mall, a spacious walkway through campus that students and student groups routinely use for tabling, advocacy, playing music, and all kinds of other expression. During these performances, SOUnD does not use amplified sound, but instead uses alternative percussive instruments like large plastic paint buckets.

145.    Because SOUnD stages these pop-up performances mostly in the week or so leading up to the main show, some have fallen within the last two weeks of an academic term. Prior to the Act becoming law, UT Austin staff never cited SOUnD for using drums and other percussive instruments during the last two weeks of a term or in outdoor common areas.

146.    SOUnD intends to continue putting on its end-of-semester shows and promotional performances across campus.

147.    **The End-of-Term Drum Ban covers Plaintiff Strings Attached's expressive activities.** In its performances during the last two weeks of academic terms, Strings Attached has used drums. The student group intends to continue using drums during performances it puts on during the last two weeks of academic terms at UT Dallas.

**The Act mandates even more restrictions on speech, including that institutions need allow only "members of the university community" to speak on campus.**

148.    The Act changes the 2019 law's guarantee that "any person" could engage in expressive activities at public universities and colleges, subject to permissible time, place, and manner restrictions, by requiring that institutions need only allow "members of the university community" to engage in expressive activities at public colleges and universities. Tex. Educ. Code § 51.9315(f)(1)(A) ("Community Members Provision"); *see also* Tex. S.B. 2972 [Ex. A].

149.    The Act does not define "members of the university community."

150.    "Members of the university community" or "university community" is not defined elsewhere in the Texas code. *E.g.,* Tex. Educ. Code § 51.9315(c).

151.    Thus, the Act requires students, staff, and the public to guess whether "members of the university community" includes:

    a.    University alumni, including those who routinely participate in a student organization's expressive activities, like the FOCUS ministers;

    b.    Non-student advisors to student members of a political advocacy group like YAL, whose members rely on guidance from staff and representatives of the national organization;

    c.    Clergy members from churches, mosques, and other religious institutions adjacent to campus and which routinely serve students; and

    d.    Outside professionals who serve on the boards of student organizations or advise those organizations, like some of *The Retrograde*'s board members.

152.    The Act also removes the 2019 law's requirement that institutions treat common outdoor spaces as traditional public forums, and instructs the governing board of each institution

29

to permit only students and employees of the institution to engage in "expressive activities" in those common outdoor spaces. Tex. Educ. Code 51.9315(d-1); *see also* Tex. S.B. 2972 [Ex. A].

**The University of Texas System and its member institutions implement the Act's requirements.**

153.    On August 21, 2025, the UT System Board Defendants convened in Austin to consider for approval each UT System institution's "revised institutional policies regarding speech, expression, and public assembly and designations of public forums, as required by" the Act, including revised policies from UT Austin and UT Dallas.

154.    UT Dallas's revised policy includes the Act's Overnight Expression Ban, End-of-Term Invited Speaker Ban, End-of-Term Amplified Sound Ban, and End-of-Term Drumming Ban (collectively, "Challenged Prohibitions"), nearly verbatim. The only difference is UT Dallas adds "horns" to its of prohibited instruments under the End-of-Term Drum Ban. UT Dallas Revised Policy [Ex. D], § L.9.6.iv.

155.    UT Dallas's revised policy also bars "members of the public" from engaging in expressive activities on campus, despite its past practice of allowing the public to speak on campus and reserve campus facilities for expression during non-peak times. *Id.* at § A.1.3

156.    UT Austin's revised policy includes the End-of-Term Speaker Ban, End-of-Term Amplified Sound Ban, and End-of-Term Drum Ban nearly verbatim. UT Austin's policy specifies that the "last two weeks of a semester or term" means "the week of final exams and the week immediately preceding final exams." UT Austin Revised Policy [Ex. E], § 13-301(b)(3).

157.    In addition, UT Austin's policy states, "the use of Amplified Sound, drums or other musical or percussive instruments (including makeshift instruments), Guest Speakers, and Assembly for the purpose of expressive activity in the Common Outdoor Areas during the period

of final exams and the week immediately preceding final exams is in fact disruptive of University students' ability to prepare for and take their final exams." *Id.*

158.    On August 21, 2025, the UT System Board Defendants, after due deliberation and with Chancellor Zerwas's recommendation, voted to approve both UT Austin's revised policy and UT Dallas's revised policy.

159.    Defendants have given no indication they will disobey the Act's mandates. UT System policy mandates that "U.T. System officers and employees" comply with state laws. Univ. of Tex. Sys. Bd. of Regents R. 109.01, § 2.

160.    There is an ongoing and substantial threat that Defendants will enforce the Challenged Prohibitions that the Act mandates, and the policies Defendants have adopted or may adopt to implement those Prohibitions.

**Because of the Act, those who engage in expressive activities on campus face a range of penalties.**

161.    The Act requires Texas public universities to "establish disciplinary sanctions for students, student organizations, or employees who … violate an institution policy or state law." Tex. Educ. Code § 51.9315(f)(3).

162.    Students and student organizations who violate the Act's prohibitions, including the Challenged Prohibitions, risk discipline ranging from written warnings, probation, suspension, or even denial of a degree. UT Dallas Revised Policy [Ex. D] at § L.49, and UT Dallas Pol'y No. UTDSP5003 Student Code of Conduct at § F (rev. June 1, 2020);[8] UT Austin Gen. Info. 2025-

---

[8]    UT Dallas Pol'y No. UTDSP5003 is *available at* https://policy.utdallas.edu/utdsp5003/makepdf [perma.cc/L4RS-52LV].

2026 Catalog, App'x C: Institutional Rules on Student Servs. and Activities, at § 11-701;[9] and UT Austin Revised Policy [Ex. E] at § 13-1202.

163.    Because of the Act's various prohibitions on invited speakers and non-members "of the university community," anyone who is not a student or employee who engages in expressive activities on campus—even if a student group or employee invites them to do so—risks criminal trespass charges. *See* Tex. Penal Code § 30.05; UT Dallas Revised Policy [Ex. D] at § L.49; Revised UT Austin Policy [Ex. E] at § 13-1202.

## PLAINTIFFS' INJURIES

164.    As detailed in this Complaint, each Plaintiff engages in protected expression, and intends to engage in protected expression, that one or more of the Challenged Prohibitions and the Community Members Provision threatens.

