**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

**FILED**

September 09, 2025

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY:    _Christian Rodriguez_

DEPUTY

| | |
|---|---|
| FELLOWSHIP OF CHRISTIAN UNIVERSITY STUDENTS AT UNIVERSITY OF TEXAS AT DALLAS, et al., | |
| Plaintiffs, | Civil Case No. 1:25-cv-1411-DAE |
| v. | |
| KEVIN P. ELTIFE, et al., | |
| Defendants. | |

**PLAINTIFFS' MOTION FOR A
<u>PRELIMINARY INJUNCTION</u>**

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................1

STATEMENT OF FACTS ..................................................................................................3

      Texas enacts a campus free speech law broadly protecting public university students' speech. ..................................................................................................3

      After student demonstrations, Texas amends the 2019 law, mandating that state universities instead adopt policies to suppress "expressive activities." ...........................4

      The UT Board of Regents ratifies UT Dallas and UT Austin's proposed policies implementing the Act's mandatory bans on expressive activities. .....................................6

      The Act threatens the expressive activities of each of the Plaintiffs and their student members. ........................................................................................................7

ARGUMENT .......................................................................................................................9

    I.     Plaintiffs Are Substantially Likely to Succeed on the Merits Because the Act Restricts a Breathtaking Range of Protected Expression. .................................9

          A.    The First Amendment provides robust protection for student expression at public universities. ..................................................... 9

          B.    The First Amendment protects Plaintiffs' expressive activities. .............. 10

               1.    The First Amendment protects FOCUS's worship activities at UT Dallas, including those with outside leaders ...................... 10

               2.    The First Amendment protects *The Retrograde*'s journalism at UT Dallas. ................................................................11

               3.    The First Amendment protects the advocacy of Young Americans for Liberty students at UT System campuses, like Zall Arvandi at UT Austin. .......................................................... 12

               4.    The First Amendment protects the artistic performances of percussion ensemble SOUnD at UT Austin and Strings Attached at UT Dallas. ................................................................. 13

          C.    The Act's boundless restriction on expressive activities between 10 P.M. and 8 A.M. violates the First Amendment. ................................. 14

               1.    The content-based Overnight Expression Ban fails strict scrutiny. ......................................................................... 14

2.    The Overnight Expression Ban would also fail the intermediate scrutiny applied to content-neutral time, place, and manner restrictions. ................................................. 17

3.    The Overnight Expression Ban also fails under the overbreadth doctrine. ........................................................ 20

D.    The Act's restrictions on students' end-of-term expressive activities violate the First Amendment ............................................. 21

1.    Each of the end-of-term bans is an overbroad, content-based restriction that fails strict scrutiny. ................................. 21

2.    The End-of-Term Invited Speaker, Amplified Sound, and Drum Bans fail intermediate scrutiny as not narrowly tailored to prevent disruption. ....................................... 22

3.    The end-of-term bans also fail under the overbreadth doctrine. ........................................................................... 24

II.    Without a Preliminary Injunction, Plaintiffs Will Suffer Irreparable Harm to Their First Amendment Freedoms. ..................................................... 24

III.    The Balance of Equities and Public Interest in Protecting Student Expression Favors a Preliminary Injunction. ....................................... 25

IV.    The Court Should Waive a Bond Requirement. ................................... 25

CONCLUSION ...................................................................................................... 26

## TABLE OF AUTHORITIES

**Cases**

*Ams. for Prosperity Found. v. Bonta*,
  594 U.S. 595 (2021) ................................................................................. 20

*Broadrick v. Oklahoma*,
  413 U.S. 601 (1973) ................................................................................. 20

*Brooks v. Auburn Univ.*,
  296 F. Supp.188 (M.D. Ala. 1969) ............................................................ 10

*Bus. Leaders in Christ v. Univ. of Iowa*,
  991 F.3d 969 (8th Cir. 2021) .................................................................... 10

*Christian Legal Soc'y v. Walker*,
  453 F.3d 853 (7th Cir. 2006) .............................................................. 11, 25

*City of Atlanta v. Metro. Atl. Rapid Transit Auth.*,
  636 F.2d 1084 (5th Cir. Unit B Feb. 1981) ............................................... 25

*City of Austin v. Reagan Nat'l Advert. of Aus., LLC*,
  596 U.S. 61 (2022) ................................................................................... 15

*City of Cincinnati v. Discovery Network, Inc.*,
  507 U.S. 410 (1993) ................................................................................. 15

*DeJohn v. Temple Univ.*,
  537 F.3d 301 (3d Cir. 2008) ..................................................................... 20

*Gay Students Org. of Univ. of N.H. v. Bonner*,
  367 F. Supp. 1088 (D.N.H. 1974) ............................................................ 10

*Grutter v. Bollinger*,
  539 U.S. 306 (2003) ................................................................................. 10

*Hays Cnty. Guardian v. Supple*,
  969 F.2d 111 (5th Cir. 1992) .................................................................... 17

*Healy v. James*,
  408 U.S. 169 (1972) ........................................................................... passim

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
  515 U.S. 557 (1995) ................................................................................. 13

*Just. for All v. Faulkner*,
  410 F.3d 760 (5th Cir. 2005) .......................................................... 17, 19, 20

*Koala v. Khosla*,
    931 F.3d 887 (9th Cir. 2019) ......................................................................... 11

*McCullen v. Coakley*,
    573 U.S. 464 (2014) ...................................................................................... 22

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024) ................................................................................. 17, 24

*Nken v. Holder*,
    556 U.S. 418 (2009) ...................................................................................... 25

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*,
    460 U.S. 37 (1983) ................................................................................... 17, 21

*Police Dep't of Chi. v. Mosley*,
    408 U.S. 92 (1972) ........................................................................................ 16

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ............................................................................ 14, 15, 22

*Roberts v. Haragan*,
    346 F. Supp. 2d 853 (N.D. Tex. 2004) .......................................................... 16

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
    592 U.S. 14 (2020) ..................................................................................... 2, 24

*RTM Media, L.L.C. v. City of Houston*,
    584 F.3d 220 (5th Cir. 2009) ......................................................................... 15

*Saia v. New York*,
    334 U.S. 558 (1948) ................................................................................. 22, 23

*Shelton v. Tucker*,
    364 U.S. 479 (1960) ..................................................................................... 2, 9

*Smith v. Tarrant Cnty. Coll. Dist.*,
    694 F. Supp. 2d 610 (N.D. Tex. 2010) .......................................................... 12

*Speech First, Inc. v. Fenves*,
    979 F.3d 319 (5th Cir. 2020) ........................................................... 9, 10, 12, 15

*Stanley v. Georgia*,
    394 U.S. 557 (1969) ...................................................................................... 10

*Students for Just. in Pal., at Univ. of Hou. v. Abbott*,
    756 F. Supp. 3d 410 (W.D. Tex. 2024) ............................................................ 4

*Texans for Free Enter. v. Tex. Ethics Comm'n*,
    732 F.3d 535 (5th Cir. 2013) ...................................................................... 2, 25

*Turner v. Driver*,
    848 F.3d 678 (5th Cir. 2017) ........................................................................ 11

*United States v. Doe*,
    968 F.2d 86 (D.C. Cir. 1992) ........................................................................ 13

*United States v. Kokinda*,
    497 U.S. 720, 728–29 (1990) ........................................................................ 19

*United States v. Playboy Ent. Grp., Inc.*,
    529 U.S. 803 (2000) ...................................................................................... 15

*United States v. Stevens*,
    559 U.S. 460 (2010) ................................................................................ 20, 21

*Univ. of Md. Students for Just. in Pal. v. Bd. of Regents of Univ. Sys. of Md.*,
    Civil No. 24-2683 PJM, 2024 WL 4361863 (D. Md. Oct. 1, 2024) ................................ 18

