**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| FELLOWSHIP OF CHRISTIAN UNIVERSITY STUDENTS AT THE UNIVERSITY OF TEXAS AT DALLAS, THE RETROGRADE NEWSPAPER, YOUNG AMERICANS FOR LIBERTY, INC., ZALL ARVANDI, TEXAS SOCIETY OF UNCONVENTIONAL DRUMMERS, AND STRINGS ATTACHED, | ) | Case Number 1:25-cv-01411-DAE |
| Plaintiffs, | ) | |
| vs. | ) | Austin, Texas |
| KEVIN P. ELTIFE, JANIECE LONGORIA, JAMES C. "RAD" WEAVER, NOLAN PEREZ, M.D., STUART W. STEDMAN, ROBERT P. GAUNTT, CHRISTINA MELTON CRAIN, JODIE LEE JILES, and KELCY L. WARREN, in their official capacities as members of the Board of Regents of The University of Texas System, JOHN M. ZERWAS, M.D., in his official capacity as Chancellor of The University of Texas System, JAMES E. DAVIS, in his official capacity as President of The University of Texas at Austin, and DR. PRABHAS V. MOGHE, in his official capacity as President of The University of Texas at Dallas, | ) | |
| Defendants. | ) | October 2, 2025 |

********************************

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION HEARING

BEFORE THE HONORABLE JUDGE DAVID ALAN EZRA

********************************

APPEARANCES

For Plaintiffs: Mr. JT Morris
Foundation for Individual Rights and Expression
700 Pennsylvania Avenue, SE
Suite 340
Washington, DC 20003
jt.morris@thefire.org

For Defendants: Mr. B. Keith Ingram
Office of the Attorney General of Texas Special Litigation Division
Post Ofice Box 12548
Austin, Texas 78711-2548
keith.ingram@oag.texas.gov

COURT REPORTER: Ms. April Balcombe, CSR, CRR, CRC
501 West 5th Street, Suite 4150
Austin, Texas 78701
(512) 391-8795
April_Balcombe@txwd.uscourts.gov

Proceedings reported by computerized stenography, transcript produced by computer-aided transcription.

01:15 P-R-O-C-E-E-D-I-N-G-S

01:35 THE CLERK: Court calls Austin:25-cv-01411, Fellowship of Christian University Students at the University of Texas Dallas, et al. v. the State of Texas.

01:35 THE COURT: All right. Can we have appearances, please?

01:35 MR. MORRIS: Good afternoon, Your Honor. JT Morris on behalf of Plaintiffs, and alongside me is my colleague, Adam Steinbaugh.

01:35 THE COURT: All right.

01:35 MR. INGRAM: Yes, Your Honor. Keith Ingram here for the Defendants, and I have with me a law fellow in our office, Lauren Saeger.

01:35 THE COURT: All right. Good afternoon to all of you. All right. This is a motion filed and we will hear argument.

01:36 You may proceed.

01:36 MR. MORRIS: Thank you, Your Honor. Would you like me to proceed from here or from the podium?

01:36 THE COURT: It doesn't really matter as long as you speak up loudly enough so that we make sure the reporter hears you.

01:36 MR. MORRIS: Sure. I'm going to take the podium, if that's okay.

THE COURT: Sure.

MR. MORRIS: Again, good afternoon, Your Honor. JT Morris on behalf of Plaintiffs. I also have at least one of the Plaintiffs with me in the courtroom today, Mr. Daniel Gonzalez-Allende. He's the director of Student Rights for Plaintiff Young Americans for Liberty.

And just as an initial housekeeping matter, Your Honor, both parties have agreed, there is no need to call witnesses this afternoon. We do have exhibits we'd like to introduce into the record. My understanding is that Mr. Ingram has not objected to those. We're also not objecting to Defendants' exhibits.

So at this time I'd like to move Exhibits 1 through 19 in the binder that we provided to the Courtroom Deputy into evidence.

THE COURT: All right. That will be received.

*(Plaintiffs Exhibits 1-19 admitted.)*

MR. MORRIS: Thank you, Your Honor.

I want to start by taking the Court back a little over 50 years ago, Supreme Court case of Healy v. James, where the Court struck down a public university's attempt to deny a student group the constitutional right to speak even though it was during, as the Court put it:

01:37 A climate of unrest that prevailed on many college campuses in this country.

01:37 And in striking down that restriction on campus speech, the Supreme Court cemented a core First Amendment principle: The vigilant protection of First Amendment freedoms is nowhere more vital than at our public universities because they are, of course, the quintessential marketplace of ideas.

01:37 And yet now, decades after Healy, the State of Texas is repeating history in response to a climate of unrest at public universities across the country.

01:37 Last spring, the State of Texas is imposing restrictions on expression at its public universities, but on a scale that dwarfs the restriction that the Supreme Court struck down in Healy.

01:38 The Texas Campus Protection Act is not tailored towards preventing disruption or maintaining the universities' interest in its academic mission, nor does it serve to uphold First Amendment freedoms. Instead what the Legislature is doing is commanding that every State university and college impose a prohibition against almost all expressive activity, all protected speech 10 hours a day between 10:00 p.m. and 8:00 a.m.

01:38 The Legislature is also commanding those institutions to prohibit almost all protected speech

during the last two weeks of any academic term as long as it relates to an invited speaker, the use of amplified sound, and the use of drums.

And those staggering prohibitions, Your Honor, prohibit almost all protected speech at any location on campus and without regard to whether or not they are disruptive or impose an imminent -- pose an imminent threat to campus safety.

The bottom line is this: These extensive prohibitions cannot survive any level of First Amendment scrutiny and are more likely to succeed on the merits, which is one reason Your Honor should enter a preliminary injunction.

Underscoring that is these prohibitions' flagrant overgrowth, something that Defendants do not contest in their brief, rendering them facially invalid.

The irreparable harm here is also clear, Your Honor. The Campus Protection Act and the four challenged prohibitions that we have raised in this lawsuit all cast a chill not over -- not only over Plaintiffs' speech, but over their fellow speakers across the U.T. System.

And that harm is doubly so because those broad prohibitions give any campus administrator unfettered authority to wield these prohibitions against

01:39 any speaker or speech they dislike.

01:39 This Court should uphold those enduring principles that the Supreme Court first set out in Healy v. James and enter a preliminary injunction halting the harm that those four prohibitions from the Act are imposing on the State's public universities.

01:40 Your Honor, I want to cover four sort of basic topics today. I think it's important to start with what the Act says and what its plain text means.

01:40 Second, the Defendants have raised issues of standing and sovereign immunity, so I think it's important that I address those, especially in case the Court has any questions on those issues.

01:40 Third, turning to likelihood of success on the merits, I think the key issue here is the immense breadth of these provisions and how the only thing they target is its protected speech and how they are nowhere near tailored only to advance the government interests.

01:40 They are not the least restrictive means of advancing any interests. They are the most restrictive. And when I say I do want to address the remedy, we are seeking. Defendants have raised a concern about that and I want to lay that to rest with the Court.

01:40 But, first, let's start with the text of the Campus Protection Act. I don't think this is a hard

statute to construe. We start with the text. We end with the text. And I think it all starts with how the Act defines expressive activities.

The Act defines expressive activities -- and this is in the Texas Education Code -- as almost -- as anything protected under the First Amendment with two exceptions -- one are the narrow sets of unprotected speech that is set out in Supreme Court precedent like true threats, obscenity, defamation, and the like. And the other is commercial speech.

So, essentially, the Act defines expressive activities as all protected speech that is noncommercial. You can imagine what that encompasses.

It encompasses political speech, religious expression, artistic expression, journalism, those four pillars of the First Amendment that our Plaintiff group here represents so well, Your Honor.

And then what the Act does is it says, Universities -- Public universities and colleges prohibit expressive activities, prohibit all protected, noncommercial speech between the hours of 10:00 p.m. and 8:00 a.m.

It also commands prohibit expressive activities, prohibit all noncommercial, protected speech during the last two weeks of any term -- which at most

01:42 of these U.T. System institutions amounts to around 98 days a year -- if that expressive activity involves an invited speaker, it involves amplified sound, or involves the use of drums.

01:42 That is a sweeping prohibition on speech at the place, at a public university where the Constitution commands that we uphold those protections the most, Your Honor.

01:42 And it's clear that those prohibitions cover the expression of every Plaintiff in this case. We start with the Plaintiffs at The University of Texas at Dallas. We have FOCUS UTD, a Christian ministry that's a registered student organization.

01:42 They regularly meet on Friday nights, and this is in their verified allegations and the verified complaint. They read on Friday nights to engage in worship and engage in discussions of faith that often last until after 10:00 p.m. They also meet with members of the campus community before 8:00 a.m. to discuss issues of faith.

01:43 That same overnight prohibition restricts the speech of The Retrograde, the independent student newspaper at the University of Texas at Dallas. As you can imagine, Your Honor, student journalists are very busy.

They have classes. They have labs. Most of their work is done after 10:00 p.m. and that includes their newsgathering. As our students verify in their complaint, they often have to go to areas on campus to meet with sources after hours just to do their job.