165.    Each of the Challenged Prohibitions, and their implementation in the UT Austin and UT Dallas rules and policies, are causing immediate, practical, and irreparable harm to the Plaintiffs' First Amendment rights.

166.    The Act's Community Members Provision, and its implementation in the UT Austin and UT Dallas rules and policies, is also causing immediate, practical, and irreparable harm to UTD FOCUS, YAL, Arvandi, and *The Retrograde*'s First Amendment rights.

167.    Because the Challenged Prohibitions lack any limiting criteria for Defendants and other campus officials, there is a significant risk Defendants and other campus officials will

---

[9]  UT Austin Gen. Info. 2025-2026 Catalog, App'x C: Institutional Rules on Student Servs. and Activities, § 11-701 is *available at* https://catalog.utexas.edu/general-information/appendices/appendix-c/student-conduct-and-academic-integrity/#text [perma.cc/P3CE-TDCG].

enforce these restrictions in arbitrary and viewpoint-based ways, substantially chilling Plaintiffs, students, staff, and the public from expressing unpopular or contentious views on campus.

168.    Because the Challenged Prohibitions restrict and punish *only* protected speech, they are *per se* causing, and will cause, irreparable harm to Plaintiffs' First Amendment freedoms. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." (quoting *Elrod v. Burns,* 427 U.S. 347, 373 (1976) (plurality opinion))).

169.    If not enjoined, the Challenged Prohibitions and Community Members Provision will chill a substantial amount of protected speech, including Plaintiffs' expression.

**Plaintiff UTD FOCUS's injuries.**

170.    The Overnight Expression Ban, the End-of-Term Speaker Ban, and the End-of-Term Amplified Sound Ban cover UTD FOCUS's expressive activities. So do the UT Dallas policies that implement those prohibitions.

171.    UTD FOCUS and its student members fear sanction or discipline from UT Dallas if they (a) engage in fellowship, discussions of faith, and similar expressive activities between 10 P.M. and 8 A.M., (b) invite and associate with FOCUS's outside ministers, many of whom are alumni, to participate in and help with UTD FOCUS's expressive activities during the last two weeks of a semester or academic term, or (c) use amplified sound with its expressive activities during the last two weeks of a semester or term.

172.    Because the Act prohibits UTD FOCUS from inviting outside ministers to campus to speak during UTD expressive activities, including worship and similar events during the last two weeks of any term, the Act will substantially impede UTD FOCUS from carrying out its ministry and its mission. That's especially true during the end of semesters, when UTD FOCUS's

students are studying for finals and require even more assistance from FOCUS's ministers to help carry out the student group's expressive activities.

173.    The Community Members Provision underscores the chill on UTD FOCUS's ability to invite ministers to help carry out the group's mission, as UTD members must guess at whether its ministers are "members of the university community" permitted to speak at UT Dallas.

174.    If UTD FOCUS and its student members continue these expressive activities, as they desire to, they open themselves to discipline from UT Dallas.

175.    And if UTD FOCUS's invited ministers continue coming to campus to help UTD FOCUS with expressive activities as they desire to, they risk trespass citations or arrest.

176.    The resulting chill has caused UTD FOCUS and its members to strongly consider ceasing their expressive activities on campus between 10 P.M. and 8 A.M. and during the last two weeks of academic terms, imperiling UTD FOCUS's mission.

**Plaintiff *The Retrograde*'s injuries.**

177.    The Overnight Expression Ban and the End-of-Term Speaker Ban cover *The Retrograde*'s expressive activities. So do the UT Dallas policies that implement those prohibitions.

178.    The newspaper and its staff fear discipline from UT Dallas if they (a) continue news publishing and news gathering between 10 P.M. and 8 A.M., (b) invite and associate with speakers who are not students or UT Dallas employees, or (c) invite sources and other speakers to campus during the last two weeks of a term.

179.    Because the Act bars *The Retrograde* from gathering and publishing news between 10 P.M. and 8 A.M., it will severely harm the newspaper's mission and its right to gather and publish the news, let alone in an accurate, timely, and effective way.

180.    Because of the Act's prohibitions on protected expression, *The Retrograde* will face a reduced capacity to report the news due to limited publishing and newsgathering hours, be chilled from inviting sources to campus, and will lose opportunities to invite its board members and advisers to campus for expressive activities.

181.    If *The Retrograde* and its staff continue their expressive activities, as they desire to, the Act and UT Dallas policies open them to discipline.

182.    The Act and UT Dallas policies also open any guest speakers the newspaper invites to campus to possible trespass citations or arrest.

183.    The Community Members Provision underscores the chill on *The Retrograde's* ability to invite its board and advisers to help carry out the newspaper's mission, as the paper's staff must guess at whether its board members and advisers are "members of the university community" permitted to speak at UT Dallas.

184.    The chilling effect on *The Retrograde* and the risk of UT Dallas administrators selectively enforcing the Act against the newspaper is heightened, given that (a) UT Dallas administrators just last year disciplined *The Mercury's* leaders for its reporting about campus protests, and (b) UT Dallas administrators in Spring 2024 removed *The Mercury's* newspapers from campus kiosks and tried to restrict its reporting after the paper reported on the administration's removal of "Spirit Rocks" from campus. For that reason, *The Retrograde* fears UT Dallas administrators are especially likely to enforce UT Dallas policies implementing the Act against the newspaper, its student staff, and its faculty board members and advisers, should they publish unfavorable coverage of the university or its administration.

**Injuries to Plaintiff YAL and its members, including Plaintiff Arvandi.**

185.    The Overnight Expression Ban, the End-of-Term Speaker Ban, and the End-of-Term Amplified Sound Ban cover YAL's expressive activities and that of its student members at UT Austin and UT Dallas, including Arvandi. So do the UT Austin policies that implement those prohibitions.

186.    Arvandi fears discipline if he (a) invites YAL staff to talk to students at UT Austin during the last two weeks of a semester; or (b) uses amplified sound during the last two weeks of a semester, including for peaceful rallies and petitioning activity.

187.    If Arvandi is unable to engage in these expressive activities during the last two weeks of a semester, it will hamper his right to advocate for YAL's views and mission, his right to listen to and receive information from invited speakers, his ability to recruit YAL members, and his ability to register a YAL chapter at UT Austin.

188.    If Arvandi goes forward with his intended expressive activities, he opens himself to discipline from UT Austin, and he also fears UT Austin will not grant a YAL chapter registered student organization status.