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989) ................................................................................ 15, 22

*Widmar v. Vincent*,
    454 U.S. 263 (1981) ................................................................................ 10, 15

*Wirtshafter v. Trs. of Ind. Univ.*,
    No. 1:24-cv-00754-RLY-MKK, 2025 WL 1558171 (S.D. Ind. May 29, 2025) .. 17, 18, 20

## **Statutes**

Tex. Educ. Code § 51.9315
    (a)(2) ............................................................................................................. 3, 5
    (c)(2) .............................................................................................................. 22
    (d) ................................................................................................................... 3
    (f)(1)(B) ........................................................................................................... 3
    (f)(2)(B) .................................................................................................... 14, 21
    (f)(2)(B)(ii) ................................................................................................. 5, 12
    (f)(2)(B)(iii) ...................................................................................................... 6
    (f)(2)(B)(iv) ...................................................................................................... 6
    (f)(2)(F) .................................................................................................. 5, 12, 18
    (f)(6) ................................................................................................................ 6
    (g) .............................................................................................................. 3, 25

## Other Authorities

Asad Jung,
    *Travis County Attorney Drops Charges Against 79 More UT-Austin Protesters*,
    Tex. Trib. (June 26, 2024, 5:00 PM) ................................................................. 4

*Bell*, Encyl. Britannica ........................................................................................ 23

Catherine Marfin,
    *Texas House Passes Senate Bill Seeking to Ensure Free Speech on College
    Campuses*, Tex. Trib. (May 20, 2019) ................................................................ 3

Greg Abbott
    (@GregAbbott_TX), X (Dec. 1, 2019, 2:27 PM) ................................................ 4

Haley J. Nutt,
    *Paul Price and American Percussion Practices During the 'Golden Age' of
    Higher Education*, 46 J. Hist. Res. Music Educ. 45 (2024) ............................... 14

Kendall Meachum,
    *UT System Approves University Free Speech Policy to Comply with State Law*,
    Daily Texan (Aug. 26, 2025) ............................................................................... 6

Letter from Dr. Aaron Voyles, Exec. Dir. Student Involvement, Ofc. of the Dean of
    Students, & Melissa Jones-Wommack, Acting Exec. Dir. Student Conduct &
    Acad. Integrity, Univ. of Tex. at Aus., to Palestine Solidarity Committee (Apr. 23,
    2024) ...................................................................................................................... 4

S.B. 18, 86th Leg., Reg. Sess. (Tex. 2019) ..................................................... 1, 3

S.B. 2972, 89th Leg., Reg. Sess. (Tex. 2025) ...................................................... 1

Tex. House Comm. on Higher Educ.,
    Bill Analysis, S.B. 2972, 89th Leg., Reg. Sess. (2025) ...................................... 5

Texas SOUnD,
    *"Metal to the Pedal"*, Performed on a Bicycle (YouTube, July 2, 2025) ........ 23

Univ. of Tex. at Aus.,
    *2025 - 2026 Academic Calendar* ....................................................................... 7
    *2025-2026 Catalog* app. C (rev. Aug. 22, 2024) .............................................. 7

Univ. of Tex. at Dall.,
    *Official Academic Calendar Fall 2025* ............................................................. 7
    *Official Academic Calendar Spring 2026* ......................................................... 7
    *Official Academic Calendar Summer 2026* ...................................................... 7

Univ. of Tex. Sys. Bd. of Regents,
    *Consent Agenda, Aug. 20–21, 2025* .................................................................. 6

UT Dallas Pol'y No. UTDSP5003 Student Code of Conduct (rev. June 1, 2020) ........................ 7

Video posted by Greg Abbott
(@GregAbbott_TX), X, *I just signed a law protecting free speech on college
campuses.* (June 9, 2019, 7:12 PM) ..................................................................................... 4

## <u>INTRODUCTION</u>

Texas once led the nation in recognizing the First Amendment's robust protection of freedom of speech at public universities and colleges. In 2019, due to concerns about administrators censoring certain viewpoints, Texas enacted a law reinforcing the First Amendment's protections for free expression on campus. S.B. 18, 86th Leg., Reg. Sess. (Tex. 2019). To protect expression, it adopted a broad definition of "expressive activities": "any speech or expressive conduct protected by the First Amendment to the United States Constitution."

But after the political winds have shifted, Texas is now contorting that same provision *against* speech, turning the 2019 free-speech statute into a *no*-speech statute—the "Campus Protection Act." S.B. 2972, 89th Leg., Reg. Sess. (Tex. 2025) (amending Tex. Educ. Code § 51.9315) (the "Act"). Effective September 1, the plain language of the Act requires universities to *ban* those same broadly defined "expressive activities" in several contexts, even if they are not substantially disruptive:

- Universities *must* prohibit *any* expression protected by the First Amendment (except commercial speech) between 10 P.M. and 8 A.M., at *all* places on campus.

- Universities *must* bar students and student organizations from *any* "expressive activity" involving (i) invited speakers, (ii) amplified sound, and/or (iii) percussion instruments anywhere on campus during the last two weeks of any "term"—a blackout period occupying some 98 days each year at UT Austin and UT Dallas.

Those bans now threaten protected expression of all kinds—including Plaintiffs' expression. Students must now think twice before worshipping, discussing politics, or—for student journalists—breaking campus news between 10 P.M. and 8 A.M. Inviting a lawmaker to campus to discuss pending bills at the Texas Legislature, hosting a finals-week movie screening, or playing drums at a year-end performance—to take just a few examples—all open students to discipline.

The limit on guest speakers looms over the Christian student ministry UTD FOCUS, whose members rely on invited ministers to lead weekly worship sessions at UT Dallas. Verified Compl.

1

¶¶ 48, 113–14. FOCUS members—and untold numbers of students—will violate the overnight speech ban when they utter a single syllable before 8 A.M. or after 10 P.M. *Id.* ¶¶ 89–91, 100–103. So too will student journalists at *The Retrograde* when they publish after-hours breaking news coverage, as will Young Americans for Freedom's student members when they strategize on social media after sunset. *Id.* ¶¶ 92–99. And the limits on amplified sound and percussion instruments threaten the UT Austin percussion ensemble Texas Society of Unconventional Drummers (SOUnD) and UT Dallas music group Strings Attached, even though their regular end-of-semester campus performances pose no threat of disruption. *Id.* ¶¶ 20–21, 134–38, 143–47.

The Court should therefore preliminarily enjoin enforcement of the Act's sweeping bans on protected expression and restore the First Amendment to Texas's public universities and colleges. First, Plaintiffs are likely to succeed on the merits. The Act will squelch speech on public university campuses, where the First Amendment is "nowhere more vital." *Healy v. James*, 408 U.S. 169, 180 (1972) (quoting *Shelton v. Tucker*, 364 U.S. 479, 487 (1960)). Each of the challenged provisions is content-based and fails strict scrutiny, and would not survive even as time, place, and manner restrictions. And if there were ever a case tailor-made for the overbreadth doctrine, this is it. The limitless bans also invite arbitrary enforcement against disfavored speech and speakers.

Second, the Act is harming Plaintiffs' rights to worship, report, perform, advocate, and simply speak. Verified Compl. ¶¶ 171–74, 176, 178–81, 183–84, 186–87, 189–95, 197–200, 202–205. That "loss of First Amendment freedoms, for even minimal periods of time," is "unquestionably" irreparable injury. *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (citation omitted). And the equities favor relief, especially because "injunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) (citation omitted).