That overnight ban also restricts our Plaintiffs, Young Americans for Liberty and Mr. Zall Arvandi, a student at U.T. Texas, who is a member of Young Americans for Liberty. They communicate about their political views and advocacy after hours on campus, whether on email or in person.

So you can see, I think, how broad, just by looking at the speech that this overnight speech ban prohibits from our Plaintiffs; and you can imagine all the other activities, I think, that that prohibits on a college campus, the same with the end of two -- the two-week ban on invited speakers, on amplified sound, the use of drums.

Take, for example, our Plaintiff, University of Texas at Austin, the Texas Society of Unconventional Drummers. They rely -- and most of their shows are done during the last two weeks of the term, including in outdoor public forums, like the Speedway at U.T. Austin where they do pop-up shows. They play Home Depot buckets and other things to promote their end-of-year

01:44 concerts.

01:44 But under this ban and under the U.T. Austin policies that implement that ban, they can't play during the last two weeks of -- of a term.

01:44 Or take our Plaintiffs, Strings Attached, again, another musical group, they are at University of Texas at Dallas. They rehearse. They perform celebratory concerts at the end of the spring semester.

01:45 Under this ban and under U.T. Dallas policies implementing that ban, their speech is infringed. They can no longer perform that without risking discipline.

01:45 And I think that's a good point to turn into standing, Your Honor. This is an easy case for standing. All of our Plaintiffs are operating under the threat of this Act.

01:45 At U.T. Dallas, they're operating under the policy implementing the Act, and these four provisions we're challenging that copies the Act verbatim. There is no question that U.T. FOCUS -- UTD FOCUS, The Retrograde, and Strings Attached all have standing here. There is two bases for standing.

01:45 Again, there is actual harm because their specific speech is being chilled and you also have under the Fifth Circuit's decision in Speech First confirming

that when a statute, especially a newly-enacted statute, is in place and it prescribes speech, that's enough to show an Article III injury.

So despite the fact the Defendants are saying, well, no school has enforced this yet, that doesn't matter. The Fifth Circuit makes that clear in Speech First.

I want to turn quickly to our Plaintiffs at the University of Texas at Austin because I think this is where the standing dispute is centered. University of Texas at Austin, their policy differs slightly from the Act.

What happened is they proposed an act with the recommendation of the Chancellor that the board approve implementing those four prohibitions that we are challenging. They did not implement the overnight ban, but they did implement the three end-of-term bans, again, prohibiting speech involving invited speakers, amplified sound, use of drums during the last two weeks of school.

After we filed this lawsuit, they changed their policy again. The invited speakers' ban is the same. It says you can't invite speakers to campus during the last two weeks of any term.

But they're now saying you cannot use

01:47 amplified sound or you cannot play drums during the last
01:47 two weeks of any term if it's in a common outdoor area.
01:47 Defendants argue that somehow change is standing here.
01:47 We're here to tell the Court it does not for two
01:47 reasons.
01:47 Number one, even if the U.T. Austin policy
01:47 is limited to the common outdoor areas, it still covers
01:47 our Plaintiffs' speech. As I just noted to the Court,
01:47 SOUnD, the Society for Unconventional Drumming [sic],
01:47 they play their performances outdoors during the
01:47 last two weeks of the camp- -- the last two weeks of a
01:47 term.
01:47 So clearly the U.T. Austin current policy
01:47 covers their expression. The same with Young Americans
01:47 for Liberty and Mr. Arvandi. They use amplified sound
01:47 as defined in their verified allegations, like,
01:47 megaphones to petition the school administration to make
01:47 policy changes during the last two weeks of a term.
01:47 That's often for them necessary because they
01:47 have to gather all these signatures throughout the
01:48 semester, so often they can't present their petition to
01:48 the administration until those last two weeks of an
01:48 academic term. So one --
01:48 THE COURT: That last one doesn't apply just
01:48 after 10:00 p.m., does it? It's just in the last

two weeks, right?

MR. MORRIS: During the last two weeks of any term at any time --

THE COURT: It could be at 2 o'clock in the afternoon?

MR. MORRIS: It could be 2 o'clock in the afternoon.

And to remind the Court, even under the U.T. Austin policy, that doesn't have any criteria that the speech actually be disruptive.

So take SOUnD, for example, who is sitting there on the Speedway at U.T. Austin, the bustling area right through the middle of campus, playing their classic Home Depot buckets while music is playing, as students are handing out leaflets.

That's not going to be disruptive, but even putting that aside, we're talking about standing here. They certainly have standing to challenge that policy.

The Defendants' argument on standing as to the U.T. Austin policy is wrong for a second reason. It's the Act. It's the Legislature's mandate that controls here, not how U.T. Austin is interpreting it.

The Legislature's prohibition in the Act is unequivocal. You -- these -- U.T. Austin, you must prohibit invited speakers, amplified sound, and drums

01:49 during the last two weeks of any academic term or
01:49 semester without regard to whether its disruption and
01:49 without regard to its location.
01:49 So the University of Texas at Austin could
01:49 change their policy at any time. In fact, they've shown
01:49 that they have the proclivity to do so, having changed
01:49 their policy already after we filed lawsuit.
01:49 So you have those mandatory prohibitions in
01:49 the Act hanging over, not only the students' head, but
01:49 the university's head. That's why the injunction here
01:49 is so important. That's why the Plaintiffs have
01:49 standing to challenge it.
01:49 Because as long as the Legislature's
01:49 prohibitions are in place and not enjoined, these
01:49 universities can play games and they can impose the
01:49 Legislature's mandatory prohibitions without regard to
01:50 location at any time. So, again, I think standing is
01:50 clear here.
01:50 I want to address sovereign immunity very
01:50 quickly. As we said in our reply brief, the Fifth
01:50 Circuit's decision in Jackson v. Wright controls here.
01:50 There, the Fifth Circuit found the University of North
01:50 Texas' Board of Regents were subject to Ex parte Young's
01:50 exception to sovereign immunity, even though they
01:50 didn't -- they played no role in imposing the First

Amendment restriction at issue. Because they had ultimate governance authority over the System, that was enough of an enforcement connection, a scintilla of enforcement, to invoke Ex parte Young.

Notably, Your Honor, in the three cases we're aware of where Courts have applied Jackson v. Wright in the university context, one is the Fifth Circuit's recent decision in Spectrum v. Wendler and two are decisions from Judge Pitman that we have cited in our reply. Every single time, the Courts have found that Ex parte Young applies to university officials who have governance authority over those universities.

So, too, here we know from the Texas Education Code, the Legislature has commanded that the University of Texas Board of Regents must approve the policies implementing the Act for prohibitions that we are challenging. They have done so. The Defendants' declarations make that very clear.

So we know the Board of Regents are the right Defendants here because they have carried out their mandatory governance authority over the Act.

Second, we know the Chancellor has sufficient governance authority here. He is directed under the Board of Regents' rules. He has direct line of authority over all System business.

01:51 And, again, if you look at Exhibit 19, the
01:51 Consent Agenda from the Board of Regents meeting in
01:51 which they approved all of these implementing policies,
01:51 the Chancellor recommended to the Board that they
01:51 approve the U.T. Dallas policy and the U.T. Austin
01:51 policy at issue today. He's played a direct role. He
01:51 has that scintilla of enforcement that's necessary to
01:52 invoke Ex parte Young.

01:52 Finally, President Davis and
01:52 President Moghe, they also have a sufficient connection
01:52 to invoke Ex parte Young. They both have the power to
01:52 appoint disciplinary officers to hear violations of the
01:52 student expression policies at those schools, which is
01:52 where you will find the policies implementing the Act
01:52 and challenged provisions; and, as well, they have
01:52 general authority of the Board rules over student
01:52 policies.

01:52 So sovereign immunity, again, Your Honor,
01:52 should be an easy denial here. This is an easy case for
01:52 Ex parte Young. We are seeking nothing but prospective
01:52 relief in this case.

01:52 Which brings me, Your Honor, to likelihood
01:52 of success on the merits. We've briefed -- and I think
01:52 Your Honor, again, should find that this was a
01:52 content-based restriction for the reasons I explained

earlier.

The Act requires administrators to distinguish between noncommercial and commercial speech to see if the overnight prohibition or the three end-of-term bans apply.

THE COURT: Let me stop you for just a second.

Now, I would assume -- and I think, you know, generally the university is located -- let's say the -- let's use the University of Texas. We can use the University of, you know, North Texas Dallas as an example, but let's use U.T. Austin.

U.T. Austin is located within the city limits of the city of Austin. It's certainly state law -- federal law would apply there. State law certainly applies and also the various ordinances of the City of Austin, I would think, generally would apply there.

I don't think there is an exemption anywhere in state law unless I'm unaware of it and it exists for most general matters that would occur on the U.T. campus.