189.    As a result, the Act will force Arvandi to abstain from inviting YAL staff or using amplified sound for peaceful rallies and petitioning during the last two weeks of any semester.

190.    YAL fears its other members in the UT System face similar chilling effects.

191.    Similarly, YAL fears punishment for its staff, including possible trespass citations or arrests, if it sends staff to UT Austin or UT Dallas after YAL student members invite them to speak on campus, including during the last two weeks of a semester.

192.    If YAL is prohibited from sending invited speakers to campus under threat of arrest or other punishment, it will hinder YAL's ability to (a) meet its mission, (b) convey its message to

interested students, and (c) assist its student members with political advocacy, recruitment, and petitioning.

193.    The Community Members Provision underscores the chill on YAL and its student members' expressive activities. YAL must guess whether its staff and representatives are "members of the university community" permitted to speak at UT System institutions, even though YAL has student members across the system who want to invite YAL speakers to campus.

194.    For that reason, YAL will likely not send invited staff speakers to UT System campuses while the End-of-Term Invited Speaker Ban and Community Members Provision remain in effect.

195.    YAL's and Arvandi's fears are heightened because UT Austin policy deems hosting guest speakers or using amplified sound in outdoor common areas during the last two weeks of a semester per se disruptive.

**Plaintiff SOUnD's injuries.**

196.    The Overnight Expression Ban and the End-of-Term Drum Ban covers SOUnD's expressive activities. So do the UT Austin policies that implement those prohibitions.

197.    SOUnD and its members fear discipline from UT Austin if they play drums or other percussive instruments during the last two weeks of a term in indoor and outdoor campus spaces—expression they have often engaged in and desire to continue.

198.    SOUnD's fear is heightened because UT Austin policy deems any drumming or percussion in outdoor common areas during the last two weeks of a semester per se disruptive.

199.    If SOUnD and its members continue their expressive activities during the last two weeks of the semester, as they desire to, the Act and UT Austin policies open them to discipline.

200.    Should the Act and its implementation in UT Austin rules stand, SOUnD will likely stop promoting its year-end shows with pop-up performances during the last two weeks of the semester. Because those shows are SOUnD's primary source of income, its inability to promote the shows effectively will harm its mission and its right to engage in musical performances.

**Plaintiff Strings Attached's injuries.**

201.    The Overnight Expression Ban, the End-of-Term Amplified Sound Ban, and the End-of-Term Drum Ban cover Strings Attached's expressive activities. So do the UT Dallas policies that implement those prohibitions.

202.    Strings Attached and its members fear discipline from UT Dallas if they (a) rehearse or perform on campus after 10 P.M. or (b) rehearse or perform—including doing so using the drums or other percussive instruments they've used in the past—during the last two weeks of any academic term.

203.    Because the Act bars Strings Attached members from even rehearsing after 10 P.M. or during the end of certain terms, it will severely harm the musical group's mission and its right to engage in musical performance on campus.

204.    If Strings Attached and its staff continue their expressive activities, as they desire to, the Act and UT Dallas policies open them to discipline.

205.    Should the Act and its implementation in UT Dallas rules stand, Strings Attached will likely have to curtail rehearsal and its performance schedule, harming its mission and its right to engage in musical performances.

**FIRST CAUSE OF ACTION**
**Overnight Expression Ban**
**First Amendment Violation — Freedom of Speech, Freedom of the Press, and Freedom of Association**
**(42 U.S.C. § 1983)**
**(Facial and As-Applied Against all Defendants in their official capacities)**

206.    Plaintiffs re-allege and re-incorporate paragraphs 1–205 as though fully set forth herein.

207.    By imposing sweeping prohibitions on protected expression at Texas's public universities and colleges, including UT Austin and UT Dallas, the Overnight Expression Ban is unconstitutional on its face and unconstitutional as applied to each Plaintiff.

208.    The First Amendment broadly protects expression at public universities and colleges, where the "vigilant protection of constitutional freedoms is nowhere more vital." *Healy,* 408 U.S. at 180 (citation omitted). That protection applies 24 hours a day.

209.    Yet the Overnight Expression Ban prohibits *all* protected expression (except commercial speech) for 10 hours every day in all areas of campus, even in places like dorm rooms, campus libraries, and campus walkways.

210.    The Ban covers a near-infinite range of protected expression across UT System campuses, including, for example and without limitation: core political speech and other expression on matters of public concern; religious expression; news reporting and news gathering; and artistic expression and musical performance. It also covers expressive association involving those matters. And it covers listening to speakers, reading and looking for information, and watching performances.

211.    No matter Texas's interest in passing the Act, the Overnight Expression Ban's staggering restriction of protected expression fails any level of First Amendment scrutiny.

212.    **The Overnight Expression Ban is Content-Based and Fails Strict Scrutiny.** The Overnight Expression Ban makes a content-based distinction based on the commercial content of an on-campus expressive activity.

213.    The Act incorporates the Texas Education Code's definition of "expressive activities," which includes all protected speech except commercial speech. And so the Overnight Expression Ban's prohibition on "engaging in expressive activities on campus" between 10 P.M. and 8 A.M. covers protected non-commercial speech, but does not cover protected commercial speech.

214.    The First Amendment protects commercial speech. Both UT Austin and UT Dallas policy recognizes the right of registered organizations and individuals to engage in a range of commercial speech. Revised UT Dallas Policy No. UTDSP5001, Speech Expression and Assembly [Ex. D] at § B.8; Revised UT Austin Institutional Rules on Student Servs. and Activities [Ex. E] Subchapter 13-205.2.

215.    Defendants, other campus officials, students, and campus staff must look at the content of campus expression to determine if it is commercial or non-commercial, and thus whether the expression falls within "expressive activities" the Overnight Expression Ban prohibits.

216.    Thus, the Overnight Expression Ban restricts speech based on its content.

217.    For instance, the Overnight Expression Ban prohibits peacefully holding a sign on campus at 7:00 A.M. protesting world hunger, but does not prohibit holding a sign at 7:00 A.M. promoting a student organization's bake sale. Likewise, it does not bar a student group from selling Bibles on campus at 10:30 P.M., but it does bar that group from discussing their favorite Bible verses at 10:30 P.M.

218.    Because it is content-based, the Overnight Expression Ban is presumptively unconstitutional on its face and as applied to each Plaintiff, and must satisfy strict scrutiny.