## STATEMENT OF FACTS

**Texas enacts a campus free speech law broadly protecting public university students' speech.**

In 2019, Texas lawmakers, concerned by threats to conservative students' freedom of expression at public universities and colleges, passed a bill fortifying the First Amendment's protections for students, student organizations, and guest speakers. Tex. S.B. 18.[1] To meet the goal of assuring free expression due to its "critical importance" to university communities, the Legislature crafted an intentionally broad definition of "[e]xpressive activities" to protect campus speech. Tex. Educ. Code § 51.9315(a)(2); Tex. S.B. 18. The law thus reached "any speech or expressive conduct protected by the First Amendment," including "assemblies, protests, speeches, the distribution of written material, the carrying of signs, and the circulation of petitions," and excluded *only* "commercial speech." Tex. Educ. Code § 51.9315(a)(2). It protected student organizations' expressive activities, including their invitations to outside speakers. *Id.* §§ 51.9315(f)(1)(B), (g). And it recognized that institutions could craft narrowly tailored, content-neutral regulations governing the manner of speech, such as the use of amplified sound, without allowing the institutions to impose blanket prohibitions. *E.g.*, *id.* § 51.9315(d) (authorizing time, place, or manner regulations of expressive activities when "narrowly tailored to serve a significant institutional interest").

When Governor Greg Abbott signed S.B. 18 into law, he was aghast it was even necessary. "Some colleges are banning free speech on college campuses," he lamented in a Twitter video as

---

[1] *See* Catherine Marfin, *Texas House Passes Senate Bill Seeking to Ensure Free Speech on College Campuses*, Tex. Trib. (May 20, 2019), https://www.texastribune.org/2019/05/17/texas-free-speech-college-campus-legislation [perma.cc/3SYF-7TP7].

he signed the bill into law.[2] The law shouldn't be necessary at all to protect student rights, he said, because the "First Amendment guarantees it," but it would reinforce those rights, and "[n]ow it's law in Texas."[3] With the law in place, Governor Abbott said the "[c]onservative speech" that "was under attack on college campuses" was now protected against censorship.[4]

**After student demonstrations, Texas amends the 2019 law, mandating that state universities instead adopt policies to suppress "expressive activities."**

Five years later, free speech on campus was again on legislators' minds as lawmakers across the country pressured universities to suppress student speech about the conflict in Gaza and Israel. In Texas, Governor Abbott pressured university leaders to suppress chants he deemed antisemitic.[5] At UT Austin, officials tried to ban a demonstration about the Gaza conflict, dispatched law-enforcement on horses and in riot gear, and arrested student demonstrators—on charges the district attorney refused to prosecute.[6]

---

[2] Video posted by Greg Abbott (@GregAbbott_TX), X, *I just signed a law protecting free speech on college campuses.* (June 9, 2019, 7:12 PM), https://x.com/GregAbbott_TX/status/1137875109362974724 [perma.cc/KPQ5-P38N].

[3] *Id.*

[4] Greg Abbott (@GregAbbott_TX), X (Dec. 1, 2019, 2:27 PM), https://x.com/GregAbbott_TX/status/1201236295827312640 [perma.cc/NF79-HJCQ].

[5] *Students for Just. in Pal., at Univ. of Hou. v. Abbott*, 756 F. Supp. 3d 410, 414–15 (W.D. Tex. 2024).

[6] Letter from Dr. Aaron Voyles, Exec. Dir. Student Involvement, & Melissa Jones-Wommack, Acting Exec. Dir. Student Conduct & Acad. Integrity, Univ. of Tex. at Aus., to Palestine Solidarity Committee (Apr. 23, 2024), https://www.documentcloud.org/documents/24628398-ut-dean-of-students-letter-to-psc-about-protest-42324; Asad Jung, *Travis County Attorney Drops Charges Against 79 More UT-Austin Protesters*, Tex. Trib. (June 26, 2024, 5:00 PM), https://www.texastribune.org/2024/06/26/university-of-texas-protesters-79-charges-dropped [perma.cc/B234-TUYA].

Texas adopted the Act challenged here in response to those demonstrations, purporting to allow speech "while setting clear boundaries to prevent disruption and ensure community safety."[7] But four provisions of the Act reach a wide range of speech wholly unrelated to disruption or safety, overstepping—by miles—any allowable boundaries on campus speech:

**<u>Overnight Expression Ban</u>**: The Act *mandates* that state universities adopt policies to "prohibit" students from "engaging in expressive activities on campus"—indoor or outdoor— "between the hours of 10 p.m. and 8 a.m."[8] In doing so, it repurposes the 2019 law's broad definition of "expressive activities" to now require universities to suppress "*any* speech or expressive conduct protected by the First Amendment," except "commercial speech," between 10 P.M. and 8 A.M. Tex. Educ. Code § 51.9315(a)(2) (emphasis added). The Act does not tether this prohibition to objective disruption or safety.

**<u>End-of-Term Invited Speaker Ban</u>**: The Act also requires universities to prohibit specific "expressive activities" during the last two weeks of any "term." Among these is a restriction on students and student organizations who want to "engage in expressive activities … by inviting speakers to speak on campus."[9] Students may hold events, but may not invite guest speakers, regardless of whether the speech has any impact on campus operations.

---

[7] Tex. House Comm. on Higher Educ., *Bill Analysis, S.B. 2972, 89th Leg., Reg. Sess.* (2025), http://capitol.texas.gov/tlodocs/89R/analysis/pdf/SB02972H.pdf [perma.cc/X8RV-WC9A].

[8] Tex. Educ. Code § 51.9315(f)(2)(F) ("Overnight Expression Ban"); Univ. of Tex. at Dall. Speech Expression & Assembly Policy Statement ("UTD Revised Policy") § B.9(9) [Ex. D, at 10].

[9] Tex. Educ. Code § 51.9315(f)(2)(B)(ii) ("End-of-Term Invited Speaker Ban"); UTD Revised Policy § B.9(6)(ii) [Ex. D at 10]; Univ. of Tex. at Aus. Speech, Expression, and Assembly Policy ("UTA Revised Policy") § 13-105(2)(D)(b) [Ex. E, at 5].

**End-of-Term Amplified Sound Ban**: Students also cannot "engage in expressive activities" by using any "device to amplify sound" during the last two weeks of any "term."[10] The prohibition applies to every inch of a public university campus, both indoors and outdoors, regardless of the volume of the amplified sound or whether it is disruptive.

**End-of-Term Drum Ban**: Students also cannot "engage in expressive activities … by using drums or other percussive instruments."[11] This prohibition also applies without respect to location, volume, or disruption.

**The UT Board of Regents ratifies UT Dallas and UT Austin's proposed policies implementing the Act's mandatory bans on expressive activities.**

On August 21, 2025, the UT Board of Regents, which oversees all University of Texas institutions, approved proposed revisions to each institution's policies. *See* Tex. Educ. Code § 51.9315(f)(6) (requiring governing boards to approve the policies mandated by the Act).[12]

UT Dallas's policy adopted the Act's clear provisions verbatim, but exempted university-organized programming and speakers. UTD Revised Policy §§ A.3(21) & B.9(9) [Ex. D, at 5, 10]. The policies of both UT Dallas and UT Austin adopted the end-of-term prohibitions verbatim. UTD Revised Policy § B.9(6) [Ex. D, at 10]; UTA Revised Policy § 13-105(2)(D)(b)–(d) [Ex. E,

---

[10] Tex. Educ. Code § 51.9315(f)(2)(B)(iii) ("End-of-Term Amplified Sound Ban"); UTD Revised Policy § B.9(6)(iii); UTA Revised Policy § 13-105(2)(D)(c) [Ex. D, at 5].

[11] Tex. Educ. Code § 51.9315(f)(2)(B)(iv) ("End-of-Term Drum Ban"); UTD Revised Policy § B.9(6)(iv) [Ex. D, at 10]; UTA Revised Policy § 13-105(2)(D)(d) [Ex. E, at 5].