And there are ordinances in the City of Austin, and I'm sure there are regulations existent already at the University of Texas prohibiting things like public nuisances, disruptive behavior on campus,

01:54 somebody, for instance, if they were to be angry about something, setting up a very loud, Mexican-style -- I don't know if you have ever been across the border, but they have had these automobiles that have these large speakers on the top and they drive through the cities with these things blaring.

01:54 If somebody were to park one of those things outside of a dormitory and turn it on and just completely disrupt the sleep of anybody, I would think that there are already in place rules, prohibitions at the University of Texas that would prevent that kind of thing and certainly the City of Austin.

01:55 You couldn't do that in a neighborhood. You couldn't drive one of those cars in a neighborhood at 11:00 o'clock at night and sit there in front of somebody's house and turn it on. The police would come and they would direct you to turn it off. You would be a public nuisance and you would get arrested if you didn't do it.

01:55 So what -- how do you draw the distinction here between those -- how do those interact with this layering? I mean, one wonders if there is already ordinances that would prevent the disruption of student life, people trying to sleep in the dormitories.

01:56 Let's say there is some sort of late -- it

would have to be fairly late, but it happens on university campuses, late-night activity that is going on in some classroom. The disruption of that, I would think, would already be prohibited, wouldn't it?

MR. MORRIS: I think, yes, Your Honor, the universities have policies, and certainly the City has policies against things like public nuisances.

The University has policies already in place, and they did before the Act, to deal with the conduct that was disruptive to sleeping students or studying students. And I think that drives home the real problem with the Act. It's --

THE COURT: So let me stop you for just a second. I'll give you a chance --

MR. MORRIS: Sure.

THE COURT: -- and I'll ask the same question of your opposing counsel.

If that is the case, this would appear -- if the justification for this is that we're trying to keep the campus quiet and peaceful at night, it would appear that this would be somewhat redundant because there must already be rules in place -- there certainly are ordinances in the City of Austin that would apply, I would think.

MR. MORRIS: If it's --

01:57 THE COURT: Keep, you know, this -- if the purpose here is to keep things quiet at night, it would appear that these -- and the university police are certainly capable of enforcing those rules.

01:57 MR. MORRIS: I think that's one of the major problems with the statute, Your Honor, is it's redundant in terms of the Legislature trying to step into the shoes of universities and saying, We have a need to prevent campus disruption and maintain safety and maintain the academic environment.

01:57 But the way to do that is not prohibiting all noncommercial protected speech between 10:00 p.m. and 8:00 a.m. By the Legislature's own words, you can't have a quiet political discussion after 10:00 p.m. now. You can't post a political tweet after 10:00 p.m. You can't have a candlelight vigil. You can't have a sunrise worship service.

01:58 Those are all nondisruptive and it really drills down to why this law is overly broad. You already had policies here to begin with. How does it serve the public interest, number one, to pass sweeping prohibitions to deal with a narrow problem of disruption that current policies already handle, as Your Honor duly noted.

01:58 Second, whatever the legitimate sweep --

perhaps, if you want to call it a redundant law, is -- preventing disruptive conduct, the unconstitutional applications here dwarf that.

And what you have now in talking about the layering, the Legislature has told these universities, your policies aside, whether the speech is disruptive or not, you have to impose a policy that prohibits all noncommercial protected speech between 10:00 p.m. and 8:00 a.m., no matter where it is on campus and no matter whether it's disruptive.

You cannot allow -- you universities cannot allow invited speakers on campus during the last two weeks of any term, no matter whether it's disruptive and no matter where it takes place. You can't use amplified sound or drums, students, anywhere on campus, no matter if it's disruptive or not, if it's during the last two weeks of any term.

So essentially what the Legislature has done is prohibited almost all protected speech in the name of solving -- if there was a problem to solve to begin with, and I don't think there was for the reasons Your Honor just noted -- of trying to maintain campus safety. That is no way to uphold the First Amendment at a place where the First Amendment must reign supreme, Your Honor.

02:00 And I think we can walk through one by one why these prohibitions are so lacking in tailoring, even if the government's interest is preventing disruption and even assuming it's not -- it's not meeting an interest that wasn't already met by university policies.

02:00 Again, consider the overnight ban. We just went over, this is over-inclusive. It sweeps up an enormous amount of nondisruptive speech between the hours of 10:00 p.m. and 8:00 a.m.

02:00 And we have examples in our verified complaint, I think, 12 or 11 examples of real world things that college students do on campus. And I just named some of them off to you, a candlelight vigil, worship services at sunrise, late-night political discussions.

02:00 It's also under-inclusive, Your Honor. If the university wants to protect its academic mission, why are you prohibiting all noncommercial protected speech during the hours when classes are least likely to happen?

02:00 THE COURT: I was having a difficult time, to be honest with you, trying to figure out what this was all about, to be honest with you. I mean, I looked at the -- you know, I've looked at the background.

02:01 I mean, obviously, there was -- there is an

indication in the record, I believe you pointed it out, that this was designed to react to the -- some of the disruption that occurred.

I don't know if the word "disruption" is -- let's say some of the protests that occurred over the Palestinian situation, the Israeli-Palestinian conflict that's going on. I think there is some record of that in the State Legislature. Am I correct there?

MR. MORRIS: There was a couple of committee reports, I think one from the Senate and one from the House. The House Committee report's in there and --

THE COURT: They reference that?

MR. MORRIS: Yes, that's correct.

THE COURT: So -- but why would you do this when the majority of students are not on campus? I mean, if you're going to prohibit people from causing a -- what you might term as a disruption or put on a protest, why would you do it after 10:00 p.m.?

Most students aren't on campus after 10:00 p.m. Now, there certainly are students on campus after 10:00 p.m., but certainly not the number of students on campus as -- that there would be at 2 o'clock in the afternoon. I mean, it just -- the logic of it here is a little hard to understand.

MR. MORRIS: I would agree with you, Your

02:02 Honor. But at the end of the day, the Legislature's logic and intent doesn't matter, you know, whether it was deliberate or they were sloppy, that is never a justification for violating the First Amendment.

02:03 I think you look at the Supreme Court's decision of U.S. v. Stevens, where the Federal Government came and tried to justify an overbroad law by saying, well, that's not what we really meant to --

02:03 THE COURT: Have these protests or demonstrations or whatever they are that you might want to call them occurred late at night? I mean, is that -- has that happened in the past? Is that what they're targeting?

02:03 MR. MORRIS: It's not in the record, Your Honor. I can --

02:03 THE COURT: I didn't see it.

02:03 MR. MORRIS: I can tell you as a general matter, students have the right to peaceably assemble at night on campus as long as it's not disruptive or doesn't pose an imminent threat to campus safety. I would point the Court to the recent decision out of the Southern District of Indiana, which we cite in our brief, and that's the Wirtshafter Case.

02:03 University of Indiana responds to some of these late-night protests, passed a policy saying if you

want to do that, you have to get a permit from us.

Otherwise, we are banning all giving of speeches and all protests on campus between 11:00 p.m. and 6:00 a.m. and the univers- -- the District Court said, No, that violates the First Amendment. That's not narrowly tailored and it fails the overbreadth doctrine.

THE COURT: So let's say there is a group of students, let's say there is a club, okay, political club -- there are certainly political clubs on campus.

MR. MORRIS: Yes, there are.

THE COURT: I think, for instance, University of Texas Law School has the Federalist Society. Let's say they want to have a meeting of the Federalist Society.

For whatever reason, they want to do it at 10:00 o'clock or let's say they want to start at 9:30. Okay? Or 8:30. And it's going to last a couple of hours, and roll-over to past 10:00 o'clock.

And it would be perfectly all right -- let's say we're within the last couple of weeks of the term, okay, when this law would be effective, right, in that regard.

MR. MORRIS: Well, in terms of the overnight ban, the overnight ban is unlimited. It does not have the end-of-term ban. The overnight ban applies year

02:05 round.

02:05 THE COURT: I know. Well, I am talking about previous speakers.

02:05 MR. MORRIS: Okay.

02:05 THE COURT: Yes, I understand that. That this would violate -- what I'm talking about would violate both. Okay?

02:05 MR. MORRIS: Gotcha.

02:05 THE COURT: And if it was just members of the Federalist Society themselves who were speaking, they wouldn't violate that speaker ban, but let's say that they wanted to invite a prominent conservative speaker, a jurist, for instance, or someone else to speak to them, that would violate the ban, wouldn't it?

02:06 MR. MORRIS: It would, yes.

02:06 THE COURT: So if that -- let's say they started at 8:30, they had a couple of speakers, and it rolled around to 9:30 or a quarter to 10:00 and the -- whoever the featured speaker was, took the podium and rolled over to 10:30, they would be clearly in violation of the ban?

02:06 MR. MORRIS: They would be in violation of two of the prohibitions. One is the overnight ban --

02:06 THE COURT: Well, we're not going into the speaker one.

MR. MORRIS: And I think --

THE COURT: And I don't think that the Federalist Society is known for creating disruptive activity. It's not like they are rioting or anything.

They would be just speaking or -- I don't mean to -- I'm not, you know, selecting the Federalist Society for any reason other than the fact that it is generally known for having meetings and well-behaved meetings and no disruptive activities.