219.    But there is no compelling government interest in prohibiting nearly all protected speech at a public university for 10 hours a day, let alone imposing that prohibition based on a content-based distinction between commercial and non-commercial speech.

220.    Whatever Texas's interest in passing the Act, the sweeping Overnight Expression Ban is not the least restrictive means of meeting that interest, let alone narrowly tailored to address that interest.

221.    Even if Texas's interest is ensuring "community safety" or preventing "disruption" on its public university campuses, banning nearly all expression between 10 P.M. and 8 A.M. falls well short of meeting that interest. The Overnight Expression Ban is not limited to expressive activities that pose an imminent risk to campus safety or expressive activities causing substantial disruptions to academic activities, student residences, or campus operations.

222.    On the other hand, the Overnight Expression Ban chills expressive activities like late-night study groups or early-morning research, underscoring why the sweeping Ban not only fails to meet any purported government interest in preventing disruption, but harms the very expressive activity that interest purports to foster.

223.    **The Overnight Expression Ban Fails Other Levels of Scrutiny.** Alternatively, even if the Overnight Expression Ban is content-neutral, it still fails First Amendment scrutiny.

224.    There is no significant government interest in prohibiting nearly all protected speech at a public university for 10 hours a day, nor is the unbounded Overnight Expressive Ban narrowly tailored to meet any significant government interest.

225.     The Overnight Expression Ban fails to leave open alternative channels for communicating a speaker's message. Instead, it effectively denies Plaintiffs and other speakers the ability to speak for 10 hours a day at all, on a public university campus where many students live, through *any* channel of communication.

226.     Nor is it reasonable to ban all protected speech (except commercial speech) between 10 P.M. and 8 A.M. at a public university, in light of (i) the purpose for which UT Austin and UT Dallas make many areas of campus available for or open to expressive activities, and (ii) the mission of these institutions generally, including the importance of free expression to furthering that mission.

227.     In sum, the Overnight Expression Ban fails First Amendment scrutiny in every or almost every application to "expressive activities," rendering it facially unconstitutional.

228.     Because the Ban fails First Amendment scrutiny as applied to Plaintiffs' protected First Amendment activities, it also violates the First Amendment as applied to each Plaintiff.

229.     Because the Overnight Expression Ban (and any university policies implementing the Ban) infringes a staggering amount of protected speech and cannot satisfy First Amendment scrutiny, Plaintiffs require preliminary and permanent injunctive relief to protect their fundamental expressive rights from immediate, ongoing, and irreparable harm.

## SECOND CAUSE OF ACTION
**End-of-Term Invited Speaker Ban**
**First Amendment Violation — Freedom of Speech, Freedom of the Press, and Freedom of Association**
**(42 U.S.C. § 1983)**
**(Facial and As-Applied Against all Defendants in their official capacities)**

230.     Plaintiffs re-allege and re-incorporate paragraphs 1–229 as though fully set forth herein.

231.    By banning "engaging in expressive activities" by inviting speakers to Texas's public universities and colleges during the last two weeks of any academic term, the End-of-Term Invited Speaker Ban is unconstitutional on its face and unconstitutional as applied to Plaintiffs UTD FOCUS, YAL, Arvandi, and *The Retrograde*'s protected expression.

232.    The First Amendment protects students and student groups inviting outside speakers to campus, associating with those speakers, and hosting on-campus events presenting those speakers.

233.    The First Amendment also protects speakers invited to speak at public universities and colleges.

234.    Yet the End-of-Term Invited Speaker Ban prohibits that protected expression for over 90 days a year at UT Austin and UT Dallas, if not also all other UT System institutions.

235.    The Ban covers, for example and without limitation: political advocates; clergy; lawmakers; sources of news and information for student journalists; guest musicians and actors; student group advisors and board members; career advisors; and other speakers that students, faculty, or staff invite to campus. It also covers students, faculty, and staff expressively associating themselves with invited speakers. And it impacts students, staff, and faculty who want to listen to and receive information from invited speakers.

236.    No matter Texas's interest in passing the Act, the End-of-Term Invited Speaker Ban's unbounded restriction of protected expression fails any level of First Amendment scrutiny.

237.    **The End-of-Term Invited Speaker Ban is Content-Based and Fails Strict Scrutiny.** Because the End-of-Term Invited Speaker Ban prohibits "engaging in expressive activities," it requires reference to the expressive activity's content to determine whether it is commercial or non-commercial, and thus an "expressive activity" subject to the Ban.

238.    For instance, the End-of-Term Invited Speaker Ban prohibits a student group advocating for an issue from inviting an expert to campus in May to talk about a pending bill at the Texas legislature impacting that issue, but it would not prohibit the group from inviting vendors to campus in May to help sell the group's t-shirts advocating the issue.

239.    The End-of-Term Invited Speaker Ban is also content-based because it draws distinctions (i) between speakers who are and are not engaged in commercial speech, and (ii) between speakers invited for expressive activities with content relevant to the end-of-terms and those who are not, thus depriving students, faculty, and staff "the right and privilege to determine for [themselves] what speech and speakers are worthy of consideration." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010). To that end, it burdens the expressive freedom of invited speakers, like YAL staff and FOCUS's ministers, whose participation in expressive activities on campus during the end of academic terms is essential for students and student groups intending to share a message on campus.

240.    Because it is content-based, the End-of-Term Invited Speaker Ban is presumptively unconstitutional on its face and as applied to Plaintiffs UTD FOCUS, YAL, Arvandi, and *The Retrograde*. Thus, the Ban must satisfy strict scrutiny.

241.    But there is no compelling government interest in prohibiting all expressive activities involving an invited speaker at a public university for the last two weeks of an academic term—amounting to over 90 days a year at both UT Austin and UT Dallas— let alone imposing that prohibition based on a content-based distinction.

242.    Whatever Texas's interest in passing the Act, the sweeping End-of-Term Invited Speaker Ban is not the least restrictive means of meeting that interest, let alone narrowly tailored to address that interest.

243.    The End-of-Term Invited Speaker Ban is not limited, for example, to end-of-term invited speaker events that substantially disrupt academic activities, graduation preparations, or other end-of-term events.

244.    UT Austin's "Speech, Expression, and Assembly" policy deems presenting a guest speaker in the campus's outdoor common areas during the last two weeks of a semester as *per se* disruptive, even in outdoor common areas far removed from academic and residential buildings, or those areas which students and employees use for expressive activity throughout the day.