[12] *See also* Univ. of Tex. Sys. Bd. of Regents, *Consent Agenda, Aug. 20–21, 2025*, at 244, 252–53, https://www.utsystem.edu/sites/default/files/offices/board-of-regents/board-meetings/agenda-book-full/8-2025AB.pdf [perma.cc/SU3Z-TF5K]; Kendall Meachum, *UT System Approves University Free Speech Policy to Comply with State Law*, Daily Texan (Aug. 26, 2025), https://thedailytexan.com/2025/08/26/ut-system-approves-university-free-speech-policy-to-comply-with-state-law [perma.cc/D5CU-G3VB].

at 5].[13] Because both institutions have multiple terms throughout the year, those prohibitions bar expression for 98 days of the year at each campus.[14]

Penalties for violations are substantial, as both UT Dallas and UT Austin authorize disciplinary measures ranging from written warnings, probation, suspension, or even denial of a degree.[15]

**The Act threatens the expressive activities of each of the Plaintiffs and their student members.**

As detailed below, *infra* § I(B), each of the Plaintiffs will engage in expression protected by the First Amendment but banned under the Act.

UTD FOCUS: An interdenominational student organization, UTD FOCUS's student members use campus spaces to host weekly worship events throughout the year. Verified Compl.

---

[13] Although the Act requires UT Austin to adopt the Time Range Ban, that institution has not yet done so.

[14] The UT Dallas academic calendar divides each of its three semesters (fall, spring, and summer) into "[f]ull-term session[s]" and at least two sessions of five, eight, or eleven weeks. Univ. of Tex. at Dall., *Official Academic Calendar Fall 2025*, https://bit.ly/utdacademiccalendar (last visited Sept. 4, 2025). The spring semester similarly has two eight-week sessions. Univ. of Tex. at Dall., *Official Academic Calendar Spring 2026*, https://bit.ly/utdacademiccalendarspring (last visited Sept. 4, 2025). The summer semester has four sessions of five, eight, or eleven weeks. Univ. of Tex. at Dall., *Official Academic Calendar Summer 2026*, https://bit.ly/utdacademiccalendarsummer (last visited Sept. 4, 2025). The fall semester's full-term session concludes on December 19, 2025, and its eight-week sessions conclude on October 18 (after final exams from October 14–18) and on December 16 (after final exams from December 11–16). Each academic term requires a two-week blackout period, totaling 98 days each year. Because UT Austin has eight academic terms (two of which overlap), the Act restricts speech there for 98 days each year, as well. Univ. of Tex. at Aus., *2025 - 2026 Academic Calendar*, https://registrar.utexas.edu/calendars/25-26 [perma.cc/N6CT-4ZA6] (last visited Sept. 4, 2025).

[15] UTD Revised Policy § K.49(5) [Ex. D, at 29]; Univ. of Tex. at Dall., Policy No. UTDSP5003, Student Code of Conduct § F (rev. June 1, 2020), https://policy.utdallas.edu/utdsp5003/makepdf [perma.cc/L4RS-52LV]; UTA Revised Policy § 13-1202(5) [Ex. E, at 29]; Univ. of Tex. at Aus., *2025-2026 Catalog* app. C, § 11-701 (rev. Aug. 22, 2024), https://catalog.utexas.edu/general-information/appendices/appendix-c [perma.cc/P3CE-TDCG].

¶¶ 12–13, 113. These regular events feature off-campus ministers who lead worship and fellowship with students on campus. *Id.* ¶¶ 113–14, 128–29. UTD FOCUS's members also hold early morning one-on-one meetings to discuss issues of faith, and its members often stay past the formal 10 P.M. conclusion of evening events for continued discussion and fellowship. *Id.* ¶¶ 89–91.

*The Retrograde*: An independent student newspaper at UT Dallas, *The Retrograde*'s journalists and editors gather news, write, edit, and publish stories after 10 P.M. from locations across campus. They also invite non-student sources to interview on campus year-round. Verified Compl. ¶¶ 14–15, 97–99, 115–16.

Young Americans for Liberty (YAL) and Zall Arvandi: A national grassroots organization dedicated to mobilizing college students on the ideals of liberty and the Constitution, YAL has thousands of student members across the country, including at UT Austin, UT Dallas, and other UT System institutions. *Id.* ¶¶ 17–19. YAL's members—including Plaintiff and UT Austin student Zall Arvandi—look forward to inviting YAL staff to assist with recruitment and campus petitioning efforts during the critical final two weeks of terms. *Id.* ¶¶ 117–20. YAL members (including Arvandi) plan to use megaphones while soliciting support for petitions as part of YAL's "Student Rights Campaigns" program. *Id.* ¶¶ 130–33. And YAL members, including Arvandi, will petition, talk, and post on social media before 8 A.M. and after 10 P.M. *Id.* ¶¶ 92–96.

Texas Society of Unconventional Drummers (SOUnD): A registered student organization at UT Austin, the percussive ensemble SOUnD plans to continue its indoor and outdoor end-of-semester music performances, which focus on exploring alternative percussion techniques—such as drumming on paint buckets and using utensils to play cafeteria trays. *Id.* ¶¶ 20, 143–46, 196–200.

Strings Attached: A registered student organization at UT Dallas, Strings Attached hosts regular musical performances—from showcasing Americana to '90s rock'n'roll or jazz—in open areas of campus using drums and amplified sound. *Id.* ¶¶ 21, 137. Strings Attached plans to continue its performances, some of which occur during the final two weeks of UT Dallas' academic terms and sessions. *Id.* ¶¶ 136–48. The group's practices and performances often last until after 10 P.M. *Id.* ¶¶ 101–104.

## **ARGUMENT**

### I.    **Plaintiffs Are Substantially Likely to Succeed on the Merits Because the Act Restricts a Breathtaking Range of Protected Expression.**

The Act unconstitutionally restricts Plaintiffs' speech based on content, limiting student expression only if it is noncommercial. Faced with the burden imposed by the strict scrutiny applicable to content-based regulations, Defendants cannot show the restrictions are the least restrictive means to achieve a compelling interest. The Act's regulations are so unwieldy they fail lower tiers of scrutiny, because they are neither narrowly tailored to meet any state interest nor reasonable given the public universities' purpose in fostering free expression. That unwieldiness is also why the Act's blanket bans on expression also violate the First Amendment as overbroad.

### A.    **The First Amendment provides robust protection for student expression at public universities.**

The Act is simply the latest "assault[] on speech in the Constitution's care," *Speech First, Inc. v. Fenves*, 979 F.3d 319, 339 (5th Cir. 2020), and burdens a breathtaking range of protected expression. Long-settled law leaves "no room for the view that … First Amendment protections should apply with less force on college campuses than in the community at large"; in fact, its protection is "nowhere more vital." *Healy*, 408 U.S. at 180 (quoting *Shelton*, 364 U.S. at 487). Universities "occupy a special niche in our constitutional tradition," owing to the "expansive freedoms of speech and thought associated with the university environment." *Grutter v. Bollinger*,

539 U.S. 306, 329 (2003). Freedom of expression is a foundational characteristic of university campuses, and "courts must be especially vigilant against" efforts to limit speech at public universities. *Speech First*, 979 F.3d at 339. That is why a "consistent line of cases … have uniformly found campus speech codes unconstitutionally overbroad or vague." *Id.* at 338–39.

**B.    The First Amendment protects Plaintiffs' expressive activities.**

Each of the Plaintiffs engages in expression protected by the First Amendment, but which the Act prohibits, and they intend to continue doing so.