I mean, and there are very liberal, democratic legal groups that are aligned with, say, the ACLU or some other organizations that are the same. They could -- the same thing would happen to them, right?

MR. MORRIS: That's exactly right, Your Honor. And I think you can even go beyond political student organizations and political speakers on campus.

Certainly, I think those really highlight the dangers here because, as political winds shift, the university administrators can use those prohibitions and use those violations to silence speech that might not be -- fit the political winds at the moment.

But it also extends, for example, to religious speakers. Just take our Plaintiff at the University of Texas, UTD FOCUS. Again, they host

meetings at night. They have outside ministers come in who preside and guide these students on issues of faith. Those meetings often go after 10:00 p.m.

And so when you have, right, not only is the meeting going after 10:00 p.m., but invited ministers coming on campus the last two weeks when these students need that spiritual guidance and those ministers' assistance the most, that's a double whammy against their First Amendment rights.

And as they verify in our complaint, this is chilling their speech. They are now having to second-guess, can we even worship at our spiritual home for some of these, which is their UTD campus.

THE COURT: Well, a good example might be a situation -- and I know this -- my recollection is that it did occur or does occur occasionally on the University of Hawaii -- you know, I'm from Hawaii, originally -- the University of Hawaii campus where certain religious organizations, mostly, you know, Christian organizations, will get together on campus and have an Easter sunrise service. It starts at 6:00 in the morning. They could not conduct an Easter sunrise service, could they?

MR. MORRIS: They could not, not under the Legislature's mandates to these State universities. And

I think what's particularly -- again, even if you look at -- we have no -- there is no question about the University of Texas at Dallas policy -- and I do want to address the policies because --

THE COURT: Well, there is a difference and I'm wondering why -- you know, obviously, you know, the University of Texas at Austin has plenty of lawyers running around and they have access to the Attorney General's Office, and they did make a couple of modifications to their plan. Why -- and these modifications were an effort to try to save the plan from being a violation of the First Amendment, obviously.

Why are -- in your view, the modified plan that the University of Texas, why is that modified plan, which appears to violate the statute because the statute says you shall do X, Y, and Z -- and they're not doing X, Y, and Z, they are doing X and Y, but they're not doing Z -- why is that still unconstitutional in your view?

MR. MORRIS: So I'll start with -- I will give you three reasons, Your Honor. I will start with the most straightforward one. Their modified plan -- and it modifies those three last two end-of-term bans. It doesn't modify the invited speaker ban.

02:10 So to the extent, for example, that Young Americans for Liberty and Mr. Arvandi are having invited speakers, Mr. Arvandi invites speakers from Young Americans for Liberty to come to campus and assist him with his political advocacy, that, just like the Act, covers their speech.

02:11 The other two -- the two modifications are for the amplified sound and the drum band. It limits those only to common outdoor areas, but, again, that still covers our Plaintiffs' speech.

02:11 SOUnD performs their drum shows outdoors during the last two weeks of campus. Young Americans for Liberty and Mr. Arvandi intend to use amplified sound like megaphones when they engage in their petitioning drives the last two weeks of campus.

02:11 So the most straightforward answer here is, as applied, it still violates the Constitution. On its face, it can -- the Court can still invalidate it for two reasons.

02:11 One, simply limiting those bans to common outdoor areas is still overbroad. It has no regard for whether the speech is disruptive. It has no regard for whether using amplified sound or drums poses an imminent threat to campus safety.

02:12 So, in the end, it does the same thing, it

sweeps in a host of protected speech that is not necessary to advance the Government's interest.

And the third point, Your Honor, and I think you alluded to it a little bit earlier, the policy doesn't comply with what the Legislature has commanded them to do.

If the Legislature commands the university to do something, they have to comply with that. And if you're a student, if you're a staff member, or if you're a member of the public and you're reading this law, you're saying, well, the University of Texas at Austin can do this anytime.

So if the law itself is unconstitutional and the University of Texas has to be enforced -- enjoined, excuse me, from implementing those prohibitions that maybe at this point it hasn't implemented yet, but the Legislature says it has to implement.

I think that's a real danger here that -- one of the reasons we're asking for the preliminary injunction is to stop institutions like the University of Texas at Austin from playing games with this policy and sort of, you know, being able to unleash it because the Legislature has given them the authority to on students at any time.

THE COURT: Well, this brings to mind a case

02:13 that was right here in Austin which I'm sure you're
02:13 familiar with in which I was involved, and that -- I
02:13 can't remember the exact name of the case now as I sit
02:13 here. I should remember it, but I don't remember it, to
02:13 be honest with you. But the case --
02:13 I wish I had the mind of Dean Chemerinsky,
02:13 who could rattle off names of every case that ever, I
02:14 think, was filed. In this -- in this case, it was a
02:14 speech case. The school had -- the college had a ban on
02:14 any type of speech that would cause discomfort to
02:14 another student.
02:14 Are you familiar with that?
02:14 MR. MORRIS: Is that the Speech First v.
02:14 Fenves case, Your Honor?
02:14 THE COURT: Yes, I think that's right. I
02:14 think that's right. It was a Speech First case. And in
02:14 that case, the -- I said, unequivocally, that the -- in
02:14 my order that the -- I think I said it from the bench --
02:14 that the ban was unconstitutional. There was no
02:14 definitions. It was very fluid. There was no question
02:15 about it. So it goes up -- but I said, look, here is
02:15 what happened. The State actually -- the school
02:15 actually I think came to the realization that it was
02:15 unconstitutional and they rescinded the policy.
02:15 And the Deputy Attorney General showed up in

court and said, look, Judge, this is moot because they have rescinded the policy, you know, they don't disagree with you. They've rescinded the policy and they're not going to reenact the policy. It's gone, so the case is moot.

And in my somewhat lengthy experience on the bench, generally, in a Federal Court, you have to have a case or controversy in order to proceed, and I did not see a case or controversy anymore because the school -- the State Attorney General who was an officer of the court stood up in front of me and said, unequivocally, that the policy was gone and it wasn't coming back again.

So Free- -- the Plaintiff took it up on appeal on the ground that it really wasn't moot and they prevailed on appeal.

Judge Ho wrote, look, we don't disagree with, you know, Judge Ezra, I don't think he said that, but the essence of it was, we don't disagree with him, that the ban was unconstitutional.

And it is true that the school rescinded the policy, so the policy wasn't there. It's gone. And it's true that the State Attorney General said they weren't going to reenact it.

However, they didn't file an affidavit

02:16 saying they wouldn't reenact the policy, so, therefore, the case wasn't moot. This was a new one on me, but I --

02:17 Look, I follow Fifth Circuit precedent. I have respect for the Fifth Circuit. Certainly, Judge Ho had a point. I don't think he was wrong. I mean, I -- as a practical matter, I think that generally when a lawyer representing the State stands up in front of you and says, I'm telling you, this is a dead duck, you can expect that it isn't going to fly out of the -- you know, fly south for the winter.

02:17 And, nonetheless, I was -- my decision holding that it was moot was vacated.

02:17 Now, the situation here seems to be far less dramatic than that one. In this case, the law says clearly and unequivocally that certain things should be done -- have to be done, shall be done, I think is the word, and the University of Texas hasn't done them. They've done something less.

02:18 And I didn't see that they had the discretion to do that in the statute.

02:18 Am I wrong?

02:18 MR. MORRIS: You're not, Your Honor, and I think Speech First -- sorry to interrupt.

02:18 THE COURT: So the bottom line is the State

Attorney General could do something to try to force them to comply or the Governor could do something, I would assume, to tell the provost, if you don't comply with the law, you're not going to be here anymore, or somebody could do something to require them to comply with the law. I assume they don't just get to make a decision on their own, that they're not going to comply with the law.

MR. MORRIS: Yeah, I certainly don't -- and I -- to be honest, I'm not prepared to speak about who could force the university to do something. I think it's enough here that two things are in place. As Your Honor noted --

THE COURT: The point is -- excuse me, Counsel. The point is they've made the law less restrictive, which is clearly less than the law allows. They could always go back and do what the law allows without any problem at all, correct?

MR. MORRIS: That's exactly right and that's why this is, I think, as Your Honor said, sort of less extreme than the situation in Speech First.

As the Fifth Circuit noted there, if the University of Texas' president or one of its officers had filed an affidavit saying, we expressly disavow this rescinded policy, the case would be moot and there would

be no standing.

But here, the University of Austin can't do that for two reasons. As Your Honor noted, the Legislature has said, you must impose those four prohibitions on speech, and second, the Board of Regents' own rules, as we note in our complaint, say that the university -- the U.T. System institutions have to comply with State law. They have no wiggle room here.

So the mandatory prohibitions from the Legislature are active and at any time that the University of Texas at Austin, or I suppose somebody could tell them, you have to comply with State law.

That's where a lot of this chill comes from even if their policies don't say it. The fact that they could impose those sweeping, extensive prohibitions on protected speech at a university campus at any time underscores why a preliminary injunction here is of the utmost importance.