245.    **The End-of-Term Invited Speaker Ban Fails Other Levels of Scrutiny.** Alternatively, even if the End-of-Term Invited Speaker Ban is content-neutral, it still fails First Amendment scrutiny.

246.    There is no significant government interest in barring expressive activities involving invited speakers at a public university for over 90 days a year, nor is the unbounded End-of-Term Invited Speaker Ban narrowly tailored to meet any significant government interest.

247.    The End-of-Term Invited Speaker Ban fails to leave open alternative channels for communicating a speaker's message. Instead, it effectively denies Plaintiffs, other student groups, and other speakers the ability to share their message with their intended audience.

248.    Nor is it reasonable to ban all expressive activities involving invited speakers (except commercial ones) for over 90 days a year at a public university, in light of (i) the purpose for which UT Austin and UT Dallas make many areas of campus available for or open to expressive activities, and (ii) the mission of these institutions generally, including the importance of free expression to furthering that mission.

249.    In sum, the End-of-Term Invited Speaker Ban fails First Amendment scrutiny in every or almost every application to inviting speakers "to engage in expressive activities," rendering it facially unconstitutional.

250.    Because it fails First Amendment scrutiny as applied to Plaintiffs' protected First Amendment activities, it also violates the First Amendment as applied to Plaintiffs UTD FOCUS, YAL, Arvandi, and *The Retrograde*.

251.    Because the End-of-Term Invited Speaker Ban (and any university policies implementing the Ban) infringe a range of protected speech and cannot satisfy First Amendment scrutiny, Plaintiffs require preliminary and permanent injunctive relief to protect their fundamental expressive rights from immediate, ongoing, and irreparable harm.

### THIRD CAUSE OF ACTION
**End-of-Term Amplified Sound Ban**
**First Amendment Violation — Freedom of Speech**
**(42 U.S.C. § 1983)**
**(Facial and As-Applied Against all Defendants in their official capacities)**

252.    Plaintiffs re-allege and re-incorporate paragraphs 1–251 as though fully set forth herein.

253.    By banning "engaging in expressive activities" using amplified sound at Texas's public universities and colleges during the last two weeks of any term, the End-of-Term Amplified Sound Ban is unconstitutional on its face and unconstitutional as applied to Plaintiffs UTD FOCUS, YAL, Arvandi, SOUnD, and Strings Attached's protected expression.

254.    The First Amendment protects using amplified sound to speak, perform music and theatre, and engage in other expressive conduct at public universities and colleges.

255.    Yet the End-of-Term Amplified Sound Ban prohibits that protected expression for over 90 days a year at UT Austin and UT Dallas, if not also all other UT System institutions.

256.    No matter Texas's interest in passing the Act, the End-of-Term Amplified Sound Ban's unbounded restriction of protected expression fails any level of First Amendment scrutiny.

257.    **The End-of-Term Amplified Sound Ban is Content-Based and Fails Strict Scrutiny.** Because the End-of-Term Amplified Sound Ban prohibits "engaging in expressive activities" using amplified sound, it requires reference to the speech's content to determine whether it is commercial or non-commercial, and thus "expressive activity" within the Ban.

258.    For instance, the End-of-Term Amplified Sound Ban prohibits a student group from using a microphone during a rally on a breaking political issue during the last two weeks of a term, but it would not prohibit the group using the microphone to peddle tickets for a year-end party.

259.    Because it is content-based, the End-of-Term Amplified Sound Ban is presumptively unconstitutional on its face and as applied to Plaintiffs UTD FOCUS, YAL, Arvandi, SOUnD, and Strings Attached. Thus, the Ban must satisfy strict scrutiny.

260.    But there is no compelling government interest in prohibiting all expressive activities using amplified sound at a public university for the last two weeks of an academic term— amounting to over 90 days a year at both UT Austin and UT Dallas—let alone imposing that prohibition based on a content-based distinction and without any reference to location or noise level.

261.    Whatever Texas's interest in passing the Act, the sweeping End-of-Term Amplified Sound Ban is not the least restrictive means of meeting that interest, let alone narrowly tailored to address that interest.

262.    For example, the End-of-Term Amplified Sound Ban is not limited to expressive activities using amplified sound that exceed a reasonable decibel level or any other objective measure of volume. Nor is it limited to uses of amplified sound within certain proximities to

academic activities, campus residential areas, graduation preparations, or other areas or activities that excessive amplified sound might substantially disrupt during the last two weeks of a term.

263.    The Ban prohibits using amplified sound for end-of-term expressive activities even in campus spaces UT System institutions have designated for expressive activities using amplified sound.

264.    As one example of its lack of narrow tailoring, the End-of-Term Amplified Sound Ban would prohibit a small Cinco de Mayo concert in a campus auditorium featuring an electronic keyboard, but not a louder, horns-only Cinco de Mayo concert in an outdoor performance space. It would likewise bar students from using a small, hand-held microphone to conduct a Christmas season worship service, but not bar those students from hosting a holiday carol sing-a-long for dozens of participants.

265.    UT Austin's "Speech, Expression, and Assembly" policy deems using amplified sound for expressive activities in the campus's outdoor common areas during the last two weeks of a semester as *per se* disruptive, even if below a disruptive decibel level, or if in outdoor common areas far removed from academic and residential buildings.

266.    While the Act also prohibits amplified sound "while engaging in expressive activities on campus during class hours" that "(i) intimidate others; (ii) interfere with  campus operations; or (iii) interfere with an institution employee's or a peace officer's lawful performance of a duty," Tex. Educ. Code § 51.9315(f)(2)(A), those criteria only underscore that the End-of-Term Amplified Sound Ban could be substantially more narrowly tailored, and thus lacks such tailoring. For instance, those criteria still lack any consideration for volume level. They offer no guidance on what constitutes "interference," and fail to pair "intimidate others" with an intent requirement.

267.    **The End-of-Term Amplified Sound Ban Fails Other Levels of Scrutiny.** Alternatively, even if the End-of-Term Amplified Sound Ban is content-neutral, it still fails First Amendment scrutiny.

268.    There is no significant government interest in barring all expressive activities involving amplified sound at a public university for over 90 days a year, nor is the unbounded Amplified Sound Invited Speaker Ban narrowly tailored to meet any significant government interest.