1.    <u>The First Amendment protects FOCUS's worship activities at UT Dallas, including those with outside leaders.</u>

The First Amendment protects the rights of religious student organizations, such as FOCUS, to gather in worship with fellow students. *See Widmar v. Vincent*, 454 U.S. 263, 270–71 (1981) (recognizing use of campus facilities by "religious groups and speakers"). And it protects FOCUS's invitations to guest speakers—its outside ministers—who lead student worship sessions. *E.g.*, *Gay Students Org. of Univ. of N.H. v. Bonner*, 367 F. Supp. 1088, 1096 (D.N.H.) (recognizing the "right" of students "to hear speakers of their own choice" as one of the "activities traditionally protected by the First Amendment"), *modified*, 509 F.2d 652 (1st Cir. 1974); *see also Brooks v. Auburn Univ.*, 296 F. Supp. 188, 192–96 (M.D. Ala.) (restriction on "the rights of students and faculty to hear a speaker invited to the campus" was "unconstitutional censorship in its rawest form"), *aff'd*, 412 F.2d 1171 (5th Cir. 1969); Verified Compl. ¶¶ 48, 113–14, 171–72.

Speaker invitations implicate several First Amendment interests. For one, the First Amendment protects not only FOCUS's right to speak, but also "the right to receive information and ideas" from others. *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). And it protects FOCUS's right to both expressively associate with the invited speaker and convey a message through a selected speaker. *Bus. Leaders in Christ v. Univ. of Iowa*, 991 F.3d 969, 986 (8th Cir. 2021)

(reversing grant of qualified immunity to university officials over restriction of religious student group's expressive association); *see also Christian Legal Soc'y v. Walker*, 453 F.3d 853, 861 (7th Cir. 2006) ("Implicit in the First Amendment freedoms of speech, assembly, and petition is the freedom to gather together to express ideas—the freedom to associate.").

Those interests are critical to FOCUS and its student congregation. Each week, students gather to worship in communion with ministers that FOCUS's student members invite to campus. Verified Compl. ¶¶ 13, 113–14. Those worship leaders ensure that UTD students have access to worship services in their campus community every week. But FOCUS will violate the End-of-Term Invited Speaker and Amplified Sound Bans when those services (which use amplified sound) occur during the final two weeks of each term. *Id.* ¶¶ 128–29, 171–72, 176. Those weeks are critical to FOCUS members' faith. For instance, the organization typically holds observances of the Christmas season during those last weeks of the fall semester. *Id.* ¶ 129.

UTD FOCUS and its members will also violate the Overnight Expression Ban in at least two respects. First, its members and staff frequently meet on campus before 8 A.M. for one-on-one meetings to discuss issues of faith. *Id.* ¶ 91. Second, when UTD FOCUS events conclude at 10 P.M., its members often remain in and around the on-campus meeting space to discuss their faith, continue their fellowship, and engage with FOCUS ministers. *Id.* ¶¶ 89–90.

2.    The First Amendment protects *The Retrograde*'s journalism at UT Dallas.

Just as it protects journalism off-campus, the First Amendment protects student journalists at public universities. *Koala v. Khosla*, 931 F.3d 887, 896–906 (9th Cir. 2019). That includes not only the publication itself, but also the steps taken before publication, such as gathering information, drafting and editing articles, and preparing them for print. *Turner v. Driver*, 848 F.3d 678, 688–89 (5th Cir. 2017). So when *Retrograde* journalists and editors speak to sources— whether by inviting off-campus sources to talk to journalists on campus, or by phone from their

11

on-campus residences—and draft or edit articles from their on-campus residences, they are engaged in newsgathering within the First Amendment's shield. Verified Compl. ¶¶ 97–99.

These newsgathering and publishing activities often occur at night. Sometimes that is because *The Retrograde*'s student journalists are busy during the day, attending classes and fulfilling their academic commitments. *Id.* ¶ 99. And sometimes that is because the news does not stop at 10 P.M. For example, the night after a destructive storm knocked out power to campus, *The Retrograde* continued reporting well into the night, publishing updates as late as 12:59 A.M. *Id.* ¶ 97 & n.7. And whatever the time of day, *Retrograde* journalists invite sources to speak to them on campus, including during the final two weeks of the term—because, again, the news does not take weeks off. *Id.* ¶¶ 97–99, 115.

In sum, *The Retrograde*'s ordinary newsgathering and news publishing activities will violate the Act's Overnight Expression Ban and End-of-Term Invited Speaker Ban, as well as UT Dallas' implementing regulations. *See* Tex. Educ. Code §§ 51.9315(f)(2)(B)(ii), (f)(2)(F); UTD Revised Policy § B.9(6)(ii), (9) [Ex. D, at 10].

### 3. The First Amendment protects the advocacy of Young Americans for Liberty students at UT System campuses, like Zall Arvandi at UT Austin.

The First Amendment also protects the rights of students and student organizations to "engage in robust debate" on "political topics." *Speech First*, 979 F.3d at 330–34 (holding university's campus speech code, in the form of harassment policies, violated the First Amendment). And it protects the ability of students to affiliate with local, state, and national groups offering "organized assistance in expressing [students'] views." *Smith v. Tarrant Cnty. Coll. Dist.*, 694 F. Supp. 2d 610, 636–37 (N.D. Tex. 2010) (enjoining prohibition on "cosponsorship" of student events by outside organizations).

Plaintiff YAL's members at universities across the UT System will violate the End-of-Term Invited Speaker and Amplified Sound Bans when they invite and host YAL staff to assist in on-campus recruiting efforts. Verified Compl. ¶¶ 117–21, 130–33. That includes Plaintiff Zall Arvandi, a UT Austin student working to establish a registered YAL chapter at the university. *Id.* ¶ 44. Arvandi, like other YAL members, wants to invite YAL staff to speak on campus to prospective members, and to assist with petitioning activity (including through use of a megaphone), to raise interest in the burgeoning organization. *Id.* ¶¶ 120, 133. The speaker and amplified sound bans frustrate the non-disruptive expressive activities of Arvandi and other YAL members. *Id.* ¶¶ 186–87, 189–95. And the Overnight Expression Ban will force YAL, its members, and Arvandi to cease speaking to one another (or to others) about their political views (and for all other noncommercial purposes) when the clock strikes 10:00. *Id.* ¶¶ 92–96.

4.    The First Amendment protects the artistic performances of percussion ensemble SOUnD at UT Austin and Strings Attached at UT Dallas.

The First Amendment "is not limited to … written or spoken words," but also reaches artistic expression, including music. *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995). That includes drumming. *See, e.g.*, *United States v. Doe*, 968 F.2d 86, 87 (D.C. Cir. 1992) (holding there is "no question that beating a drum in the context of a clearly identified anti-war demonstration is expressive conduct protected by the First Amendment"). The drummer's pace-keeping is often integral to a multi-instrument performance, as with Plaintiff Strings Attached when it performs popular rock songs. Verified Compl. ¶ 21. Likewise, percussion ensemble—performances exclusively using percussion, like Plaintiff SOUnD's innovative

concerts (*id.* ¶¶ 20, 134–35)—is a medium in its own right.[16] To that end, the Act regulates the use of percussion instruments *only* when it is expressive. Tex. Educ. Code § 51.9315(f)(2)(B).

So when Strings Attached and SOUnD perform during the last two weeks of UT Dallas academic sessions and UT Austin terms, respectively, they will violate the End-of-Term Amplified Sound and Drum Bans. Verified Compl. ¶¶ 134–38, 143–47. And they will violate the Overnight Expression Ban when rehearsals extend beyond—or end shortly before—10 P.M., or when members discuss music in person or over campus internet message after dark. *Id.* ¶¶ 100, 102.