Because by telling the University of Texas System and the U.T. president and the Chancellor, you cannot enforce what the Act says because those mandatory prohibitions are unconstitutional, at that point, then the likelihood of them or the possibility of them trying to adhere their policies more to the Act, that goes

away, and all --

THE COURT: The State -- Deputy Attorney General -- you're from the Attorney General's Office, are you not?

MR. INGRAM: Yes, sir.

THE COURT: Okay. He is not going to do that because he is defending the policy. But were he to stand up in front of me today and say, You know, before we came in this afternoon, I got a call from the Board and they are -- they've decided they're not going to enforce this policy, they're going to rescind the policy. They're not going to enforce it.

If I were to faithfully follow Fifth Circuit precedent -- and I always intend to do that. That's my job. I don't have the right to not follow Fifth Circuit precedent. His telling me that they're not going to follow this policy would not moot this case.

MR. MORRIS: It would not moot it and it certainly would not upset the likelihood of success on the merits here, Your Honor. Because, again, it's the State's mandate.

The Legislature mandates these public universities that says, you must prohibit all of this protected speech. I will give Your Honor another case here that we cite in our reply, and that's the Roake v.

02:22 Brumley case where you had a group of parents who on behalf of their minor school children were asking for a preliminary injunction against Louisiana's law that mandated the state education agency in the school districts impose policies to post or hang copies of the Ten Commandments in every classroom across the state.

02:22 One of the things that the education agency and the school districts that the parents sued said is, well, you know, we haven't enforced this law yet. The Fifth Circuit says that doesn't matter.

02:22 I mean, it's not -- the law doesn't say you can or you may hang the Ten Commandments in every classroom. It's that you must. That was enough to carry the case forward and support the preliminary injunction in that case. So, too, here, doesn't matter --

02:23 THE COURT: Well, I think the Fifth Circuit struck down the law on that.

02:23 MR. MORRIS: They did, Your Honor, on a state-wide basis as well, which is much more narrow than we're asking here. We're simply asking the Court to enjoin it against the Plaintiffs, against expressive activities at the two institutions, and enjoin the Board Defendants from enforcing legislations for prohibitions on speech across the U.T. System.

And because, again, this law is overbroad, again, something that the Defendants do not challenge in their brief. It is right to be invalidated on its face and enjoined System wide.

THE COURT: This isn't the case where we would run into the ban on nationwide injunctions because nobody is seeking a nationwide injunction. This is a state statute that applies to these two schools. There are other schools it applies to. The law applies to all universities.

But I have never been one -- as a judge, I don't believe in nationwide, never did. I always confined my injunctions, if I was going to enter one, which I don't do that often, to the parties in front of me and the circumstances in front of me. I don't just issue nationwide injunctions.

MR. MORRIS: Yeah, I think that's right, Your Honor. This is not like the situation in Trump v. CASA where the Court said, you know, we're not allowing nationwide injunctions.

Again, as Your Honor noted, this is a State statute, State Plaintiffs. And I would point out it's different with a First Amendment challenge. Think about the overbreadth doctrine.

One of the origins of the doctrine is

02:24 allowing a Plaintiff to stand in the shoes of other
02:24 speakers because we don't want to allow the Legislature
02:24 to pass such statutes that are so overly broad that they
02:24 choke out breathing space for exercises of First
02:25 Amendment rights.

02:25 So, particularly, where a State statute
02:25 imposes prohibitions like the challenged prohibitions
02:25 here from under the Act and the Court finds them overly
02:25 broad as we're asking the Court to do here, a broader
02:25 injunction is appropriate.

02:25 As the Supreme Court has said time and time
02:25 again, geographic scope is not the controlling factor
02:25 for injunctions. What's controlling, I think, as Your
02:25 Honor alluded to, is the extent of the Constitutional
02:25 violation.

02:25 And here we have an overbroad law from the
02:25 Legislature, equally overbroad implementing policies at
02:25 U.T. Dallas and U.T. Austin that are sweeping in a whole
02:25 host of protected student speech, making the remedy we
02:25 are asking for more than warranted under both the
02:25 Supreme Court precedent and Article III and the
02:25 congressional grant of injunctive powers to the Courts.

02:25 With that, Your Honor, I don't have anything
02:25 else unless you have any more questions.

02:26 THE COURT: No, that's fine, thank you. I

appreciate your argument and we'll have a brief opportunity for rebuttal.

MR. MORRIS: Thank you, Judge Ezra.

THE COURT: Good to see you again.

MR. INGRAM: Thank, Your Honor. Good to be here.

So I wanted to, as an initial matter, introduce the Exhibits A and B, the declarations of Katie McGee and Amanda Smith.

Exhibits A and B.

THE COURT: It will be received.

*(Defendants Exhibits A and B admitted.)*

MR. INGRAM: And I would also like for Your Honor to take judicial notice of Texas Education Code 51.9315 as amended by SB 2972.

THE COURT: Why don't you lay out that code provision. What is the code provision of that?

MR. INGRAM: That's exactly where I was going to start, Your Honor, because I agree with the Plaintiffs' counsel that the Act is the controlling thing, the Act as a whole, not just the provisions cherrypicked by the Plaintiffs to complain about.

The Act as a whole, Texas Education Code 51.9315(b) says: It is the policy of this State and the purpose of this section of law to protect the expressive

02:27 rights of persons guaranteed by the Constitution.
02:27 So the whole point of this section is to protect free speech, not to impinge upon it. They want universities to recognize --
02:27 THE COURT: Let me stop you for just a second because if you have, you know, you can say -- I mean, it's easy enough to say it's very laudatory.
02:27 I mean, I'm happy that it says we've got to protect free speech because I think certainly one of my main responsibilities, one of the main responsibilities of any Federal Judge certainly at my level, at the Court of Appeals level and one would hope at the Supreme Court as well, would be to uphold the Constitution of the United States and certainly the First Amendment is the First Amendment for a reason. The framers thought it was the most important.
02:28 It was and remains the hallmark of our country, and so those statements are good, but it doesn't -- you know, just putting those statements in by -- in and of itself and then going ahead and doing other things that might chip away at that later by having a more specific exposition as this statute is --
02:28 MR. INGRAM: Right.
02:28 THE COURT: -- doesn't save it.
02:28 MR. INGRAM: But, in this case, Your Honor,

what the statute is for, is for campuses of higher education to implement a policy. So the Legislature is directing campuses to put in place policies regarding expressive conduct on campus and they want the colleges when they're doing this implementation of policy to make sure that speech under the Constitution is protected and that it recognizes that freedom of speech and assembly are central to the mission of institutions of higher education.

And then they say, if you're going to restrict speech, you need to make sure that you follow the test in U.S. v. O'Brien. And they lay out exactly the four factors from U.S. v. O'Brien for colleges to follow when they're implementing their speech policy.

They can implement reasonable restrictions on time, place, and manner that are content and viewpoint neutral that advance a significant institutional interest, that provide for ample alternative means of expression, and that allow members of the university community to assemble and distribute written material without a permit.

So they have given universities specific guidance when they put in place -- time, place, and manner restrictions regarding speech that they have to follow exactly the test from U.S. v. O'Brien regarding

permissible content-neutral limitations.

THE COURT: Well, okay. So let's go back to my example of an Easter sunrise service. There are no real alternatives to an Easter sunrise service other than sunrise, right?

MR. INGRAM: Yes, sir. Having attended several of them, that's when it happens.

THE COURT: That's right. Me as well. And you haven't had an Easter sunrise service until you've had it on Mt. Haleakala on Maui. That's quite a --

MR. INGRAM: Absolutely.

THE COURT: -- spiritual experience.

MR. INGRAM: We had one that I went to at the Garden Tomb in Jerusalem.

THE COURT: But let's say that some students, you have a Christian organization, we have one here who is a Plaintiff, decides that they want to have an Easter Sunrise Service for the students that are on campus and maybe some that are off campus.

They meet together at 4:00, 4:30 in the morning and they get together and they have their Sunrise Service that starts at 5:00, 5:30, 6:00 in the morning, they're in violation of this policy?

MR. INGRAM: No, sir.

THE COURT: They're not?

MR. INGRAM: They are not. They are not in violation of --
THE COURT: Why --
MR. INGRAM: -- either of the Universities' policies as enforced.
THE COURT: Okay. Now that -- so this is news to me. So you're in absolute disagreement with opposing counsel. So you tell me why they're not in violation of the policy.
MR. INGRAM: Because that's not the way these policies are going to be enforced. That's --
THE COURT: I don't -- okay. Counsel, I didn't mean to interrupt you. I'm sorry.
MR. INGRAM: I understand.
THE COURT: But how somebody chooses to enforce or not enforce the policy isn't the question. The question is: Does the policy itself, on its face prohibit the activity, not because there is a certain administrator who just so happens to be there now who says, No, we're not --
MR. INGRAM: No. No.
THE COURT: -- I know that, you know, technically it's going to be in violation of the policy, but we're not going to enforce that.
MR. INGRAM: And that's not what I meant, and

I'm sorry if that's what I'm understood to be saying.