269.    The End-of-Term Amplified Sound Ban also fails to leave open alternative channels for communicating a speaker's message, as it applies to amplified sound across the entire campus. For students who put on year-end concerts, worship services, and other end-of-term expressive events on campus that require amplified sound, the Ban denies their right to share their message with their intended audience.

270.    Nor is it reasonable to ban all expressive activities involving amplified sound (except commercial ones) for over 90 days a year at a public university, in light of (i) the purpose for which UT Austin and UT Dallas make many areas of campus available for or open to expressive activities, and (ii) the mission of these institutions generally, including the importance of free expression to furthering that mission.

271.    In sum, the End-of-Term Amplified Sound Ban fails First Amendment scrutiny in almost every application of using amplified sound "to engage in expressive activities," rendering it facially unconstitutional.

272.    Because it fails First Amendment scrutiny as applied to Plaintiffs' protected First Amendment activities, it also violates the First Amendment as applied to Plaintiffs UTD FOCUS, YAL, Arvandi, SOUnD, and Strings Attached.

273.    Because the End-of-Term Amplified Sound Ban (and any university policies implementing the ban) infringe a range of protected speech and cannot satisfy First Amendment scrutiny, Plaintiffs require preliminary and permanent injunctive relief to protect their fundamental expressive rights from immediate, ongoing, and irreparable harm.

### FOURTH CAUSE OF ACTION
**End-of-Term Drum Ban**
**First Amendment Violation — Freedom of Speech**
**(42 U.S.C. § 1983)**
**(Facial and As-Applied Against all Defendants in their official capacities)**

274.    Plaintiffs re-allege and re-incorporate paragraphs 1–273 as though fully set forth herein.

275.    By banning "engaging in expressive activities" using drums or other percussive instruments at Texas's public universities and colleges during the last two weeks of any term, the End-of-Term Drum Ban is unconstitutional on its face and unconstitutional as applied to Plaintiffs SOUnD and Strings Attached's protected expression.

276.    The First Amendment protects musical and stage performance, including using drums and other percussive instruments, at public universities and colleges.

277.    Yet the End-of-Term Drum Ban prohibits that protected expression for over 90 days a year at UT Austin and UT Dallas, if not also all other UT System institutions.

278.    No matter Texas's interest in passing the Act, the End-of-Term Drum Ban's unbounded restriction of protected expression fails any level of First Amendment scrutiny.

279.    **The End-of-Term Drum Ban is Content-Based and Fails Strict Scrutiny.** Because the End-of-Term Drum Ban prohibits "engaging in expressive activities" using drums or other percussion, it requires reference to the speech's content to determine whether it is commercial or non-commercial, and thus "expressive activity" within the Ban.

280.    For instance, the End-of-Term Drum Ban prohibits a student group from putting on an interactive drum show for their peers to blow off steam during finals, but it would not prohibit the group from using the drums to attract buyers to a booth selling finals study guides.

281.    The End-of-Term Drum Ban is also content-based because it distinguishes expression based on its musical or performative content. For instance, under the Ban, students can perform a song during the last two weeks of a term if it includes an acoustic guitar or a tuba, but not a snare drum or triangle.

282.    Because it is content-based, the End-of-Term Drum Ban is presumptively unconstitutional on its face and as applied to Plaintiffs SOUnD and Strings Attached. Thus, the Ban must satisfy strict scrutiny.

283.    But there is no compelling government interest in prohibiting all expressive activities using drums or other percussive instruments at a public university for the last two weeks of an academic term—amounting to over 90 days a year at both UT Austin and UT Dallas—let alone imposing that prohibition based on a content-based distinction.

284.    Whatever Texas's interest in passing the Act, the sweeping End-of-Term Drum Ban is not the least restrictive means of meeting that interest, let alone narrowly tailored to address that interest.

285.    For example, the End-of-Term Drum Ban is not limited to expressive activities using percussive instruments that exceed a reasonable decibel level or any other objective measure of volume. Nor is it limited to uses of percussive instruments within certain proximities to academic activities, campus residential areas, graduation preparations, or other areas or activities that excessive amplified sound might substantially disrupt during the last two weeks of a term.

286.    As one example of its lack of narrow tailoring, the End-of-Term Drum Ban would prohibit a student group from putting on an authentic performance of The Little Drummer Boy on a campus stage in early December, but it would not prohibit the student choir from singing the eponymous song on that stage.

287.    UT Austin's "Speech, Expression, and Assembly" policy deems using drums and other percussion in the campus's outdoor common areas during the last two weeks of a semester as *per se* disruptive, even if below a disruptive decibel level, or if in outdoor common areas far removed from academic and residential buildings.

288.    **The End-of-Term Drum Ban Fails Other Levels of Scrutiny.** Alternatively, even if the End-of-Term Drum Ban is content-neutral, it still fails First Amendment scrutiny.

289.    There is no significant government interest in barring all expressive activities involving drums or other percussion at a public university for over 90 days a year, nor is the unbounded End-of-Term Drum Ban narrowly tailored to meet any significant government interest.

290.    The End-of-Term Drum Ban also fails to leave open alternative channels for communicating a speaker's message, as it applies to expressive activities using drumming and percussion across the entire campus. For students who put on year-end concerts or hold rehearsals on campus that require percussion, the Ban denies their right to share their message with their intended audience.

291.    Nor is it reasonable to ban all expressive activities involving drums or other percussive instruments (except commercial ones) for over 90 days a year at a public university, in light of (i) the purpose for which UT Austin and UT Dallas make many areas of campus available for or open to expressive activities, and (ii) the mission of these institutions generally, including the importance of free expression to furthering that mission.

292.     In sum, the End-of-Term Drum Ban fails First Amendment scrutiny in almost every application of using drums "to engage in expressive activities," rendering it facially unconstitutional.

293.     Because it fails First Amendment scrutiny as applied to Plaintiffs' protected First Amendment activities, it also violates the First Amendment as applied to Plaintiffs SOUnD and Strings Attached.

294.     Because the End-of-Term Drum Ban (and any university policies implementing the Ban) infringe a range of protected speech and cannot satisfy First Amendment scrutiny, Plaintiffs require preliminary and permanent injunctive relief to protect their fundamental expressive rights from immediate, ongoing, and irreparable harm.

## FIFTH CAUSE OF ACTION
### Overnight Expression Ban
### First Amendment Violation — Facial Overbreadth
### (42 U.S.C. § 1983)
### (Against all Defendants in their official capacities)

295.     Plaintiffs re-allege and re-incorporate paragraphs 1–294 as though fully set forth herein.

296.     The Overnight Expression Ban prohibits engaging in all protected expression (except commercial speech) on campus between 10 P.M. and 8 A.M. at UT Austin, UT Dallas, and every other UT System institution.