## C. The Act's boundless restriction on expressive activities between 10 P.M. and 8 A.M. violates the First Amendment.

Plaintiffs are likely to succeed in showing the Overnight Expression Ban—facially and as applied to Plaintiffs—violates the First Amendment. As a content-based restriction, it is subject to strict scrutiny. It fails that exacting test because a prohibition on *all* protected noncommercial expression for ten hours each day is not the least restrictive means to meet any compelling state interest. Even if the ban were a content-neutral time, place, or manner restriction subject to intermediate scrutiny, its lack of narrow tailoring still dooms it. It is also invalid under the overbreadth doctrine because the ban reaches a shocking range of protected expression with few—if any—conceivable constitutional applications.

### 1.    The content-based Overnight Expression Ban fails strict scrutiny.

Because the Overnight Expression Ban draws lines based on the commercial content of expression, banning "all" noncommercial speech between 10 P.M. and 8 A.M., it is content based and "presumptively unconstitutional." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). Thus,

---

[16] *See generally* Haley J. Nutt, *Paul Price and American Percussion Practices During the 'Golden Age' of Higher Education*, 46 J. Hist. Res. Music Educ. 45 (2024) (discussing percussion's evolution as an art form).

it is "justified only if the government proves [it is] narrowly tailored to serve compelling state interests." *Id.* In all cases, Defendants cannot meet that burden.

The ban is content based because it "cannot be 'justified without reference to the content of the regulated speech.'" *Id.* at 164 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). On that basis, a regulation that hinges on whether speech is commercial or noncommercial in nature, like the Overnight Expression Ban, is content based. *City of Austin v. Reagan Nat'l Advert. of Aus., LLC*, 596 U.S. 61, 74 (2022) (remarking that a restriction on "communicating a message or ideas for noncommercial purposes" is "overt subject-matter discrimination" and "facially content-based"); *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429–30 (1993) (holding city's prohibition of newsracks for commercial but not noncommercial publications was content based).

Because the Overnight Expression Ban is content based, Defendants bear the burden to show it is "necessary to serve a compelling state interest" and narrowly tailored to achieve that purpose using the least speech-restrictive means. *Widmar*, 454 U.S. at 270. They can show neither.

For one, the Act does not serve a compelling state interest. To the contrary, *fostering* student expression at public universities is the compelling interest at stake. *See Healy*, 408 U.S. at 180–81 (protection of First Amendment is the "vital" interest at stake at public universities); *see also Speech First*, 979 F.3d at 338–39 (noting courts' consistency in rejecting university speech codes). And privileging commercial speech over noncommercial speech is not a compelling interest. *See RTM Media, L.L.C. v. City of Houston*, 584 F.3d 220, 224–25 (5th Cir. 2009).

Nor can Defendants meet their burden of showing that the ban is the least restrictive means of achieving whatever interest the State might proffer. *See United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000). A prohibition on *all* noncommercial speech for ten hours each day is

not the least restrictive means to accomplish any interest. That restriction is simultaneously underinclusive and overinclusive, permitting commercial speech—no matter how disruptive— while forbidding all noncommercial speech when neither Defendants nor the state has any basis to treat noncommercial speech as more disruptive. *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95–101 (1972) (holding content-based prohibition on all picketing violated the First Amendment, concluding the government could not exclude labor picketing to satisfy any interest in preventing disruption to schools). And if preventing disruption to the educational environment is the goal, the Act does not serve it: It is not directed to prohibiting disruptive conduct during class hours, but rather after classes have ended, when the university's interests in its academic mission wane. *See Roberts v. Haragan*, 346 F. Supp. 2d 853, 872–73 (N.D. Tex. 2004) (observing that a university's interests in its "academic mission are most pronounced" within "classrooms and other facilities" when they are being used for academic purposes).

Under the Act, an ROTC student who salutes the flag when it is raised at dawn risks disciplinary action. So does the protester peacefully holding a sign at sunrise. When the clock strikes ten, a Jewish student must remove his yarmulke, and a Political Science student must remove his MAGA hat. The student journalist who publishes a breaking story from her dorm room at 10:30 P.M.? Subject to disciplinary action. UTD Revised Policy § L.49(2) [Ex. D, at 27]; UTA Revised Policy § 13-1202(2) [Ex. E, at 28]. But passing out flyers advertising sales of a student group's ticketed fundraiser is unaffected. There are obvious ways to narrowly address disruptive and unsafe conduct without limiting all noncommercial speech.

Plaintiffs are likely to succeed in showing the Overnight Expression Ban, as applied to Plaintiffs, violates the First Amendment. *See supra* § I(B) (summarizing Plaintiffs' protected expression). So too are Plaintiffs likely to succeed on their facial challenge to the Overnight

Expression Ban, because its unconstitutional applications to "expressive activities" are overwhelming compared to any narrow legitimate sweep—assuming the Ban has one. *Moody v. NetChoice, LLC*, 603 U.S. 707, 723–24 (2024). By the Act's plain text, the Overnight Expression Ban applies *only* to "engaging in expressive activities, " which includes *only* protected speech. So any hypothetical applications to non-expressive conduct or unprotected speech simply fall outside the Ban's scope—and thus its legitimate sweep. And existing institutional policies already address whatever interest Texas may have in preventing material and substantial disruption.

> 2.    The Overnight Expression Ban would also fail the intermediate scrutiny applied to content-neutral time, place, and manner restrictions.

Even if one overlooks the Act's plain language and treats the Act as a content-neutral regulation on the time, place, or manner of speech, the Overnight Expression Ban still violates the First Amendment. It is not a reasonable restriction "narrowly tailored to serve a significant government interest." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983). What's more, it not only fails to "leave open ample alternative channels of communication," *id.*, but by foreclosing all noncommercial speech, it closes *all* channels.

"A regulation is narrowly tailored" only where it "does not burden substantially more speech than is necessary to further the government's legitimate interest." *Just. for All v. Faulkner*, 410 F.3d 760, 770 (5th Cir. 2005) (quoting *Hays Cnty. Guardian v. Supple*, 969 F.2d 111, 118 (5th Cir. 1992)). A recent decision from the Southern District of Indiana that enjoined a university's similar but significantly less restrictive regulation of student speech is instructive. *Wirtshafter v. Trs. of Ind. Univ.*, No. 1:24-cv-00754-RLY-MKK, 2025 WL 1558171 (S.D. Ind. May 29, 2025). In the wake of protesters' overnight encampments in response to the Gaza-Israel conflict, a university prohibited protests between the hours of 11 P.M. and 6 A.M. unless students obtained a permit or the activity was "spontaneous"—for example, an immediate "response to a newsworthy

occurrence." *Id.* at *1–3. The parties disputed whether the policy limiting "protesting," "making speeches," and "circulating petitions" was content-based and therefore subject to strict scrutiny. *Id.* at *2, *7. But the court did not need to resolve that question because the policy failed intermediate scrutiny's narrow tailoring requirement: the policy applied to late-night protests even if they consisted only of small groups, and the university's "interest in public safety is not likely to be implicated by a protest involving two people, even if they seek to express themselves at night." *Id.* at *7–9.

Or consider another district court enjoining the University of Maryland's recent attempt to prohibit protests on only one day. *Univ. of Md. Students for Just. in Pal. v. Bd. of Regents of Univ. Sys. of Md.*, Civil No. 24-2683 PJM, 2024 WL 4361863 (D. Md. Oct. 1, 2024). Seeking to bar a pro-Palestinian group from holding a demonstration on the anniversary of the October 7 attacks, the University of Maryland banned *all* student-sponsored events on that date. *Id.* at *5–6. The district court granted a preliminary injunction against the university, finding that its one-day restriction was not narrowly tailored to address the government's interests in campus safety and the university's educational mission. *Id.* at *10–11, *14.