What I'm saying is the statute itself directs colleges not to impinge upon expressive conduct any more than necessary.

The two declarations that are before the Court as evidence show that the dean of students, who is the responsible party for enforcing speech policy on campus at both of these institutions, will only go after speech that is disruptive overnight and speech that is disruptive during the last two weeks of the semester.

And that's because they have been directed by the Legislature to ensure that their speech policies preserve protected speech. They have to do it that way.

THE COURT: Why, Counsel, in all due respect, aren't you leaving this up to the individualized judgment of somebody as to what constitutes disruptive? What is disruptive? You know, disruptive to one person may not be disruptive to another.

MR. INGRAM: I understand that.

THE COURT: It's a problem. So we're talking about a peaceful group of Christian society, of Christian students that get together and have an Easter Sunrise Service. Okay?

What if we had a group of Muslim students who happen to support the Palestinian cause and decide

that on a particularly important religious day for them, they're going to get together at 3:30 or 4:00 in the morning, maybe 5:00 in the morning, you know, and they're going to sing and they're going to pray and they're going to have somebody give a speech? Maybe -- that might be okay for you and I. We might not find that to be particularly disruptive, but maybe somebody else does.

I mean, I think it's a little -- I forgot what -- he was giving a -- I was on a panel with the late -- my friend, Justice Scalia. He came to Hawaii and I think I was Chief Judge of the District Court at the time.

And he and I were on a panel together and somebody asked him a question and it was about the First Amendment, and he said, I think he used the word, "a little too squishy." I think he said, you know, it's "a little too squishy."

There's no parameters here. You can just mold it and shape it the way you want to. And you can't have that. You can't have that. You can't leave it to the discretion of somebody.

Person A is there today. They say, Well, it's okay. Person B says: You know, this thing could really erupt into something bad. The other students are

02:35 going to start to come on campus and this could be a
02:36 problem. We need to clear them out. We need to get
02:36 them out and we're going to enforce the policy.
02:36 I mean, it's -- you can't have something
02:36 that, like Justice Scalia said, was squishy.
02:36 MR. INGRAM: I completely agree with
02:36 Your Honor on that, absolutely. And --
02:36 THE COURT: I remember him using that term. I
02:36 asked him about it later and I said, where did you get
02:36 that?
02:36 MR. INGRAM: I'm --
02:36 THE COURT: And he said, I don't know, it just
02:36 came to me.
02:36 MR. INGRAM: In this case, the squishiness
02:36 that's involved is the conflict within the text of the
02:36 statute that you pointed out. You've got a provision
02:36 that says: Shall prohibit all expressive conduct
02:36 between 10:00 p.m. and 8:00 a.m.
02:36 And then you've got a provision in exactly
02:36 the same section of the law that says: You shall
02:36 implement this section in a way that doesn't infringe on
02:36 Constitutional speech.
02:36 And so what that puts the squishiness on,
02:36 the squishiness goes to the administration of the
02:37 university and they are the ones who have to enforce it,

and that's why counsel -- opposing counsel's emphasis on the language of the Act is not the end of the story.

They need to rest -- point to particular items in the speech policy as adopted by the university and as it will be enforced by the dean of students.

And this gets to the point that I really wanted to make, which is that they have sued the wrong Defendants. They have sued the Board of Regents and the Chancellor and the presidents of these two universities, but those folks aren't the ones on the ground making these decisions.

It is the dean of students at both of these universities. So Katie McGee and Amanda Smith, their declarations are before you, they are the ones who are charged with this responsibility.

The Texas Alliance for Retired Americans case, Fifth Circuit 2022 says that: In order to be held responsible under Ex parte Young, you have got to have more than an incidental requirement for enforcement.

So you can't just have a general obligation to enforce the law, and I would say that Presidents Davis and Moghe both have exactly that, a general responsibility to enforce University policy. But the specific enforcement is the Dean of Students at both of these institutions.

02:38 So the presidents aren't the right people to sue and certainly the Board of Regents, which is even more attenuated in responsibility from the actual implementation of this Act. They shouldn't be before this Court.

02:38 THE COURT: Well, but if you have a policy -- let's say you have a policy in effect as a result of a State law and the State law compels the City to do something and the person who is in charge of compelling -- I mean, of enact- -- enforcing that is going to be the Chief of Police. You would sue the Chief of Police.

02:39 You wouldn't sue the individual police officer on the beat who is the one that's actually going to be arresting somebody pursuant to the policies.

02:39 MR. INGRAM: Completely agree with that. And then -- and, in this case, the Chief of Police is the Dean of Students at these universities.

02:39 THE COURT: So wouldn't it be the Board of Regents, who is responsible for -- and/or the president, who is responsible for enforcing these laws?

02:39 MR. INGRAM: No. Both of the declarations before you, which are the only evidence we have on this point, state that the Dean of Students is this primary responsible person for enforcing the speech policy on

these campuses.

They are the Chief of Police. They are the ones -- and they both have a structure underneath them for disciplinary councils and hearings and all of that. But they are the ones, ultimately, responsible on each of these campuses and they are the ones that should be before this Court if anybody should.

Which gets me to my second point, which is that this case has been brought too soon. Until we know how the universities are going to enforce this policy, we can spin hypotheticals all day about what could be affected.

But, in this case, the colleges have been directed to make their policy implementation be such that it protects protected speech and that -- and until they --

THE COURT: How do you square that -- Counsel, how do you square that with Judge Ho's opinion in my case where the university had said, well, we're not enforcing this rule at all, in fact, we rescinded it, we're not enforcing it, we don't intend to enforce it.

And the lawyer shows up from your office and says, they're not enforcing it, and Judge Ho says, It's not moot because they can change their mind at any time and enforce it.

02:40 MR. INGRAM: And that's -- if they do so -- if that were to happen, then that would be the time to bring a case. That's when there would be a case responding to.

02:41 THE COURT: That's what I thought, too, but I got vacated. I got reversed, so --

02:41 MR. INGRAM: I understand.

02:41 THE COURT: -- and I don't think that Judge Ho was wrong. I'm -- I'm not criticizing him, that's for sure, because I think he was right, in reflection.

02:41 But the point is, you know, I don't think you have to wait until, you know, the other shoe drops and you get disciplined or arrested.

02:41 MR. INGRAM: Oh, I agree with that.

02:41 THE COURT: Oh, boy.

02:41 MR. INGRAM: And at any rate, if they've got the right Defendants and if it's the right time, these are reasonable time, place, and manner restrictions that are content neutral.

02:41 What Plaintiffs are arguing about commercial speech versus noncommercial speech is not the definition of content neutral. The TikTok case from the US Supreme Court earlier this year said that there were two bases for content neutrality.

02:42 Number one, it needs to be facially neutral

and not for or against any particular kind of speech or viewpoint. And, number two, it needs to not be -- it can't be facially neutral but only apply in such a way that it goes against one kind of speech. So in other words, sidewalks at an abortion center --

THE COURT: So this law would not prohibit BarBri, you know, the bar review course from setting up a stand and having somebody speak to students, walk by as a speaker in attempting to sell them bar review courses. They can do that because that's commercial speech, right?

MR. INGRAM: Well, the commercial speech is handled elsewhere in the speech policy. And then prevents -- prohibits solicitation on campus. So that's already taken care of. And it's not in this --

THE COURT: It's this statute?

MR. INGRAM: This lawsuit -- this statute doesn't affect that at all.

THE COURT: So they could do --

MR. INGRAM: At any time of the day or night --

THE COURT: So they could -- in this statute, they could do it, but there is another statute that says they can't do it, which takes me back to my earlier comment to opposing counsel -- your opposing counsel

02:43 where I said, There has got to be other ordinances already in place on campus that would prevent somebody from causing a noise pollution of such a degree that it would be a public nuisance. I'm sure there has got to be something. I don't know. I don't run around the University of Texas campus at night.

02:43 MR. INGRAM: Right. I agree with that.

02:43 THE COURT: You know, I think also there is -- I think there is almost a disconnect here between those of us who are older and students, because we operate on different timetables, so to speak. I don't --

02:44 You know, maybe when I was a young, second lieutenant, I was up until 11:00 or 12 o'clock, I don't know. I think I was at times, but not now. And I certainly wouldn't be wandering around looking for somebody to listen to at 10 o'clock at night.

02:44 But that's just not the way a lot of these young people, 18-year-olds and 19-year-olds and 20-year-olds on the University of Texas campus operate.

02:44 I mean, these young people are up until quite late at night frequently, and, you know, if they can get away with it, they may try to sleep later in the morning if they don't have class.

02:45 Yeah, it's a totally different world. So I just wonder why they picked -- why did they pick

10:00 p.m. to 8:00 a.m.? Where did that come from? What was the rationale there? I mean, I didn't see it anywhere.

MR. INGRAM: I have no idea what the rationale was, Your Honor.

THE COURT: It just -- I mean, I don't know.