297.     Thus, the Overnight Expression Ban prohibits an overwhelming amount of protected expression at UT Austin, UT Dallas, and the other UT System institutions, under the threat of discipline or even arrest.

298.     The Overnight Expression Ban's restrictions on expressive activities are so unbounded that they prohibit, for example, saying "good morning" on campus before 8 A.M. or saying "goodnight" after 10 P.M.; posting on social media late at night from one's dorm room;

and discussing yesterday's news with a classmate while walking across campus to an early morning class.

299.    Because the Act incorporates the Texas Education Code's definition of "expressive activities," which excludes the narrow categories of unprotected speech from its scope, the Act in turn excludes several potentially constitutional applications from the Overnight Expression Ban's sweep.

300.    Because the Overnight Expression Ban sweeps in a near-infinite range of protected speech—and only protected speech—the Ban has little, if any, plainly legitimate sweep.

301.    If the Overnight Expression Ban has any legitimate sweep, it is very narrow. It might permissibly apply to expressive activities that substantially disrupt sleeping campus residents or studying students, substantially interfere with routine maintenance of campus facilities, or pose imminent safety hazards to persons in the immediate campus area. UT Austin and UT Dallas policies largely prohibited these activities before Texas passed the Act.

302.    In all cases, the overwhelming number of the Ban's unconstitutional applications vastly outweigh the exceedingly narrow sweep of the Ban's lawful applications.

303.    The Overnight Expression Ban threatens not only to chill Plaintiffs' protected speech, but also to chill an extensive range of protected speech that any student, faculty, staff, or member of the public may wish to engage in while on a UT System institution's campus, where the "vigilant protection of constitutional freedoms is nowhere more vital." *Healy*, 408 U.S. at 180 (citation omitted).

304.    Because of the Overnight Expression Ban's unconstitutional overbreadth (and the corresponding unconstitutional overbreadth of university policies implementing the Ban),

Plaintiffs require preliminary and permanent injunctive relief to protect their fundamental expressive rights from immediate, ongoing, and irreparable harm.

## SIXTH CAUSE OF ACTION
### End-of-Term Invited Speaker, Amplified Sound, and Drum Bans
### First Amendment Violation — Facial Overbreadth
### (42 U.S.C. § 1983)
### (Against all Defendants in their official capacities)

305.    Plaintiffs re-allege and re-incorporate paragraphs 1–304 as though fully set forth herein.

306.    The End-of-Term Invited Speaker Ban, End-of-Term Amplified Sound Ban, and End-of-Term Drum Ban each prohibits engaging in an extensive range of protected expression (except commercial speech) the last two weeks of any term, which amounts to over 90 days per year at UT Austin, UT Dallas, and other UT System institutions.

307.    Thus, the End-of-Term Bans prohibit a vast amount of protected expression at UT Austin, UT Dallas, and other UT System institutions, under the threat of discipline or even arrest.

308.    The End-of-Term restrictions on expressive activities are so unbounded that they prohibit, for example, inviting a minister to lead a pre-finals prayer group, hosting a holiday movie night with the volume on during the end of fall semester, or a staging a brief drumming ceremony for students to commemorate their last final exam.

309.    If any of the End-of-Term Bans have a legitimate sweep, it is very narrow. They might permissibly apply to expressive activities that exceed a reasonable and generally applicable decibel level; substantially disrupt sleeping campus residents, classes, or students studying for or taking finals; or interfere with campus spaces the university has reserved for graduation events and ceremonies. In all cases, the overwhelming number of each Ban's unconstitutional applications vastly outweigh the exceedingly narrow sweep of the Ban's lawful applications.

310.     The End-of-Term Bans threaten not only to chill Plaintiffs' protected speech, but to chill an extensive range of protected speech that any student, faculty, staff, or member of the public may wish to engage in while on a UT System institution's campus, where the "vigilant protection of constitutional freedoms is nowhere more vital." *Healy*, 408 U.S. at 180 (citation omitted).

311.     Because of each End-of-Term Bans' unconstitutional overbreadth (and the corresponding unconstitutional overbreadth of university policies implementing the Bans), Plaintiffs require preliminary injunctive relief and permanent injunctive relief to protect their fundamental expressive rights from immediate, ongoing, and irreparable harm.

**<u>SEVENTH CAUSE OF ACTION</u>**
**First and Fourteenth Amendment Violation—Void for Vagueness**
**(42 U.S.C. § 1983)**
**(Against all Defendants in their official capacities)**

312.     Plaintiffs re-allege and re-incorporate paragraphs 1–311 as though fully set forth herein.

313.     The Act mandates that governing boards adopt a policy allowing only "members of the university community to … engage in expressive activities on campus," but it fails to provide ordinary persons with fair notice of what "members of the university community" means. Tex. Educ. Code § 51.9315(f)(1)(A).

314.     Thus, the Act requires students, staff, and the public to guess who is a "member[]" of the university community."

315.     To that end, there is a substantial risk that students and faculty will be chilled from associating with, listening to, and expressing themselves with and to those individuals and institutions, and others who are integral to campus free expression.

316.    So too is there a substantial risk those individuals and institutions will be chilled from expressive activity on campus, including when the student-group Plaintiffs, and others like them, invite individuals to campus to speak or engage in other protected expression.

317.    What's more, the vagueness of "members of the university community" invites Defendants and other campus officials to wield it in arbitrary and discriminatory ways.

318.    In their vagueness, the Act's provision at Texas Education Code §§ 51.9315(f)(1)(A) and violates the First Amendment and the Due Process Clause of the Fourteenth Amendment.

319.    Because that provision targets expression, and only expression, its vagueness heightens its chilling effects on protected expression at Texas's public universities and colleges, including Plaintiffs' expression.

320.    In all cases, the chill on protected speech from the statute's vagueness, and the arbitrary discretion it gives Defendants and other campus officials, is substantial and ongoing.

321.    Because of the Act's unconstitutional vagueness, Plaintiffs require preliminary and permanent injunctive relief to protect their fundamental expressive rights from immediate, ongoing, and irreparable harm.