Texas's Overnight Expression Ban is far more onerous than the University of Indiana policy and the one-day restriction at the University of Maryland. The Ban reaches significantly more speech, including speech far removed from any form of "protest." It bars speech across a larger time window in comparison to Indiana's 11 P.M. to 6 A.M. restriction and Maryland's one-day limit. And unlike Indiana's policy, the Overnight Expression Ban makes no allowance for a permitting exception—universities "must" prohibit expression ten hours each day. Tex. Educ. Code § 51.9315(f)(2)(F).

If the narrower policies at issue in *Wirtshafter* and imposed by the University of Maryland could not withstand intermediate scrutiny, the Overnight Expression Ban fails it spectacularly. It is not narrowly tailored. Rather, it threatens a near-endless range of important, protected expression—whether that is *The Retrograde*'s reporting (Verified Compl. ¶¶ 97–99), UTD FOCUS's early-morning prayer (*id.* ¶ 91), YAL members' political discussions (*id.* ¶¶ 92–96), non-disruptive Strings Attached performances (*id.* ¶¶ 101–104), or SOUnD members' messages to one another after hours (*id.* ¶ 100). It takes little imagination to consider the countless other daily "expressive activities" on campus the Ban threatens. None of these is disruptive, but the ban sweeps up all of them, whether they occur in a student's own bedroom or the wide-open area of the campus quad. *See, e.g.*, *id.* ¶ 105 (collecting examples).

That breadth is also why forum doctrine is not an appropriate framework for analyzing campus-wide speech codes. That framework considers whether a particular location on government property is a public forum. *United States v. Kokinda*, 497 U.S. 720, 728–29 (1990) (holding that the "location and purpose" of a particular sidewalk is "critical" to determining whether that sidewalk is a public forum). University campuses cannot be reduced to a one-forum-fits-all approach, as they are a collection of different types of properties with differing purposes—*e.g.*, residential living spaces, buildings set aside for classroom instruction, indoor spaces set aside for entertainment and social functions, and open areas traditionally used for expressive purposes. That is why the Fifth Circuit held that courts are not required to "choose between the polar extremes of treating an entire university campus as a forum designated for *all* types of speech by *all* speakers, or, alternatively, as a limited forum where any reasonable restriction on speech must be upheld." *Just. for All*, 410 F.3d at 766. And even if forum analysis were a useful framework here, the result would be the same: Restrictions on Plaintiffs' expression would be subject to strict

scrutiny because Plaintiffs are among the class for which the university is set aside, *id.* at 766–67, and the challenged restrictions are unreasonable even in a limited or nonpublic forum, given the university's purpose in facilitating student expression, *Healy*, 408 U.S. at 180–81 (recognizing the "surrounding environs" of a university campus as "peculiarly the 'marketplace of ideas'").

    3.    The Overnight Expression Ban also fails under the overbreadth doctrine.

Plaintiffs are also likely to succeed on their overbreadth challenge to the Overnight Expression Ban because "a substantial number of its applications are unconstitutional, judged in relation to [its] plainly legitimate sweep." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021) (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)); *see also Broadrick v. Oklahoma*, 413 U.S. 601, 630 (1973) ("[O]verbreadth review is a necessary means of preventing a 'chilling effect' on protected expression") (Brennan, J., dissenting). Whatever limited application a restriction on late-night speech might serve in some places (*e.g.*, adjacent to a student dormitory), those fleeting applications are dwarfed by the substantial number of unconstitutional applications.

Consider again the narrower ban enjoined in *Wirtshafter*. There, the district court had no trouble finding the policy—again, significantly narrower than the Overnight Expression Ban— was "hopelessly overbroad." *Wirtschafter*, 2025 WL 1558171, at *10 (citation omitted). The same result should follow here, given the significant potential chilling effect posed by the unfettered discretion extended to campus administrators and police. Overbroad policies pose an unacceptable risk to university students' speech because they are "susceptible to selective application amounting to content-based or viewpoint discrimination." *DeJohn v. Temple Univ.*, 537 F.3d 301, 313–20 (3d Cir. 2008) (enjoining university's sexual harassment policy under the overbreadth doctrine). Because university officials are very likely to enforce the sweeping Overnight Expression Ban in arbitrary or discriminatory manners, it creates a dangerous risk that controversial or unpopular speech will bear the brunt. If *The Retrograde* were to publish a story embarrassing to university

officials, the hour of their publication would invite penalty under the Act. Or, if campus law enforcement officials felt slighted by YAL members' petitions for students' rights, their leaders might face disciplinary action. UTD Revised Policy § L.49(2) [Ex. D, at 27]; UTA Revised Policy § 13-1202(2) [Ex. E, at 28].

The sheer breadth of the ban provides university officials with limitless authority to suppress speech for ten hours every day. That unfettered discretion is anathema to basic principles of the First Amendment. "[T]he First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*." *Stevens*, 559 U.S. at 480. "We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly." *Id.*

This Court should swiftly enjoin the Overnight Expression Ban, as Plaintiffs are likely to succeed on their as-applied, facial, and overbreadth challenges.

### D.    The Act's restrictions on students' end-of-term expressive activities violate the First Amendment.

The other challenged provisions—the bans on student expression through guest speakers, amplified sound, or percussion instruments during the final two weeks of any "term"—fail First Amendment scrutiny for many of the same reasons the Overnight Expression Ban falters. Each is a content-based restriction subject to strict scrutiny, and each would fail even intermediate scrutiny because it is not narrowly tailored and does not leave open ample alternative channels of communication. *Perry Educ. Ass'n*, 460 U.S. at 45.

### 1.    Each of the end-of-term bans is an overbroad, content-based restriction that fails strict scrutiny.

The end-of-term bans are content-based for the same reason the Overnight Expression Ban is content-based: they apply *only* to engaging in noncommercial "expressive activities" through invited speakers, sound amplification, or percussive instruments. Tex. Educ. Code § 51.9315(f)(2)(B). To determine whether the policy applies, the university must determine

whether the expression is commercial or noncommercial. *See Reed*, 576 U.S. at 164 (citing *Ward*, 491 U.S. at 791). For example, a student who invites a speaker to discuss quantum physics during the final two weeks of a term violates the Speaker Ban—but a student group who hosts a bank representative pitching student loan refinancing does not. Tex. Educ. Code § 51.9315(f)(2)(B)(ii). That limitation on the content of the speech is the same evaluation that renders the Overnight Expression Ban a content-based restriction. *Supra* § I(C)(1).

Nor are the end-of-term bans the least restrictive means to meet a compelling state interest. Universities can (and do) bar conduct that materially and substantially disrupts their functions. *See* Tex. Educ. Code § 51.9315(c)(2). But these bans declare protected expression *per se* disruptive. Consider the prohibition on percussive instruments, which applies anywhere on campus, in any context, during the final two weeks of any term. That prohibition extends, for example, to indoor performances by SOUnD in venues specifically set aside for musical performances. Verified Compl. ¶¶ 134–35, 143.

> 2.   The End-of-Term Invited Speaker, Amplified Sound, and Drum Bans fail intermediate scrutiny as not narrowly tailored to prevent disruption.

The end-of-term bans would also fail intermediate scrutiny, as each "burden[s] substantially more speech than is necessary to further the government's legitimate interests." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (citation omitted). Start with the Act's restrictions on amplified sound and percussion music. They ban *any* amplified sound, drawing no distinction between a bullhorn in a library and an iPhone in an outdoor area of campus. That evidences the restriction's lack of narrow tailoring, because to "bar the use of loud-speakers because their use can be abused is like barring radio receivers because they too make a noise." *Saia v. New York*, 334 U.S. 558, 562 (1948) (holding ordinance prohibiting use of amplification devices violated the First Amendment, as officials "need not be given the power to deny a man the use of his radio to

protect a neighbor against sleepless nights" because narrower limits would readily serve the government's interests). A defensible regulation might impose limits on "the hours or places of use" of amplifiers or percussion instruments, or on "the volume of sound (the decibels)," but a blanket ban impermissibly burdens a broad range of expression. *Id.* at 560.