MR. INGRAM: You can see in the declarations that both Katie McGee and Amanda Smith talk about the need for there to be a quiet place on campus for students to rest and study overnight.

So as far as they're concerned, the policy is designed to protect the ability of students on campus to study and to sleep undisturbed. And so that is the campus-level policy that is being implemented on these campuses.

THE COURT: That might be great, but if you have a -- I mean, you know, the person doesn't have to be disruptive. If you have a gathering on campus during the last two weeks of the semester and you happen to have a speaker come in, you know, you could -- it could be anybody, you know.

Let's say -- you know, Attorney General Paxton is running for public office, okay, at the moment. He wants to be a senator. And let's say there is a group that's meeting at 10 o'clock at night, and

02:46 they've invited him to come and speak. I don't think he's going to blow up the university or cause a riot, but nobody's going to let him speak? No, he can't do it.

02:46 MR. INGRAM: They -- they could invite him before the last two weeks of the semester.

02:47 THE COURT: But they can't -- if it's within the last two weeks of the semester, they can't invite him because -- heaven knows, maybe that's the only time he is available.

02:47 MR. INGRAM: And both the declarations of Katie McGee and Amanda Smith talk about how important those last two weeks are. That's when projects are due. That's when studying occurs. That's when classes are out and more time to study, so studying around the clock. And scholarships and continued attendance at the university, all of these things are on the line for these students.

02:47 And that is the time that needs to be especially protected and that's the substantial public interest that's impacted here.

02:47 THE COURT: You know, judges -- and I'm one of them -- are loath to inject themselves into the educational decisions of the administrators on campuses. I mean, I think judges generally are ill-equipped.

Just like we're ill-equipped to inject ourselves into military decisions, I think we're just as ill-equipped to inject ourselves into educational decisions on behalf of parties deciding how schools should be run.

I think there is no question that if we were just talking about a policy about, you know -- that would interfere with examinations or something like that, you know, this Court would be very loath to issue some sort of injunction to prevent the school from implementing that policy because that is just not within the purview of a Federal Judge at any level, really --

MR. INGRAM: Right.

THE COURT: -- to be telling the University of Texas how it needs to run the University of Texas. That's a general proposition.

But when you start talking about the First Amendment and how students are able to hear dissenting points of view and how students will be able to present those points of view, the Supreme Court and the Fifth Circuit have repeatedly upheld rulings by the District Courts which have said you can't do that; you can't impinge upon the First Amendment on the ground that you -- it might cause some disruption.

And this is a very broad policy. I mean,

02:49 it's a very broad policy. I think you would agree with me. There is no question about it.

02:49 And you have said -- you know, it's a really good thing when the Court has a competent lawyer like yourselves and you don't -- you know, when I was a young law student, I had the benefit of being -- working with and being taught by Leon Jaworski, the famous -- he was the Watergate prosecutor.

02:50 He had Fulbright & Jaworski. They changed the name. Why they took his name off, I don't know. He is a pretty famous guy, but they did.

02:50 And he said that -- told me and some other students that, "A good lawyer attempts to work with the facts and a bad lawyer attempts to change them."

02:50 And you were quite candid and honest, which I appreciate, when you said, the problem is the tension in this statute. You acknowledge that this statute has a real problem in this regard in that it says: You shall prohibit these activities.

02:50 And that's a pretty definitive statement. And then it goes on to say, and, but, here you can do this.

02:51 MR. INGRAM: And I didn't get to the last one. The last one, they added an L to the statute that says: Nothing in this section shall be construed to interfere

with expression in any way as protected by the U.S. Constitution or the Texas Constitution.

THE COURT: But the, first -- yeah, but then the first -- but then what does that mean? And that is the problem I'm faced with. This is a very vexing statute to say the least.

I mean, I don't mean to criticize the State Legislature, but I think that there is an issue here that could have been avoided with maybe some different drafting.

MR. INGRAM: Neither you or I had any hand in that.

THE COURT: No, thank God.

MR. INGRAM: So, in closing, I would say we've got the wrong Defendants in front of the Court. It's too early to bring the lawsuit. If it's not, then it's a reasonable time, place, and manner content-neutral restriction.

I would remind the Court that the Code Construction Act in Texas says that if something is found to be incorrect or unconstitutional, that it's severable from the rest of the statute, and to make sure that any injunction that issues is limited to what it needs to be limited to.

THE COURT: If I issue an injunction, I always

try to issue the narrowest injunction that I could possibly issue that is consistent with the Constitution and the law.

I - I said before, I've never been one to believe that the Court should be issuing, you know, nationwide, broad pronouncements, particularly the District Court level.

You know, I see it regularly with the Ninth Circuit Court of Appeals by designation and I have for over 30 years -- well over 30 years. But even there, you know, sitting as -- by designation as a Circuit Judge, I've always argued with my colleagues that we should be measured, you know, and I think that's important.

But it's hard sometimes to be measured when you're dealing with the First Amendment, you know, because it's a precious right, I think we all believe, and there is a lot of controversy going on now about the First Amendment in -- generally speaking. I'm not getting into that. I've got enough problems here.

Thank you very much, Counselor.

MR. INGRAM: Thank you, Your Honor.

THE COURT: Again, it is a real pleasure to have you here.

Come on, Counsel, let me hear your rebuttal.

He raised a couple of very important points. First of all, I'd like to hear about your thoughts on whether, in fact, you sued the wrong people.

MR. MORRIS: Yeah, not at all, Your Honor. And I think, again, if you look at our reply brief, we make clear why --

THE COURT: I did look at it.

MR. MORRIS: I would urge you, you know, the argument is there. This is Jackson v. Wright and the three cases that have applied it since then. It is sufficient enforcement authority for the Board of Regents here because State -- the Texas Education Code, where this Act was amended, says, Board of Regents, you have to approve the policies that implement this.

The Chancellor in Exhibit 19 that we've submitted today recommended to the Board of Regents that they approve these policies. The Presidents who, by Board of Regents' rules, are responsible for student policies at the Universities, have also authority to preside over and appoint hearing officers for violations of U.T. Dallas' and U.T. Austin's speech and expression policies.

That's more than a scintilla of enforcement under Jackson. In Jackson, they held that the University of North Texas Board of Regents was the right

02:55 Defendant for a First Amendment challenge, even though the Board of Regents members had zero role in implementing the restriction on speech that was at issue in that case.

Here, not only do the Board of Regents members, the Chancellor of the U.T. System, and two university presidents have sufficient governance authority, but they've all played a direct role in carrying out the Legislature's mandates for the reasons I've just expressed.

Jackson v. Wright controls in this case, Your Honor. The three cases that I alluded to earlier, Spectrum v. Wendler, Students for Justice in Palestine Against Abbott, and the Coalition for Independent Technology Research against Abbott, those latter two Judge Pitman decisions all should guide this Court, find that Plaintiffs have sued the right defendants under Ex parte Young.

02:56 At worst, Your Honor, we could seek leave to amend. I think we have, actually, have a right to amend at this point if we need to add in those Deans of Students as necessary Defendants.

But the current Defendants are the right Defendants to invoke Ex parte Young's exception to sovereign immunity for the respective relief we are

seeking.

Next, Your Honor, I want to respond briefly to my friend on the other side's argument that the Act's preamble talking about upholding the rights of free speech and that saving clause that the Legislature put in at the end, that doesn't matter here.

Can we go back to Speech First v. Fenves? There, President Fenves in that case pointed out, Well, the University of Texas' own policies talks about upholding the freedom of speech on campus.

And the Fifth Circuit said, That doesn't matter, because it's not -- it doesn't modify the hate speech policies that you implemented and that you could bring back again.

So too here, the fact that they -- and I think if there is any tension, Your Honor, the tension has to be resolved in upholding First Amendment freedoms on campus.

Talking about the time, place, manner language that's in the Texas Education Code, if the Legislature really wanted to make sure that these four prohibitions were challenging, were subject to that, they could have said so.

They could have said, Each public institution must prohibit speech between the hours of

02:57 10:00 p.m. and 8:00 a.m., but subject to the content
02:57 neutral -- you know, only on content-neutral time,
02:57 place, manner policy restrictions, but they didn't.
02:57 They simply issued a blanket mandate saying:
02:57 You have to impose this blanket prohibition against
02:57 speech, all protected noncommercial speech from
02:58 10:00 p.m. to 8:00 a.m.
02:58 If you are a student reading that, if you
02:58 are a staff member reading that, that's what is going to
02:58 chill your speech, not the meaningless words on paper at
02:58 the end of the Act that say, Well, this should not be
02:58 construed to -- to impose any burden or infringe any
02:58 speech under the United States Constitution.
02:58 Speech First, again, makes that clear.
02:58 THE COURT: I'm not sure -- I didn't see any
02:58 definition in the Act about what "amplified" was.
02:58 MR. MORRIS: I don't think -- the Act does not
02:58 use it. I do know that the University of Texas at
02:58 Austin policy has it. I believe it's increasing volume
02:58 by any mechanical or electronic means, so there is a
02:58 definition in there --
02:58 THE COURT: So somebody can use just a
02:58 hand-held -- let's say a handheld -- what do you call
02:58 it, megaphone, whatever that is, the old style.
02:58 MR. MORRIS: The old plastic megaphones you

see at football games, sure.