## **PRAYER FOR RELIEF**

For these reasons, Plaintiffs respectfully ask this Court to:

a)    Enter a judgment declaring that each Challenged Prohibition violates the First Amendment to the United States Constitution, facially and as applied to Plaintiffs;

b)    Enter a judgment declaring the Community Members Provision is void for vagueness under the First Amendment and Fourteenth Amendment to the United States Constitution;

c)      Enter a preliminary and permanent injunction prohibiting Defendants and their agents, officials, servants, employees, and persons acting in concert with them, from enforcing any of the Challenged Prohibitions, or any policy or rule implementing any of the Challenged Prohibitions, as applied to Plaintiffs' expression;

d)      Enter a preliminary and permanent injunction prohibiting Defendants and their agents, officials, servants, employees, and persons acting in concert with them, from enforcing any of the Challenged Prohibitions, or any policy or rule implementing any of the Challenged Prohibitions, against any "expressive activities" (as defined in Texas Education Code Section 51.9315(a)(2)) at UT Austin and at UT Dallas;

e)      Enter a preliminary and permanent injunction prohibiting the UT System Board Defendants and Chancellor Zerwas, and their agents, officials, servants, employees, and persons acting in concert with them, from enforcing any of the Challenged Prohibitions, or any policy or rule implementing any of the Challenged Prohibitions, against any "expressive activities" (as defined in Texas Education Code Section 51.9315(a)(2)) at any other UT System Institution;

f)      Enter a permanent injunction prohibiting Defendants and their agents, officials, servants, employees, and persons acting in concert with them, from enforcing the Community Members Provision, or any policy or rule implementing the Provision, against Plaintiffs UTD FOCUS, YAL, Arvandi, and *The Retrograde*;

g)      Award attorneys' fees, statutory fees, and costs under 42 U.S.C. § 1988;

h)      Grant such other and further relief as the Court may deem just and proper.

Dated: September 3, 2025

Respectfully submitted,

/s/ JT Morris                                    .
JT Morris (Tex. Bar No. 24094444)
FOUNDATION FOR INDIVIDUAL RIGHTS
    AND EXPRESSION (FIRE)
(215) 717-3473
700 Pennsylvania Ave., Suite 340
Washington, DC 20003
jt.morris@thefire.org

Adam Steinbaugh (Cal. Bar No. 304829)*
Sara Berinhout (Mass. Bar No. 703217)*
Hannah Abbott (Pa. Bar No. 337123)*
FOUNDATION FOR INDIVIDUAL RIGHTS
    AND EXPRESSION (FIRE)
510 Walnut St., Suite 900
Philadelphia, PA 19106
adam@thefire.org
sara.berinhout@thefire.org
hannah.abbott@thefire.org

*Pro hac vice motion forthcoming*

**Attorneys for Plaintiffs**

## <u>VERIFICATION OF MARK MATTHEWS</u>

Pursuant to 28 U.S.C. § 1746, I, MARK MATTHEWS, declare as follows:

1.      I am a member and committee chair of Fellowship of University Christian Students at University of Texas at Dallas, a plaintiff in the present case.

2.      I have read the foregoing Verified Complaint for Civil Rights Violations.

3.      I have personal knowledge of the factual allegations in paragraphs 12–13, 47–48, 89–91, 113–114, 128–129, 171–174, and 176 of the Verified Complaint and know them to be true.

4.      I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Executed on   09/01/25


                                             *Mark Matthews Jr.*
                                             Mark Matthews

## <u>VERIFICATION OF GREGORIO OLIVARES GUTIERREZ</u>

Pursuant to 28 U.S.C. § 1746, I, GREGORIO OLIVARES GUTIERREZ, declare as follows:

1.     I am the Editor-in-Chief of The Retrograde Newspaper, a plaintiff in the present case.

2.     I have read the foregoing Verified Complaint for Civil Rights Violations.

3.     I have personal knowledge of the factual allegations in paragraphs 14–16, 50, 97–99, 115–116, 178–181, and 183–184 of the Verified Complaint and know them to be true.

4.     I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Executed on ___9/1/2025___


_Gregorio Olivares G._

Gregorio Olivares Gutierrez

## VERIFICATION OF DANIEL GONZALEZ-ALLENDE

Pursuant to 28 U.S.C. § 1746, I, DANIEL GONZALEZ-ALLENDE, declare as follows:

1.      I am the Director of Student Rights at Young Americans for Liberty, Inc., plaintiff in the present case.

2.      I have read the foregoing Verified Complaint for Civil Rights Violations.

3.      I have personal knowledge of the factual allegations in paragraphs 17–18, 95–96, 117–119, 121, 130–132, 151(b), and 190–195 of the Verified Complaint and know them to be true.

4.      I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on _9/1/2025_

_Daniel Gonzalez allende_
Daniel Gonazlez-Allende

<u>**VERIFICATION OF ZALL ARVANDI**</u>

Pursuant to 28 U.S.C. § 1746, I, ZALL ARVANDI, declare as follows:

1.      I am a plaintiff in the present case.

2.      I have read the foregoing Verified Complaint for Civil Rights Violations.

3.      I have personal knowledge of the factual allegations in paragraphs 19, 44, 92–94, 120, 133, 186–189, and 195 of the Verified Complaint and know them to be true.

4.      I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Executed on 09/02/2025

Zall Arvandi

## <u>VERIFICATION OF LINCOLN SCHULER</u>

Pursuant to 28 U.S.C. § 1746, I, LINCOLN SCHULER, declare as follows:

1.      I am the President of Texas Society of Unconventional Drummers, a plaintiff in the present case.

2.      I have read the foregoing Verified Complaint for Civil Rights Violations.

3.      I have personal knowledge of the factual allegations in paragraphs 20, 100, 134–135, 143–146, and 197–200 of the Verified Complaint and know them to be true.

4.      I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on  9/1/2025

Lincoln Schuler

## <u>VERIFICATION OF JAMES MCKINNEY</u>

Pursuant to 28 U.S.C. § 1746, I, JAMES MCKINNEY, declare as follows:

1.      I am the President of Strings Attached, a plaintiff in the present case.

2.      I have read the foregoing Verified Complaint for Civil Rights Violations.

3.      I have personal knowledge of the factual allegations in paragraphs 21, 101–104, 136–138, 147, and 202–205 of the Verified Complaint and know them to be true.

4.      I verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge.


Executed on 8/30/2025
            _____

Signed by:

James Mckinney
F74E2R4C1B85480

James McKinney