Here, these bans are not reasonable restrictions narrowly tailored to any interest, insofar as they apply to any use of sound amplification or percussion (1) at any volume (2) anywhere on campus (3) at any time of day, no matter how unlikely those uses are to disrupt a university function. The bans reach FOCUS UTD's indoor and outdoor worship services, which use speakers to amplify worship music, such as the Christmas music at one of the group's final events of the year. Verified Compl. ¶¶ 128–29. And they reach SOUnD's and Strings Attached's performances. *Id.* ¶¶ 134–38, 143–47. In fact, the bans prohibit SOUnD from even ringing a bicycle bell on an indoor stage, as in their "Metal to the Pedal" performance. *Id.* ¶ 134.[17] These restrictions sweep far more broadly than any cognizable interest in preventing disruption.

The Speaker Ban also fails narrow tailoring. It burdens students' First Amendment interests in hearing from guest speakers, associating with them as part of their organization's mission, and inviting them to campus to help communicate a group or individual's views. *See supra* § I(B)(1). The ban is not tailored to any recognizable state interest, lacking clear criteria for unlawful conduct, locations where speakers might disrupt classes, or specific hours. That burden on speech is particularly onerous for FOCUS UTD, which exists to provide its members—students who may not have a local place of worship because they come from another city, state, or country, or may

---

[17] Texas SOUnD, *"Metal to the Pedal," Performed on a Bicycle*, at 00:20 (YouTube, July 2, 2025), https://youtu.be/xayaqZ6CJS0?t=20 (playing a bicycle bell); *Bell*, Encyl. Britannica, https://www.britannica.com/art/bell-musical-instrument (noting bells are categorized as percussion instruments).

not be able to attend one off campus—with steady, accessible worship services. Verified Compl. ¶¶ 113–14. The ban burdens YAL student members' right to work with leaders of their national organization as they attempt to organize on campus. *Id.* ¶¶ 117–21. And it chills *The Retrograde*'s staff from exercising its freedom to speak with off-campus sources and to meet with the local journalists on its own board. *Id.* ¶¶ 115–16. A prohibition on non-disruptive events with guest speakers reaches a broad range of protected expression far removed from any legitimate interest in the university's academic functions.

   3.   The end-of-term bans also fail under the overbreadth doctrine.

The Act's bans on invited speakers, amplification, and percussion music are also facially overbroad. These restrictions subject students to discipline for non-disruptive speech—whether that is praying with a minister on campus, playing an electric guitar onstage in an indoor theater, or playing a tambourine outdoors on a sunny Saturday afternoon. UTD Revised Policy § L.49(2) [Ex. D, at 27]; UTA Revised Policy § 13-1202(2) [Ex. E, at 28]. The overwhelming number of the bans' unconstitutional applications vastly outweigh the narrow sweep of their lawful applications. *See Moody*, 603 U.S. at 723–24.

## II.   Without a Preliminary Injunction, Plaintiffs Will Suffer Irreparable Harm to Their First Amendment Freedoms.

The Act requires administrators to limit students' exercise of their First Amendment rights to worship, report, and perform. That "loss of First Amendment freedoms … unquestionably constitutes irreparable injury." *Roman Cath. Diocese*, 592 U.S. at 19 (citation omitted). Monetary damages cannot compensate, for example, students deprived of their ability to attend worship services on their home campus. Verified Compl. ¶¶ 113–14, 171–72, 176. Student journalists should not have to second-guess whether they can report campus news based on time of day, and damages cannot remedy lost opportunities to cover time-sensitive matters. *Id.* ¶¶ 179–84. And the

entire campus community suffers when student political speech falters because members of student organizations like YAL fear disciplinary action for posting on social media after dark, or when student musical groups must unplug and go home. *Id.* ¶¶ 186–87, 189–95, 197–200, 202–205. University campuses are vibrant communities because students can speak, perform, and report—but the Act will dampen that vibrancy.

## III.    The Balance of Equities and Public Interest in Protecting Student Expression Favors a Preliminary Injunction.

The balance of equities and public interest favor Plaintiffs, whose ability to worship, report, perform, and otherwise speak hangs in the balance. These factors "merge when the Government is the opposing party," as it is here. *Nken v. Holder*, 556 U.S. 418, 435 (2009). And "injunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter.*, 732 F.3d at 539 (quoting *Christian Legal Soc'y*, 453 F.3d at 859).

An injunction here especially favors the public interest, because "vigilant protection of constitutional freedoms is nowhere more vital" than public university campuses. *Healy*, 408 U.S. at 180–81. Texas first enacted its campus free speech law to forbid universities from suppressing speech due to its "political, religious, philosophical, ideological, or academic viewpoint." Tex. Educ. Code § 51.9315(g). The unfettered authority the Act invests in campus officials risks exactly that, as officials will exercise the new authority in arbitrary and viewpoint-discriminatory ways.

## IV.    The Court Should Waive a Bond Requirement.

As Plaintiffs are litigating in the public interest to vindicate First Amendment rights, "an area in which the courts have recognized an exception to the Rule 65 security requirement," *City of Atlanta v. Metro. Atl. Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. Unit B Feb. 1981), the Court should waive Rule 65's bond requirement here.

## **CONCLUSION**

Plaintiffs ask that the Court grant their motion for a preliminary injunction.

Dated: September 9, 2025                    Respectfully submitted,

/s/ JT Morris
JT Morris (Tex. Bar No. 24094444; S.D. Tex.
    Bar No. 3163670)
FOUNDATION FOR INDIVIDUAL RIGHTS
    AND EXPRESSION (FIRE)
(215) 717-3473
700 Pennsylvania Ave., Suite 340
Washington, DC 20003
jt.morris@thefire.org

Adam Steinbaugh (Cal. Bar No. 304829)*
Sara Berinhout (Mass. Bar No. 703217)*
Hannah Abbott (Penn. Bar No. 337123)*
FOUNDATION FOR INDIVIDUAL RIGHTS
    AND EXPRESSION (FIRE)
510 Walnut St., Suite 900
Philadelphia, PA 19106
adam@thefire.org
sara.berinhout@thefire.org
hannah.abbott@thefire.org

*Pro hac vice motion forthcoming*

**Attorneys for Plaintiffs Fellowship of
Christian University Students at UT Dallas,
The Retrograde, Young Americans for
Liberty, Inc., Zall Arvandi, Texas Society of
Unconventional Drummers, and Strings
Attached**

26

**CERTIFICATE OF CONFERENCE**

Under Local Rule 7(G), I certify that on the morning of September 8, 2025, I sent a copy of Plaintiffs' verified complaint to Stacy Napier, general counsel for the University of Texas Board of Regents (snapier@utsystem.edu) and Daniel H. Sharphorn (dsharphorn@utsystem.edu), general counsel of the University of Texas System. I informed them of Plaintiffs' intent to file a preliminary injunction motion later in the day on September 8, and asked if Defendants had a position on Plaintiffs' motion. I spoke with Keith Ingram, Special Counsel for the office of the Texas Attorney General on September 9, 2025. Mr. Ingram informed me that Defendants oppose this motion.

/s/ *JT Morris*

**CERTIFICATE OF SERVICE**

The undersigned certifies that on the 9th day of September, 2025, a true and correct copy

of Plaintiffs' motion was served via the CM/ECF system to all counsel of record. The undersigned

also certifies that a copy of this motion was sent by email to:

> Keith Ingram
> Special Counsel
> Office of the Texas Attorney General
> Keith.Ingram@oag.texas.gov

> /s/ *JT Morris*