THE COURT: Yeah. You could use that, that would be all right?

MR. MORRIS: I think there is an argument that you could, absolutely. Or you could have -- the University of Texas Men's Choir could perform, all hundreds of them, on the University of Texas campus during the last two weeks, you might be able to hear them from a classroom where an exam is taking place or you might be able to hear them from somewhere where a student is trying to get some rest after a long night studying, but that would be allowed.

But simply using a small speaker at a table to play a recording of a current candidate or inviting a speaker like Ken Paxton or somebody from the Texas Legislature. Right?

The Texas Legislature is often in session -- they are in session every two years towards the end of academic terms at U.T. Austin. If you're a political group, you cannot invite a member of the Legislature to come talk and tell you about pending bills. That's an intolerable violation of the First Amendment's core protection for political speech.

My last point about this is this idea that I think the Defendants are suggesting that we should sort

03:00 of just trust these administrators to implement the policy and effect the Act in a way that doesn't infringe the First Amendment. I think there is three points that I have to that, Your Honor.

03:00 One is, if that's the case, why did the University of Texas at Dallas adopt the Act or prohibitions that we're challenging verbatim? They say -- and their declarant in the record says, we're complying with the Act fully.

03:00 There is no wiggle room there. So if you're a student and you know that, not only is the Act fully chilling your speech, so are the UTD policies.

03:00 Second of all, I think the word was, we don't know how theirs are going to be enforced, so we filed too early. That's the problem.

03:01 At most, we're -- what the Defendants are saying, Well, just please trust us.

03:01 The Supreme Court said in the United States v. Stevens, we don't do that. That's too dangerous to the First Amendment, right?

03:01 If the text of a statute covers First Amendment protected speech and it's particularly in an overbroad way, like it is here, however the Government promises to use it is beside the point. That's unconstitutional.

And I think Your Honor hit the reasons why with his example about the Muslim students and their guests from off campus holding a prayer service late at night. Who knows on campus who might see that as disruptive or offensive and would wield this prohibition in a way to silence those students?

And, finally, along those points --

THE COURT: Well, I think long before this statute was ever passed, the University of Texas, the University of Texas at Dallas, any major or even nonmajor college, university would have policies in place and do have policies in place that would prevent individuals or groups from acting in such a way that they would cause a public nuisance or disruption on campus.

It has nothing to do with having speakers. I mean, you know, some fraternity can't, you know, get together -- I hate to pick on fraternities -- but some fraternity couldn't get together and have too much to drink, a bunch of, you know, wild fraternity brothers, and start screaming and yelling and running through campus and causing a ruckus.

They would get arrested, I would think, or detained or something if they were doing that kind of activity and it would have nothing to do with this law.

03:03 There -- I mean, the University of Texas can't tolerate that kind of thing and they wouldn't tolerate and they shouldn't tolerate it.

03:03 MR. MORRIS: Sure. And that's crossed the line to unprotected conduct. Certainly a public university has the authority to regulate.

03:03 But the problem with this law is, it doesn't target conduct. The only thing it targets is expressive activities as defined in the Act as all speech protected under the First Amendment that's noncommercial.

03:03 THE COURT: Well, if a speaker came on campus at 11 o'clock at night or 10:30 at night and they were highly disruptive, if they were attempting to incite students to riot, they attempted to incite students to riot and cause destruction or something like that, even if this statute were to be struck down by me and upheld at the Court of Appeals level or at the Supreme Court level, that would not prevent the University under existing law from stopping that individual. You're not allowed to incite people to riot. It's against the law.

03:04 MR. MORRIS: Sure, Your Honor. If the University has a policy that meets the Brandenburg test that says nobody on campus may engage -- may, you know, intentionally incite imminent and unlawful, criminal or unlawful conduct, yes, they could absolutely do that.

But that's not what this law does. In fact, again, under the definition of expressive activities, it accepts that speech from its definition.

And so, again, because the text of the statute says, Prohibit expressive activities, the Legislature's text is saying, Prohibit protected speech. That makes absolutely no sense, and it certainly is unconstitutional.

I think Your Honor hit the nail on the head about the savings clause at the end. If you give it any teeth, it renders these prohibitions absurd. I mean, there's a -- we think one of the core canons of construction is, we don't construe statutes in a way that render their substantive provisions absurd.

The Legislature spoke clearly here. We are trying to -- we're telling you, University campuses, you have to maintain total silence essentially on campuses at night, for 10 hours overnight.

You can -- you have to silence invited speakers, amplified sounds, use of drums, even if it's for nondisruptive and for political speech, religious speech, artistic expression.

THE COURT: Well, I think that one of the things that struck me is how long has the University of Texas been in existence?

03:06 MR. MORRIS: Over 150 years, I think, Your Honor.
03:06 THE COURT: Well over 100 years. I would think that during those many years that this great institution and the University of Texas is most certainly one of the -- I think it's the diamond in higher education in Texas.
03:06 It's a fine institution. There is no question about it. I say that as somebody who is working toward an LLM at Texas A&M law school, so I will probably get thrown out of the program.
03:06 University of Texas is a great school. There is no question about it. I cannot believe that through all of these hundreds of years that the University of Texas didn't protect students in some way, shape, or form from being disrupted in their last two weeks of studying before the exam period and they had to wait for the State Legislature to pass this statute in order to do it.
03:07 Obviously, there are rules in place at the University of Texas now that protect students and have for decades or I wouldn't have any colleagues on the Federal bench because they're all -- virtually, all of them are University of Texas law school graduates.
03:07 MR. MORRIS: I think that's right, Your Honor.

If the university has content-neutral, narrowly-tailored laws that leave open, ample means of -- alternative means of expression, it can do so constitutionally.

THE COURT: Right.

MR. MORRIS: These prohibitions, the policies that affect them are anything but that. They are the most restrictive means to advance whatever interest that Texas has in passing this law.

I'll just leave the Court with this. It is so vital that we protect breathing room for First Amendment liberties at our public universities. They are the quintessential marketplaces of ideas.

If there is any tension, I would urge the Court to resolve them squarely in favor of upholding those First Amendment liberties.

The Legislature can fix this. What cannot be fixed is ongoing irreparable harm, not only to Plaintiffs but students across the University of Texas System. Unless the Court has any more questions, I'm finished.

THE COURT: No.

And thank you both very much for your argument. Obviously, it's been very helpful on both sides. I want to take a good, hard look as I always do, again, at your briefing.

03:08 This is not an easy one, for sure, and I always try to get it right, you know, and I'm going to try to do that here, obviously. I want to look at your exhibits again.

03:09 These are important, and so it will take me a little bit of time. I'm pretty quick, actually, because I try to get on these things right away.

03:09 And so I imagine I'll try -- I'm going to try really hard to get a decision out to you in the next two to three weeks. It shouldn't be any longer than that. I'm not one of these people that you're going to have to wait six months or a year for a decision. I guess I don't -- no.

03:09 You'll get a decision out of me and it will be a written decision, a recent written decision. And whoever is aggrieved by my decision -- maybe both of you, I don't know -- can appeal. So I try.

03:09 There is a thought among some judges that the less you say, that the less opportunity the Court of Appeals will have to reverse you.

03:10 My view is you owe it to the parties and you owe it to the Court of Appeals to say what it is that you're doing and why you're doing it. And if that means you're going to get reversed, then you should, you know, get reversed. That's the name of the game. That's the

way it works.

But you don't do this, you know, kind of slipshod thing where you throw out four pages of an order like this. This is going to be a multi- -- I imagine this is going to be a 30- or 40-page order, I would think, at the very least.

All right. Well, thank you so much. I do appreciate it. And we'll get back to you as quickly as we can, consistent with getting all of your stuff.

All right. Court stands in recess.

*(Proceedings concluded at 3:10 p.m.)*

03:11 UNITED STATES DISTRICT COURT )
03:11 WESTERN DISTRICT OF TEXAS )
03:11

03:11 03:11 03:11 03:11 03:11 03:11 03:11 03:11 I, April Balcombe, Official Court Reporter in and for the United States District Court, Western District of Texas, Austin Division, for the Honorable Judge David Alan Ezra, do hereby certify that the above and foregoing contains a true and correct transcription from the record of proceedings in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

03:11 03:11 03:11 I further certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

03:11 03:11 WITNESS MY OFFICIAL HAND this the 8th day of DECEMBER, 2025.

03:11
03:11 /S/April Balcombe
03:11 April Balcombe, CSR, CRR, CRC
03:11 Texas CSR 5752 Exp: 7/31/26
03:11 Official Court Reporter
03:11 United States District Court
03:11 Western District
03:11 Austin Division
03:11 501 West 5th Street
03:11 Suite 4150
03:11 Austin, Texas 78701
03:11 Telephone: 512.391.8795